UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

DEBORAH ALEXANDER, MAUD MARON, and NOAH HARLAN,

                       Plaintiffs,

                       v.

TAJH SUTTON, President, Community Education Council 14, in her official and individual capacities; MARISSA MANZANARES, First Vice President, Community Education Council 14, in her official and individual capacities; DAVID C. BANKS, Chancellor, New York City Public Schools, in his official and individual capacities; NINA S. MICKENS, Equity Compliance Officer, in her official and individual capacities; COMMUNITY EDUCATION COUNCIL 14; NEW YORK CITY DEPARTMENT OF EDUCATION,

                       Defendants.

-----------------------------------------------------------------X

Case Number 1:24-cv-2224

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

42 U.S.C. §§ 1983, 1988

## INTRODUCTION

Tajh Sutton and Marissa Manzanares do not tolerate the presence of people who disagree with them. Nor can they stand to listen to views they reject.

Such an approach to life is not unlawful. But Sutton and Manzanares bring this attitude into their roles as President and Vice President, respectively, of a Brooklyn public school board, New York City's Community Education Council ("CEC") 14. Weaponizing their disdain for anyone who might push back against their ideological worldview, Sutton and Manzanares exclude people affiliated with disfavored advocacy groups from the Council's public meetings, block critics from accessing the

Council's social media pages, and impose a far-reaching political speech code on public debate.

And while New York City's Department of Education leaves Sutton and Manzanares free to impose their viewpoints on everyone else, it subjects Community Education Council and Citywide Council members who dissent from official orthodoxy to investigation and removal from office under its Regulation D-210—a vague, overbroad, and viewpoint-discriminatory speech code.

Deborah Alexander and Noah Harlan have been kicked out of CEC 14 meetings, apparently owing to their political views and, in Alexander's case, membership in a dissident parental rights group. Maud Maron refrains from attending CEC 14 meetings because she is a founder and member, respectively, of two education policy and parental rights advocacy groups which are evidently the prime targets of CEC 14's discriminatory exclusion policy. Even if they could gain admission, anything that Plaintiffs might say at CEC 14 meetings would likely be prohibited under CEC 14's speech code.

Moreover, Plaintiffs cannot access CEC 14's official X page to read, share, and respond to Defendants' speech, and to interact with others that Defendants allow onto the platform. Defendants have failed to approve Harlan's request to access that forum. They have blocked Alexander and Maron from even making such requests.

Defendants' discriminatory policies also impact Plaintiffs' private speech in other settings, including on the Councils to which they have been elected. Defendants, including "Equity Compliance Officer" Nina Mickens, are investigating

Alexander based on a frivolous D-210 complaint designed to intimidate her for political disagreement. Her crime: Sharing information publicly disseminated by Defendant DOE when she served as an elected member of CEC 30. Alexander remains subject to Regulation D-210, because she has since being elected to the Citywide Council on High Schools. Defendants are also investigating elected CEC 2 member Maron under Regulation D-210 for allegedly hurting people's feelings with her private political speech. Defendant Banks has threatened to remove Maron for wrongthink when at least some of the charges reach his desk. Harlan, an elected member of CEC 1, has yet to garner a D-210 complaint, but believes it is only a matter of time until he does. Until then, he, like Alexander and Maron, is constrained to watch his words.

The First Amendment does not allow New York City's Department of Education to function as a Department of Conformity. Plaintiffs are entitled to relief securing their fundamental rights to free expression, petition, assembly, and association.

THE PARTIES

1.     Plaintiff Deborah Alexander is a natural person and citizen of New York and of the United States. She served as an elected member of New York City Community Education Council 30 during all times at which her past actions are mentioned in this complaint. Alexander resigned this position on February 15, 2024, upon being elected to fill a vacancy on New York City's Citywide Council on High Schools ("CCHS") by that board. Alexander joined CCHS as a member on February 20, 2024. She is also a member and Secretary of Parent Leaders for Accelerated

3

Curriculum and Education NYC ("PLACE"), a group that advocates for improving the academic rigor and standards of K-12 public school curricula.

2.      Plaintiff Maud Maron is a natural person and citizen of New York and of the United States. She is an elected member of New York City Community Education Council 2. Maron is also a founder of PLACE, and a member of Moms for Liberty, an education policy and parental rights advocacy group.

3.      Plaintiff Noah Harlan is a natural person and citizen of New York and of the United States. He is an elected member of New York City Community Education Council 1.

4.      Defendant Tajh Sutton is President of New York City Community Education Council 14. She is sued in her official and individual capacities.

5.      Defendant Marissa Manzanares is First Vice President of New York City Community Education Council 14. She is sued in her official and individual capacities.

6.      Defendant David C. Banks is Chancellor of New York City Schools. He is sued in his official and in individual capacities.

7.      Defendant Nina S. Mickens is the Equity Compliance Officer at New York City Public Schools. She is sued in her official and individual capacities.

8.      Defendant Community Education Council 14 ("CEC 14") is a board established under N.Y.S. Education Law § 2590-e, covering New York City public schools' District 14 (Greenpoint and Williamsburg). CEC 14 is charged with promoting student achievement, advising and commenting on educational policies,

4

and providing input to the Chancellor and the governing body of the New York City public schools, the Panel for Educational Policy. Among its duties, CEC 14 must "[h]old public meetings at least every month with the superintendent during which the public may speak so that parents and the community have a voice and a public forum to air their concerns." N.Y.S. Education Law § 2590-e(14).

9.      Defendant New York City Department of Education ("DOE") is a department of New York City's government charged with overseeing, administering, implementing and financing education for K-12 students in New York City.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action challenges Defendants' violation of Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983.

11.      Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district, and Defendants Sutton, Manzanares, and CEC 14 reside in this district.

## STATEMENT OF FACTS

### Defendant CEC 14's Bylaws

12.      Article III, Section 1 of Defendant CEC 14's bylaws provides in part that "All meetings shall be open to the public except where otherwise permitted by law."

13.      Article IV, Section 2 of Defendant CEC 14's Bylaws provides in part:

> The public shall have the opportunity to comment on resolutions on the agenda prior to Council vote by signing the Speakers' List. In addition, the Public Speakers Session shall be conducted without agenda or other formalities, subject to the Council's

5

prerogative to require speakers to have signed the Speakers'
List and to manage time.

Speaking time is limited to 3 minutes per person, including
questions and answers. The time may be extended at the
discretion of the Chair, and may be limited if necessary to allow
all persons who have signed the Speakers' List to speak.

Discussion and charges relating to the competence or personal
conduct of individuals will be ruled out of order. A speaker who
is ruled out of order forfeits the balance of his/her time and will
be directed to leave the microphone; the Chair may take
appropriate measures to enforce the ruling.

*Censorship and Exclusion at CEC 14 Public Meetings*

14.     Although Community Education Councils are supposed to promote

educational achievement, Defendant CEC 14 used its official resources to encourage

students to walk out of their classes on November 9, 2023. The walkout's purpose

was to demonstrate against Israel's prosecution of the war between that country

and the Hamas terrorist organization in Gaza, against continued American support

for Israel, and, in fact, to demonstrate against Israel's continued existence.

15.     Defendant CEC 14's official Instagram page, @cecd14, called for

participation in this demonstration, and linked to a "toolkit," which included

extensive calls for specific political action. Exhibit A is a true and correct copy of

this Instagram post. Exhibit B is a true and correct copy of the toolkit.

16.     The toolkit advised demonstrators to "practice these CHANTS and use

them for your walkout," linking to various suggested chants including "We don't

want Zionists here," "Zionism has got to go," "Resistance is justified when people are

occupied," "From the river to the sea, Palestine will be free," and that slogan's

Arabic counterpart, "Min il-maya lal maya, Falasteen arabiye" (from water to water, Palestine is Arab). Exhibit C is a true and correct copy of the chant page linked from the toolkit. These slogans, endorsed by Defendant CEC 14, are widely understood to be anti-Semitic and eliminationist, calling for Israel's destruction and the murder or displacement of its non-Arab population. Some student walkout participants chanted "Fuck the Jews."

17.    CEC 14's endorsement of this walkout sparked opposition, including a change.org petition that gathered over 2,800 signatures, and calls for investigation by various elected officials. But members of the public who sought to criticize CEC 14's support of the walkout at the council's November 15, 2023, virtual public meeting were cut off and expelled on the basis of their views, while speakers expressing pro-walkout and anti-Semitic views, were allowed to express themselves, and speakers praising Defendant Sutton were not subjected to the time limit for remarks.

18.    Defendant Marissa Manzanares, who appeared to have editorial control over attendees' messages in the online meeting's chat section, made explicit CEC 14's demand for "respect" as a condition of attending the meeting, messaging everyone in attendance, "If you are not respecting our space you will be removed." Below is a screenshot of Defendant Manzanares's message:

 Marissa Manzanares to Everyone   7:00 PM

If you are not respecting our space you will be removed.

19.     Among the people Defendants Sutton, Manzanares, and CEC 14 ejected from CEC's November meeting was Plaintiff Deborah Alexander, who was booted from the virtual room after commenting in the group chat that Sutton was interrupting a speaker. Alexander is an outspoken opponent of Sutton and of Sutton's political views.

20.     For CEC 14's December 18, 2023, public meeting, presided over by Defendant Manzanares in Defendant Sutton's absence, Defendant CEC 14 adopted "Community Guidelines" containing the following "Absolute No's" to govern public comment, appearing in the meeting's minutes:

> This is not a space where we will tolerate antagonistic behavior or any of the following: homophobia, transphobia, misogyny, ableism, racism, or any other forms of oppressive beliefs or behaviors. Anyone who violates this guideline will be removed.
>
> There will be no name-calling of any community members in this space. If you violate this, you will be removed.
>
> If you continually disrespect the community, you will be given 2 warnings before being removed.

Exhibit D is a true and correct copy of CEC 14's minutes for its December 2023 meeting.

21.     For the January 24, 2024, meeting, Defendants rewrote the rules as "Community Commitments" (also called the "Community Agreements"), which read:

> We are committed to intersectional solidarity.
>
> We actively listen with the intent to understand, rather than respond.

We call each other in, and out when appropriate. We are all capable of harm and the degree of harm experienced dictates the tactic used.

Conflict is inevitable, and survivable, within community.

We embrace discomfort. We work to distinguish discomfort from harm. We work to create brave spaces in the hopes they are as safe as possible. We create the conditions to minimize harm and address harm when it happens whether verbal, behavioral or physical.

We watch our jargon and welcome teachable moments.

We believe those closest to the issues are closest to the solutions.

We distinguish between good faith dialogue and bad faith arguments.

We reserve the right to remove participants causing discord, spreading misinformation and/ or affiliated with hate groups. The DOE may not utilize this practice or standard, but we do.

These rules appeared in the meeting minutes, a true and correct copy of which are attached as Exhibit E, and were shared as a graphic with meeting attendees. Below is that graphic:



**COMMUNITY AGREEMENTS**

- We are committed to intersectional solidarity.
- We actively listen with the intent to understand, rather than respond.
- We call each other in, and out when appropriate. We are all capable of harm and the degree of harm experienced dictates the tactic used.
- Conflict is inevitable, and survivable, within community.
- We embrace discomfort. We work to distinguish discomfort from harm. We work to create brave spaces in the hopes they are as safe as possible. We create the conditions to minimize harm and address harm when it happens whether verbal, behavioral or physical.
- We watch our jargon and welcome teachable moments.
- We believe those closest to the issues are closest to the solutions.
- We distinguish between good faith dialogue and bad faith arguments.
- We reserve the right to remove participants causing discord, spreading misinformation and/ or affiliated with hate groups. The DOE may not have these standards but we do.

22.    The "hate groups" referenced in the "community commitments" or "agreements" apparently include PLACE and Moms for Liberty. A resolution circulated by CEC 14 members to "End Mayoral Control" provides in part:

> BE IT FURTHER RESOLVED, that we, the undersigned, do not accept the participation of Moms for Liberty affiliated PLACE members on any committee, task force or working group regarding the future of democratic school governance as they do not believe in democracy and only invoke justice and parent power when convenient for their segregationist agenda.

23.    Admission to CEC 14's January 24, 2024 public meeting required people to fill out a form, requiring them to affirm that "By registering I commit to uphold the D14 Community Commitments. These will be announced at the start of every meeting." A true and correct copy of the registration form is attached hereto as Exhibit F.

24.    At the meeting's outset, Defendant Sutton declared, "If people are not in alignment with our community agreements, they may not be allowed in this space."

25.    Alexander registered to attend CEC 14's January 24, 2024 meeting, but Defendants Sutton, Manzanares, and CEC 14 canceled Alexander's registration, barring her from the virtual room on account of her political views. Below is a screenshot of the message Alexander received canceling her registration.



26.     Alexander re-registered for the meeting, and made it into the waiting room, but was then removed and barred from the meeting. Alexander then re-registered again under a pseudonym, and was admitted to the meeting, though she did not speak.

27.     Defendants CEC 14, Sutton, and Manzanares also blocked Plaintiff Noah Harlan from attending the January 24, 2024 meeting. Harlan, too, holds political views that tend to conflict with those held by Sutton and Manzanares. Although Harlan has never been a PLACE member, and does not share all of its views, the group has endorsed his CEC candidacies. On trying to join the meeting, Harlan was left in the waiting room, then refused admission on account of his political views. When he tried to rejoin, Harlan was excluded again because he had reportedly been blocked by the host. Below is a screenshot of the message excluding Harlan:



*Censorship and Exclusion on CEC 14's social media sites*

28.     Defendant CEC 14 maintains a social media account on X (formerly Twitter), @council_14, through which it communicates to the public, and by which it creates a forum for public comment. However, Defendant CEC 14's X account is currently locked—meaning, only people approved by Defendant CEC 14 can follow the account, read and comment on Defendant's posts, and share those posts with their own audiences. Below is a screenshot of what a non-approved person sees when trying to read or otherwise interact with Defendant CEC 14's X account:



29.     Defendant CEC 14 has failed to approve Plaintiff Harlan's request to follow its X account, which has been pending for several months.

30.     Moreover, Defendant CEC 14 has blocked Plaintiffs Maron and Alexander from reading and interacting with its X account. Below is a screenshot of what Maron and Alexander see when trying to access Defendant CEC 14's X account:



31.     Accordingly, Plaintiffs Maron and Alexander cannot even request permission to follow CEC 14, let alone read the account, or interact with Defendant CEC 14 and with those who can visit CEC 14's timeline.

*Regulation D-210*

32.     Defendant DOE maintains and enforces Regulation D-210, a "Code of Conduct" and associated complaint procedure governing the speech of CEC members and members of the four Citywide Councils. A true and correct copy of the regulation is attached hereto as Exhibit G.

33.     "Any corrective or disciplinary action" under Regulation D-210 "may include, but is not limited to, issuance of an order to cease improper conduct or take required action, or suspension or removal of a member." Reg. D-210, § III.

34.     Regulation D-210 purports to regulate "conduct," which includes "verbal . . . acts and behavior, including a Council Member's use of oral and written language." Reg. D-210, Definition 3. That includes speech that "occurs during or at . . . CCEC elections and campaigns," as well as a catch-all "other activities" so long as speech would "foreseeably create a risk of disruption" or "interferes" with the CCEC. *Id.* "Conduct that violates this regulation may serve as a basis for discipline, even if it does not rise to the level of a violation of federal, state or local discrimination laws." Reg. D-210, § I.A.

35.     Moreover, Regulation D-210 regulates an elected Council Member's speech "during such Council Member's candidacy or prior to beginning their Council term." *Id.* § I.B. A Council Member may thus successfully run for elected office, only to be disciplined and removed from office for uttering the speech that persuaded the voters to elect him or her.

36.     "Council Members shall not engage in conduct," meaning speech, "that serves to harass, intimidate, or threaten, including but not limited to frequent verbal abuse and unnecessary aggressive speech that serves to intimidate and causes others to have concern for their personal safety." Reg. D-210, § 2.C.

37.     Additionally, the regulation states that "[t]he DOE does not tolerate disrespect towards children. Council members shall not engage in conduct involving

14

derogatory or offensive comments about any DOE student." *Id.* § 2.D. "Council Members shall not engage in conduct that would publicly reveal, share or expose private or personally identifiable information about a DOE student or a member of such student's family without their consent." *Id.* § 2.E.

38.     Anyone may file a complaint alleging a D-210 violation. Defendant DOE's Equity Compliance Officer ("ECO") reviews D-210 complaints within 3 business days of receipt. *Id.* § IV.C.1 "If the ECO determines the complaint alleges conduct prohibited by this regulation, the ECO shall conduct an investigation by interviewing the parties and witnesses and reviewing relevant evidence. A subject of a complaint has the right to respond to the allegations. The ECO shall complete their investigation within 60 calendar days of receipt of a complaint." *Id.* § IV.C.2.

39.     Although technically D-210 complaints may not be filed anonymously, they are by default anonymous as far as the accused are concerned. "The complaint and investigation shall be kept confidential except as set forth in Section IV.C.3." *Id.* § IV.B.2. Section IV.C.3 provides that "information regarding the complaint *may* need to be disclosed in certain circumstances as appropriate," considering that "the need for confidentiality must be balanced against the obligation to conduct and cooperate with required investigations, to provide due process to the subject, and/or to take necessary action to conciliate or resolve the complaint." (emphasis added).

40.     In practice, the accused are typically not provided copies of D-210 complaints and are not told their accusers' identities prior to or during the ECO's investigative interview, if ever.

41.     The ECO assesses whether the accused violated Regulation D-210 and, if so, what discipline is warranted. The ECO then reports those findings to Defendant DOE's "Equity Council," which in turn provides its views to the ECO. *Id.* § IV.C.4. Defendant Sutton is a member of the Equity Council. In the event of a disagreement, the ECO's views prevail. *Id.* § IV.C.5. The ECO then sends his or her recommendation to the Chancellor, who determines the outcome. *Id.* § IV.D.

42.     As noted *supra*, "corrective or disciplinary action" for a violation of Regulation D-210 can include suspension or removal of a committee member. Reg. D-210, § III. The Chancellor is required to provide the accused an opportunity for conciliation, *id.* § IV.E.1, unless, in the Chancellor's judgment, the accused's conduct is criminal, *id.* § IV.E.2(a); dangerous, *id.* § IV.E.2(b); or "contrary to the best interest of the New York City school district," *id.* § IV.E.2(c). These provisions mirror the Chancellor's authority to suspend or remove a committee member for failing to comply with rules or regulations under state law. N.Y.S. Education Law § 2590-l.

### *Defendants' Application of Regulation D-210*
### *Against Plaintiff Alexander*

43.     On November 6, 2023, Defendant Mickens emailed Plaintiff Alexander "because you have been identified as a subject of a complaint. As such I need to interview you to gather further information."

44.     Alexander responded the same day, "Please let me know what the complaint is and who the complainant is," so that she could "come fully prepared to the interview, and as due process requires."

45.     To this, Defendant Mickens replied the same day, "The investigative process is confidential so I can not share who filed the complaint. However, I will share the details of the complaint when you are interviewed. At that time, you can feel free to share any information you may feel will be helpful on your behalf."

46.     Alexander met Defendant Mickens via Zoom on December 8, 2023, for the purpose of being interviewed as part of Mickens' D-210 investigation into Alexander. Contrary to her email, Defendant Mickens did not provide Alexander a copy of the complaint against her, did not tell her the nature of the charges, and did not reveal the name of the complainant.

47.     From Defendant Mickens' questioning, however, Alexander could infer that Gavin Healy, a member of CEC 2 who had long been critical of PLACE, of Alexander, and of Alexander's political views, had probably filed the D-210 complaint. And Alexander can infer that the D-210 complaint alleged that she had "doxed" Healy's child by revealing that the child attended a school in District 2.

48.     Healy had joined a private Facebook group started and moderated by Alexander, as a parent, to discuss issues relating to District 30 schools. Within that group, Healy argued against the DOE's use of admissions screening criteria to access Gifted and Talented programs, claiming that such programs promote segregation, injustice, and inequity. Indeed, Healy has argued in public that parents who want to enroll their children in screened programs do so because they want segregation "to wall off their kids from other kids." Nolan Hicks, *Four wealthy*

*Manhattan middle schools restore admissions screening*, New York Post, Oct. 6, 2023, https://perma.cc/399Z-5SF5.

49.     An X user had lauded and linked to an editorial written by Healy and appearing on the City Limits website, entitled, "Screened Admissions Policies Only Worsen Segregation in NYC Schools." https://perma.cc/TD2A-3FSN. Healy's editorial had criticized the use of screening by District 2 schools, which he claimed "resulted in schools that were richer and whiter than the already rich, white district around them." Healy repeated his allegation that parents who choose screened programs do so because they desire segregation:

> It's easy to pretend to be colorblind when your head is buried in the sand. It's easy to say you know what the community wants when your "community" is meticulously curated. And it's easy for some parents to hide behind a desire for "acceleration" when what they want is control over which kids get to go to school with theirs.

50.     Alexander replied to this X post on November 4, writing:

> For all his judgment of D2 Mr. Healy sent his child OUT of his diverse D30 school to a screened G&T program IN District 2, with priority to the whiter, wealthier D2 middle schools. I wonder when Mr. Healy decided screening was bad. The day after his child got into a D2 school?

Below is a screenshot of this X post:



**Deborah Alexander**
@debalex55

For all his judgment of D2 Mr. Healy sent his child OUT of his diverse D30 school to a screened G&T program IN District 2, with priority to the whiter, wealthier D2 middle schools. I wonder when Mr. Healy decided screening was bad. The day after his child got into a D2 school?

11:32 AM · Nov 4, 2023 · **766** Views

💬 5          ⟲ 1          ♡ 13          🔖                    ⬆

51.     Defendant Mickens confronted Alexander with this post, along with Regulation D-210's prohibition on revealing private information about students. She interrogated Alexander about her affiliation with PLACE, and about Alexander's use of social media. Defendant Mickens questioned why Alexander wrote her post about Healy, and whether a third party, upon reading Alexander's post, might discern where Healy's child attends school. Defendant Mickens also inquired into Alexander's "liking" of a post by another PLACE member, Yiatin Chu, that had linked to a DOE website noting which school Healy's child attends.

52.     Alexander, who has been on the receiving end of Healy's vituperative criticism, believes it is fair for her to point out Healy's apparent hypocrisy in criticizing Gifted and Talented screening as inequitable and unjust, and accusing parents who choose screened Gifted and Talented programs as segregationists, when he himself appears to have chosen such a program for his child.

53.     That Healy resides within the boundaries of District 30 is no secret. Indeed, the *Queens Chronicle* described him as a "Jackson Heights father" as recently as February 6, 2023.

54.     Nor was it confidential information that Healy's child attended a District 2 school at the time of Alexander's post. Healy could not have been elected to CEC 2 if he did not have a child enrolled in a District 2 school. Defendant DOE disclosed Healy's child's school during his candidacy.

55.     And on June 16, 2023, months before Alexander's post, Defendant DOE disclosed that Healy's child attends P.S./I.S. 217, school code 02M217, when it

announced that Healy had won his election to CEC 2. Below is a screenshot of that
announcement:



56.    Since about the filing of the D-210 complaint against Alexander,
Defendant DOE's election results web page has been "under construction."

57.    As a District 30 resident, Healy could only send his child to that school's
Gifted and Talented program, as the school is otherwise zoned for D2 residents.
Indeed, Healy publicly declared, "My child has been a student at PS/IS 217 since
the 1st grade" when he successfully ran for a position on that school's School
Leadership Team. Below is a screenshot of Healy's candidate statement:

20

**Candidates for SLT Parent Member**

**GAVIN HEALY**

My child has been a student at PS/IS 217 since the 1st grade and is now in 3rd grade (remote).  I wish to serve on the SLT to work for its increased transparency and responsiveness to parents.  Specifically, as an SLT member, I would:

- work to ensure that the SLT foregrounds equity
- work to ensure a trauma-informed and culturally-responsive curriculum
- support students and families in the IEP process – this should be a cooperative process rather than an adversarial one
- insist that the SLT conduct all its meetings in compliance with the Chancellor's Regulations and New York State Open Meetings Law – all members of the school community must be given prior notice of the meetings so that they can attend
- provide updates to the school community of proceedings at the SLT meetings in an inclusive and transparent manner

Thank you.
Gavin Healy

*Defendants' Application of Regulation D-210*
*Against Plaintiff Maron*

58.      On February 8, 2024, Defendant Mickens emailed Plaintiff Maron "to make contact to schedule time to discuss D-210 complaints in which you are the subject."

59.      On February 27, 2024, Maron responded, "Please let me know how many D-210 complaints you are referring to and provide copies of each complaint." Maron also asked to be told "if any complaints are dismissed prior to the discussion stage of this process."

60.      On March 8, 2024, Defendant Mickens responded, "I am referring to one D-210 complaint. I cannot provide copies as the complainant details are confidential. The complaint is in reference to alleged discrimination related to comments made about the LGBTQI+ community."

61.      Maron had been expecting D-210 complaints for expressing political views about transgenderism and race. On December 14, 2023, "The 74 Million"

website published an article revealing and criticizing text messages that Maron
(and others) had sent to a private WhatsApp group. Marianna McMurdock, *In
private texts, NY Ed Council Reps, Congressional Candidate Demean LGBTQ Kids,*
Dec. 14, 2023, https://perma.cc/QT3F-3R9Q. The article's sub-head read, "Officials
call to remove elected parent leaders for remarks like 'there is no such thing as
trans kids.' NYC Dept. of Ed calls comments 'despicable.'"

62.     Among the statements the article highlighted, Maron described the rapid
rise in trans-identifying children as a "social contagion," and decried the use of
drugs and medical procedures to change children's sex:

> There is no such thing as "trans kids" bc there is no such thing
> as transition i.e. changing your sex. No child can consent to the
> permanent changes being made to their bodies. . . .
>
> Adults should be free to drug & surgically modify their bodies as
> they choose. And have their civil rights respected but children
> should not be drugged or operated on.
> Puberty cannot be paused. And the use of Lupron and other
> powerful drugs on totally healthy kids have serious side effects
> include loss of bone density and serious cognitive side effects.
>
> Some of These kids never develop adult genitalia and will never
> have full sexual function.
>
> It's an abomination

63.     Maron also criticized anti-racism in the disclosed texts. "The anti-racists
are so racist." *Id.*

64.     A DOE spokesperson has declared that Maron's comments are
"despicable" and "not in line with our values." *Id.* But Banks has not satisfied
himself by merely disagreeing with Maron and offering counter-speech. He has

directly threatened Maron's position because he disagrees with her viewpoints. At a public meeting, Defendant Chancellor Banks stated, in reference to Maron's texts, that he was "prepared . . . to take action because it is not acceptable to me, for that level of behavior, to continue to play out." *Id.* Defendant Banks has also been quoted as saying,

> One of the things I will tell you in the two years I have been chancellor that has been the greatest disappointment to me is to see on a daily basis an example of parents behaving badly. . . . I've tried to give this some time to allow adults to be adults. But when you realize they refuse to do that . . . we are going to begin to take action.

Michael Elsen Rooney, *As tensions flare in parent councils, NYC sees a surge in misconduct complaints*, Chalkbeat New York, March 13, 2024, https://perma.cc/B7QN-3W39.

65.     Maron continues to attract D-210 complaints. On March 20, 2024, Defendant Mickens emailed Maron to advise that she wanted to discuss another D-210 complaint with her, "about comments made about a DOE student." When prodded for more detail, Mickens wrote that "[t]his is related to a student at Stuyvesant HS."

66.     On February 16, 2024, the student newspaper at Stuyvesant High School, *The Spectator*, published an anonymous full page editorial titled, "Black and White: The Withheld Story of Palestine and Israel." The editorial appeared in print, but to date, has not been published on the *Spectator*'s website.

67.     The editorial accused Israel of "genocide," "apartheid," "ethnic cleansing," "crimes against humanity," "atrocities" dating to its founding, "slaughter[ing]

23

peaceful protestors," and a "relentless murder spree" since the beginning of 2023,

among other alleged outrages. But the editorial denied that the Hamas terrorist

organization has tunneled under hospitals, and it failed to mention Hamas's

October 7, 2023, invasion of Israel. The editorial referenced October 7 only in

claiming that Israel has wronged Palestinians before and after that date, and in

alleging that Gaza was "off the radar" before October 7.

68.    Indeed, the editorialist added that he declined to "essentially headline

with the fact that I condemn Hamas." The editorialist continued, "Though I refuse

to condemn resistance or anyone before I condemn the oppressor, I do not justify

any violence carried out against innocent civilians." It is thus unclear whether the

editorialist believes that Hamas's "resistance" was directed at innocent civilians.

69.    This anonymous editorial proved controversial. Many Stuyvesant parents

sharply criticized the piece and everyone potentially involved with its publication.

Among these critics was Plaintiff Maron, whose child attends Stuyvesant High

School and who serves on the School Leadership Team. Maron told the *New York

Post*,

> The byline should read coward instead of anonymous. If you are
> going to repeat revolting Hamas propaganda and transcribe
> your ignorance and Jew hatred, put your name to it. Principal
> Yu should address the school and explain to Jewish students
> why this factually inaccurate bile was published on the school
> paper anonymously.

Jon Levine and Aneeta Bhole, *NYC's Stuyvesant HS newspaper accuses Israel of

'genocide' while whitewashing Hamas' massacre*, New York Post, Feb. 24, 2024,

https://perma.cc/RNG7-8QZP.

24

70.   Maron's comments did not identify the editorial's author, as she does not know the author's identity and has never claimed to know it. Indeed, because the editorial was anonymous, Maron does not know whether the author was a student, a staff member, or some other person.

71.   In any event, Maron reasonably believes that Defendant Mickens is investigating her under Regulation D-210 for her criticism of the anonymous editorialist that appeared in the *New York Post*.

72.   Maron also reasonably fears that another D-210 complaint against her is in the works. On March 20, 2024, CEC 2 approved a resolution she introduced by a vote of 8-3: Resolution # 248, "Resolution Calling for a Comprehensive Review and Redrafting of NYCPS Guidelines on Gender with Regard to the Application and Impact on Female Athletes Participating in Physical Education, Intramural and Competitive Public School Athletic League (PSAL) Sports."

73.   The resolution resolved that CEC 2

respectfully requests that NYCPS immediately convenes a Gender Guidelines review committee which:

1.  Includes NYC PSAL female athletes, parents, coaches, relevant medical professionals and evolutionary biology experts; and

2.  Is authorized to propose amendments, changes and additions to the Gender Guidelines which are the result of an inclusive, evidence-based process concerning the impact on female athletes when the category of sex is replaced by gender identity.

74.     Defendant Banks condemned this resolution as "despicable" and "hateful," and Maron's political opponents have reportedly threatened to take action against those who voted in its favor.

75.     Considering that Maron is already facing a D-210 investigation over her comments critical of gender theory, and that Defendant Banks has threatened her over that dispute, Defendant Banks's condemnation of Resolution 248 and the threats to the resolutions' supporters reasonably suggests to Maron that Defendant Mickens will soon investigate her for supporting the resolution, and that she will face continuing D-210 complaints and investigations if she even so much as asks, as Resolution 248 does, for any reconsideration or inquiry into Defendant DOE's gender policies.

*The Continuing Impact of Defendants' Policies on Plaintiffs*

76.     Plaintiffs intend to and would participate in CEC 14's public board meetings, to express their views during the public comment periods on the full range of subjects before that board, whether Defendants Sutton, Manzanares, or anyone else agrees with them or not. Plaintiffs reasonably expect to disagree with Defendants' views on educational policies, curricula, the school budget, school personnel and administration, anti-Semitism, and Israel, among other issues.

77.     Plaintiffs also intend to criticize the competence of CEC 14 members, including Defendants Sutton and Manzanares, and of other New York City school officials and employees. For example, Plaintiffs would criticize Defendants for their treatment of public speakers, for conducting meetings virtually instead of in-person,

and for their blocking members of the public from accessing CEC 14's social media presence. They would also criticize Defendants for violating the law by not holding meetings on various months, for not keeping or publishing minutes of the July 2023 meeting at which they presumably passed the CEC 14 budget, and for using CEC 14 resources to promote their personal politics.

78.     However, Plaintiffs are all chilled from speaking at CEC 14 public meetings as they intend. Plaintiffs Alexander and Harlan refrain from trying to access CEC 14's public board meetings, because Defendants have expelled them before on account of their views and have subsequently barred their entry attempts. Plaintiff Alexander also suspects that Defendants have barred her on account of her association with PLACE. Although he is not affiliated with PLACE, Harlan suspects that the mere fact that PLACE endorsed him caused Defendants to exclude him. Plaintiff Maron has not attempted to access CEC 14's public board meetings because she believes she is barred owing to her views, and her associations with PLACE and with Moms for Liberty.

79.     Plaintiffs also refrain from trying to access CEC 14's public board meetings because they do not wish to subscribe to the "community commitments" as required by the entry form. And Plaintiffs reasonably fear that they would be interrupted, censored, subject to discriminatory treatment, and expelled owing to their viewpoints under Defendant CEC 14's "community commitments" and "community guidelines" speech codes, and under Article IV, Section 2 of CEC 14's bylaws, which prohibits them from criticizing people.

27

80.     Plaintiffs also intend to, and would, interact with Defendant CEC 14's X account by responding to CEC 14 posts and the posts of others conducting discussions under CEC 14's timeline, but they are barred from doing so because Defendants limit account access to approved followers, refuse to approve Plaintiff Harlan, and indeed, have gone so far as to block Plaintiffs Maron and Alexander.

81.     Plaintiffs are acutely aware of the proliferation of D-210 complaints—reportedly, over 36 such complaints have been filed this school year already, compared to five filed last year. *See* Rooney, *supra*, https://perma.cc/B7QN-3W39.

82.     The threat of D-210 complaints being filed against them in retaliation for expressing their political views has chilled Plaintiffs' expression, causing them to alter their public and even private speech. Plaintiffs would speak more, and speak differently than they do now, but for the threat that their words will trigger investigation and removal from office because Defendants and their ideological allies would find them unacceptable. Although Plaintiffs continue to speak regularly about controversial issues, the threats posed by Regulation D-210 weigh on Plaintiffs, and at times impact their choice of words, the viewpoints they would discuss, and the frequency of their speech, including Plaintiffs' introduction of resolutions, debate, and voting on their committees.

COUNT ONE
ACCESS TO PUBLIC MEETINGS, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AGAINST DEFENDANTS SUTTON, MANZANARES, AND CEC 14

83.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 82.

84.    Plaintiffs have a First Amendment right to attend public school board meetings, including the public meetings held by Defendant CEC 14.

85.    A school board meeting at which the public is allowed to speak is a designated public forum limited to discussing school operation and governance. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 & n.7 (1983); *Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 545 (2d Cir. 2002).

86.    "Under the . . . First Amendment . . . government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). "Once it has opened a limited forum . . . the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (internal quotation marks and citations omitted). Alternatively, even if the CEC 14's meetings are deemed nonpublic fora, viewpoint discrimination in accessing such fora is forbidden. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018).

29

87.     Moreover, the government may not "chill the assertion of constitutional rights by penalizing those who choose to exercise them." *United States v. Jackson*, 390 U.S. 570, 581 (1968). Since Plaintiffs have a fundamental First Amendment right to associate with others as members and officers of civic and political advocacy groups, including PLACE and Moms for Liberty, they cannot be punished for exercising these rights by being banished from public meetings. Nor can the government coerce people to forego exercise of a constitutional rights as a condition of obtaining a benefit. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013).

88.     Defendants Sutton, Manzanares, and CEC 14's policies and practices excluding people from their public meetings if they hold or express disfavored views, or associate with disfavored civic and political advocacy groups such as PLACE and Moms for Liberty, including Defendants' policy of "remov[ing] participants . . . affiliated with hate groups," violate the First Amendment rights of speech, assembly, and association, on their face and as applied against Plaintiffs.

89.     By enforcing these provisions, Defendants Sutton, Manzanares, and CEC 14, under color of law, deprived and continue to deprive Plaintiffs of the rights to free speech, assembly, and association in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and

maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT TWO
CONTENT AND VIEWPOINT DISCRIMINATION – PUBLIC MEETINGS
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AGAINST DEFENDANTS SUTTON, MANZANARES, AND CEC 14

90.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 82.

91.     The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The government may not silence speech because it criticizes government officials or employees, or their favorite ideas or initiatives, even if that speech does so in ways that many people may find unpleasant. Allegations of hurt feelings, real or spurious, do not justify censorship of public speech.

92.     The government may not "regulat[e] speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. "[O]nce the government has permitted *some* comment on a particular subject matter or topic, it may not then 'regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Byrne v. Rutledge*, 623 F.3d 46, 55 (2d Cir. 2010) (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)) (emphasis original).

93.     The First Amendment prohibits the exclusion of Plaintiffs' viewpoints from public speech at Defendant CEC 14's meetings, regardless of the meetings' forum classification.

94.     On their face and as-applied against Plaintiffs, Defendants' prohibitions of "homophobia, transphobia, misogyny, ableism, racism, or any other forms of oppressive beliefs," "name-calling of community members," "disrespect[ing] the community," "verbal harm," "bad faith arguments," "discord," and "misinformation," and CEC 14 By-Laws, Article IV, Section 2's prohibition on discussing the "competence or personal conduct of individuals," violate the First Amendment rights of free speech and petition by impermissibly discriminating against speech on the basis of content and viewpoint. These prohibitions are not designed to confine the forum to the limited and legitimate purposes for which it was created, but rather, to suppress ideologies and opinions respecting matters properly before the school board with which Defendants disagree.

95.     By enforcing these provisions, and otherwise suppressing public speech on the basis of content and viewpoint, Defendants, under color of law, deprive Plaintiffs of the rights to free speech and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT THREE
VAGUENESS – SPEECH CODE, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AGAINST DEFENDANTS SUTTON, MANZANARES, AND CEC 14

96.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 82.

97.     As notice is the first element of due process, and government officials require precise guidance so that they do not act in an arbitrary or discriminatory way, the Fourteenth Amendment's guarantee of Due Process prohibits the enforcement of vague laws. The First Amendment also reflects these concerns, and likewise forbids the enforcement of laws that, however valid their application may be in some instances, are so vague as to chill protected speech.

98.     Defendants' prohibitions of "homophobia, transphobia, misogyny, ableism, racism, or any other forms of oppressive beliefs," "name-calling of community members," "disrespect[ing] the community," "verbal harm," "bad faith arguments," "discord," and "misinformation," are each unduly vague and inherently subjective, serving only to authorize Defendants' arbitrary censorship of speech they dislike.

99.     By enforcing these provisions, Defendants, under color of law, deprive Plaintiffs of the rights to free speech and due process in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT FOUR
OVERBREADTH – SPEECH CODE, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AGAINST DEFENDANTS SUTTON, MANZANARES, AND CEC 14

100.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 82.

101.    Speech regulations may not "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964). "The showing that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate *all* enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (internal quotation marks and citations omitted) (emphasis original).

102.    Defendants' prohibitions of "homophobia, transphobia, misogyny, ableism, racism, or any other forms of oppressive beliefs," "name-calling of community members," "disrespect[ing] the community," "verbal harm," "bad faith arguments," "discord," and "misinformation," and CEC 14 By-Laws, Article IV, Section 2's prohibition on discussing the "competence or personal conduct of individuals," violate the First Amendment rights of free speech and petition on their face because they are substantially overbroad, sweeping vast amounts of protected political expression.

103.    By enforcing these provisions, Defendants, under color of law, deprive Plaintiffs of the right to free speech and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus

34

damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT FIVE
PRIOR RESTRAINT – X, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AGAINST DEFENDANTS SUTTON, MANZANARES, AND CEC 14

104.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 82.

105.   Defendants impose a prior restraint on speech by "protecting" the CEC 14 X account, and thereby forbidding everyone from reading and replying to speech in what is a public forum unless they first obtain their permission to do so. This prior restraint is unconstitutional because permission to access the CEC 14 X account is left entirely to Defendants' unbridled discretion, and because Defendants' practice lacks procedural safeguards.

106.   By imposing a prior restraint on Plaintiffs' speech, and thereby subjecting their access to the forum to Defendants' unbridled discretion, lacking procedural safeguards, Defendants, under color of law, deprive Plaintiffs of the rights to free speech and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

35

COUNT SIX
VIEWPOINT DISCRIMINATION – X
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AGAINST DEFENDANTS SUTTON, MANZANARES, AND CEC 14

107.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 82.

108.   First Amendment protections extend to replies, re-posts, or comments posted by users in response to posts by government officials using official X accounts, including @council_14, by operation of the Fourteenth Amendment.

109.   The interactive portions of @council_14's X page, including the reply and re-tweet features, constitute a designated public forum where state actors may impose only viewpoint neutral time, place, and manner restrictions that are narrowly drawn.

110.   In the alternative, the interactive portions of @council_14's X page, including the reply and re-tweet features, constitute a limited public forum, where state actors may only impose restrictions that are viewpoint-neutral and reasonable, in light of the purposes of the forum.

111.   In both cases, Defendants have created the @council_14 X account to engage with the public and to solicit feedback. Its purpose is to interact with the public and to foster exchange. That is a public forum.

112.   Defendants acted in a viewpoint discriminatory manner when they blocked Plaintiffs Maron and Alexander from the @council_14 X account, and when they refused to approve Plaintiff Harlan's request to follow the @council_14 X account.

36

113.    Defendants have a pattern and practice of blocking people from accessing the @council_14 X account, and refusing to approve people's requests to follow the @council_14 X account, on the basis of their viewpoints.

114.    By blocking and refusing to approve X followers on the basis of their viewpoints, Defendants, under color of law, deprive Plaintiffs of the rights to free speech and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT SEVEN
VIEWPOINT DISCRIMINATION – REGULATION D-210
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AGAINST DEFENDANTS BANKS, MICKENS, AND DEPARTMENT OF EDUCATION

115.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 82.

116.    On its face, and as-applied by Defendants, Regulation D-210 violates Plaintiffs' First Amendment rights by targeting them for investigation, discipline, and removal from elected office on account of their viewpoints. The First Amendment protects speech that one's political opponents may view as "abuse," regardless of how "frequent[ly]" it is expressed, or speech that one's political opponent may believe is "unnecessary[ily] aggressive." A person cannot silence political opponents merely by claiming that their speech is intimidating and causes "concern for [one's] personal safety."

117.    The First Amendment protects the expression of "disrespect," including the "disrespect" of children, and it protects "derogatory or offensive comments," including such comments about New York City public school students. That includes speech critical of gender ideology and anti-racism, and of students for publishing editorial opinions, which people are also free to criticize.

118.    The First Amendment also protects speech that publicly reveals, shares, or exposes a broad range of information that some might consider "private or personally identifiable information about a DOE student or a member of such student's family." Such protected First Amendment speech includes, for example, speech that repeats information published by the DOE to the effect that an elected CEC member is, as required by law, the parent of a child enrolled in a school within the CEC district; and speech that shares information that a CEC member freely shares about the school that his child attends.

119.    By implementing and enforcing Regulation D-210, and by investigating and acting upon D-210 complaints lodged against Plaintiffs on the basis of their speech's content and viewpoint, Defendants, under color of law, deprive Plaintiffs of the rights to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT EIGHT
VAGUENESS – REGULATION D-210
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AGAINST DEFENDANTS BANKS, MICKENS, AND DEPARTMENT OF EDUCATION

120.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 82.

121.   Regulation D-210 is unconstitutionally vague. No reasonably intelligent person can guess at what speech Defendants might find to constitute "frequent verbal abuse" or "unnecessary aggressive speech." What makes speech too frequent, or too abusive, or aggressive and, if aggressive, necessarily or unnecessarily so, is completely subjective, as is Regulation D-210's standard that condemns speech based on whether any listener may find the speech intimidating and as cause for concern.

122.   Regulation D-210's prohibition of "disrespect" is likewise unconstitutionally vague, as is its prohibition of speech that is "derogatory" or "offensive." These are all subjective values.

123.   Regulation D-210 is also unconstitutionally vague in that it fails to define what might be "private" or "personally identifiable information." Just about any speech about another person can be argued to as relating to "private" matters, or to "personally identify" the subject. That Defendant Mickens found reasonable cause to investigate Alexander under D-210 for referring to the fact that a CEC 2 member has a child in a District 2 school confirms as much, especially when that CEC 2 member has publicly discussed the specific school his child attends.

124.   By implementing and enforcing Regulation D-210, and by investigating and acting upon D-210 complaints lodged against Plaintiffs, Defendants, under

39

color of law, deprive Plaintiffs of the rights to free speech and due process in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT NINE
OVERBREADTH – REGULATION D-210
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AGAINST DEFENDANTS BANKS, MICKENS, AND DEPARTMENT OF EDUCATION

125.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 82.

126.    Regulation D-210's prohibitions of "frequent verbal abuse and unnecessary aggressive speech that serves to intimidate and causes others to have concern for their personal safety," Reg. D-210, § 2.C, "disrespect towards children," *id.* § 2.D, "derogatory or offensive comments about any DOE student," *id.,* and speech "that would publicly reveal, share or expose private or personally identifiable information about a DOE student or a member of such student's family without their consent," *id.* § 2.E, violate the First Amendment right of free speech on their face because they are substantially overbroad, sweeping vast amounts of protected political expression.

127.    By implementing and enforcing Regulation D-210, and by investigating and acting upon D-210 complaints lodged against Plaintiffs, Defendants, under color of law, deprive Plaintiffs of the rights to free speech in violation of the First

40

and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. Orders preliminarily and permanently enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from:

    a. Restricting access to CEC 14 meetings on the basis of viewpoint and association, including membership in any alleged "hate groups;"

    b. Discriminating against speech at CEC 14 public comment periods on the basis of viewpoint, or on the basis of content that is germane to the purposes of the meeting;

    c. Enforcing Article 4, Section 2 of CEC 14's Bylaws, prohibiting "[d]iscussion and charges relating to the competence or personal conduct of individuals" during the public comment period of CEC 14 meetings;

d.  Enforcing any rule barring "homophobia," "transphobia," "misogyny," "ableism," "racism," "any other forms of oppressive beliefs," or "name calling" during the public comment period of CEC 14 meetings;

e.  Enforcing the speech restrictions of CEC 14's so-called "community commitments," including speech deemed to constitute "bad faith arguments," "discord," or "misinformation;"

f.  Locking CEC 14's social media accounts, including its @council_14 X account, from public access pending individual approval to follow the account;

g.  Blocking people from following or interacting with CEC 14's social media accounts, including its @council_14 X account, on the basis of viewpoint, including Plaintiffs Maron and Alexander;

h.  Implementing or enforcing Regulation D-210, including conducting any investigation or disciplining or removing from office any Community Education Council or Citywide Council member on the basis that the accused engaged in "frequent verbal abuse and unnecessary aggressive speech that serves to intimidate and causes others to have concern for their personal safety," Reg. D-210, § 2.C, or expressed "disrespect towards children," *id.* § 2.D, or "derogatory or offensive comments about any DOE student," *id.,* or speech "that would publicly reveal, share or expose private or personally identifiable information about a

DOE student or a member of such student's family without their consent," *id.* § 2.E;

2. Declaratory relief consistent with the injunction, to the effect that:

   a. Excluding people from CEC 14 meetings on the basis of viewpoint and association, including membership in any alleged "hate groups," violates the First Amendment rights of speech, assembly, and association;

   b. Discriminating against speech at CEC 14 public comment periods on the basis of viewpoint, or on the basis of content that is germane to the purposes of the meeting, violates the First Amendment rights of speech and petition;

   c. Article 4, Section 2 of CEC 14's Bylaws, prohibiting "[d]iscussion and charges relating to the competence or personal conduct of individuals" during the public comment period of CEC 14 meetings, violates the First Amendment rights to free speech and petition, on its face and as applied against Plaintiffs, by impermissibly discriminating against speech on the basis of content and viewpoint; and is also overbroad in violation of the First and Fourteenth Amendments;

   d. CEC 14's so-called "community guidelines" barring "homophobia," "transphobia," "misogyny," "ableism," "racism," "any other forms of oppressive beliefs," or "name calling" during the public comment period of CEC 14 meetings, violate the First Amendment rights to free speech

and petition on their face and as-applied against Plaintiffs by impermissibly discriminating against speech on the basis of content and viewpoint, and are also unconstitutionally vague and overbroad in violation of the First and Fourteenth Amendments;

e. CEC 14's so-called "community commitments," barring speech deemed to constitute "bad faith arguments," "discord," or "misinformation" during the public comment period of CEC 14 meetings, violate the First Amendment rights to free speech and petition on their face and as-applied against Plaintiffs by impermissibly discriminating against speech on the basis of content and viewpoint, and are also unconstitutionally vague and overbroad in violation of the First and Fourteenth Amendments;

f. Locking CEC 14's social media accounts, including its @council_14 X account from public access pending individual approval to follow the account, violates the First Amendment rights to free speech and petition;

g. Blocking people from following or interacting with CEC 14's social media accounts, including its @council_14 X account on the basis of viewpoint, violates the First Amendment rights of free speech and petition;

h. Regulation D-210's prohibitions of "frequent verbal abuse and unnecessary aggressive speech that serves to intimidate and causes

others to have concern for their personal safety," Reg. D-210, § 2.C;

speech that expresses "disrespect towards children," *id.* § 2.D; or that

constitutes "derogatory or offensive comments about any DOE

student," *id.*; or speech "that would publicly reveal, share or expose

private or personally identifiable information about a DOE student or

a member of such student's family without their consent," *id.* § 2.E,

violate the First Amendment on its face and as-applied against

Plaintiffs by impermissibly discriminating against speech on the basis

of content and viewpoint; and these prohibitions are also

unconstitutionally vague and overbroad in violation of the First and

Fourteenth Amendments;

3. An award of nominal damages to each Plaintiff in the amount of $17.91;

4. Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988;

and

5. Any other relief as the Court deems just and appropriate.

Dated: March 26, 2024                    Respectfully submitted,

                                    By:   /s/ Dennis J. Saffran
Alan Gura*                                Dennis J. Saffran
Nathan Ristuccia*                         38-18 West Drive
INSTITUTE FOR FREE SPEECH                 Douglaston, NY 11363
1150 Connecticut Avenue, N.W.             718.428.7156
Suite 801                                 djsaffran@gmail.com
Washington, DC 20036
202.301.3300
agura@ifs.org
nristuccia@ifs.org

*        Application pro hac vice pending