UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

DEBORAH ALEXANDER, et al.,                          :
                                                                            :   Case No.: 1:24-cv-2444
                                    Plaintiffs,             :
                                                                            :
                        v.                                          :
                                                                            :
TAJH SUTTON, et al.,                                       :
                                                                            :
                                    Defendants.          :

-------------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR**

**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

    1.   *Regulatory background re: Community Education Council 14* ................. 2

    2.   *Censorship and Exclusion at CEC 14 Public Meetings* .............................. 2

    3.   *CEC 14's Social Media Censorship* ............................................................ 4

    4.   *Regulation D-210* ....................................................................................... 4

    5.   *Plaintiffs targeted under Reg. D-210 for expressing their views* ................ 5

    6.   *The Continuing Impact of Defendants' Policies on Plaintiffs* ...................... 7

ARGUMENT .................................................................................................................... 9

    I.   PLAINTIFFS WILL SUCCEED ON THE MERITS ...................................... 9

        A.  The First Amendment forbids Defendants from discriminating against speech on the basis of viewpoint ................................. 9

        B.  Defendants' restrictions on access and speech at CEC 14's meetings and social media spaces unlawfully discriminate against speech and petition based on content and viewpoint. ............. 10

        C.  Defendants violate the First Amendment freedoms of assembly and association by barring members of so-called "hate groups" from public meetings. ........................................................................ 14

        D.  Defendants' practice of locking CEC 14's official X account is an unconstitutional prior restraint. ............................................. 16

        E.  Regulation D-210 discriminates against speech based on viewpoint ................................................................................. 17

        F.  CEC 14's Bylaws, Community Guidelines, Community Commitments, and Regulation D-210, are all unduly vague. .............. 18

G. CEC 14's Bylaws, Community Guidelines, Community Commitments, and Regulation D-210 are all overbroad. .................... 20

II. DEFENDANTS IRREPARABLY DAMAGE PLAINTIFFS BY SUPPRESSING THEIR FIRST AMENDMENT RIGHTS ................................................... 21

III. PROTECTING FIRST AMENDMENT RIGHTS IS ALWAYS IN THE PUBLIC INTEREST, SO THE BALANCE OF EQUITIES HEAVILY FAVORS PLAINTIFFS ........ 22

IV. THIS COURT SHOULD WAIVE THE RULE 65(C) SECURITY REQUIREMENT ......... 22

CONCLUSION ............................................................................................... 23

TABLE OF AUTHORITIES

**Cases**

*Adams v. Zelotes,*
   606 F.3d 34 (2d Cir. 2010) ................................................................... 20

*Advance Pharm., Inc. v. United States,*
   391 F.3d 377 (2d Cir. 2004) ................................................................. 19

*Anderson v. Hansen,*
   489 F. Supp. 3d 836 (E.D. Wis. 2020) ................................................ 14

*Bach v. Sch. Bd. of Va. Beach,*
   139 F. Supp. 2d 738 (E.D. Va. 2001) .................................................. 13

*Beal v. Stern,*
   184 F.3d 117 (2d Cir. 1999) ................................................................. 16

*Borough of Duryea v. Guarnieri,*
   564 U.S. 379 (2011) ............................................................................. 12

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000) ............................................................................. 15

*Bronx Household of Faith v. Cmty. Sch. Dist. No. 10,*
   127 F.3d 207 (2d. Cir. 1997) ............................................................... 11

*Cohen v. California,*
   403 U.S. 15 (1971) ............................................................................... 10

*Corning Inc. v. PicVue Elecs., Ltd.,*
   365 F.3d 156 (2d Cir. 2004) ................................................................. 22

*De Jonge v. Oregon,*
   299 U.S. 353 (1937) ........................................................................ 14, 15

*Elrod v. Burns,*
   427 U.S. 347 (1976) ............................................................................. 21

*FCC v. Fox TV Stations, Inc.,*
   567 U.S. 239 (2012) ............................................................................. 19

*FW/PBS, Inc. v. City of Dallas,*
   493 U.S. 215 (1990) ............................................................................. 17

iv

*Garnier v. O'Connor-Ratcliff*,
  41 F.4th 1158 (9th Cir. 2022) ................................................................ 11

*Gooding v. Wilson*,
  405 U.S. 518 (1972) ............................................................................. 20

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ............................................................... 18, 19, 21

*Hill v. Colorado*,
  530 U.S. 703 (2000) ............................................................................. 19

*Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y.*
  *Dep't of Parks & Rec.*,
  311 F.3d 534 (2d Cir. 2002) ................................................................ 11

*Husain v. Springer*,
  494 F.3d 108, 124 (2d Cir. 2007) ....................................................... 11

*Iancu v. Brunetti*,
  139 S. Ct. 2294 (2019) ......................................................................... 10

*Ison v. Madison Local Sch. Dist. Bd. of Educ.*,
  3 F.4th 887 (6th Cir. 2021) ........................................................... 14, 18

*Jackler v. Byrne*,
  658 F.3d 225 (2d Cir. 2011) ................................................................ 22

*Kamerling v. Massanari*,
  295 F.3d 206 (2d Cir. 2002) ................................................................ 21

*Kane v. De Blasio*,
  19 F.4th 152 (2d Cir. 2021) ............................................................. 9, 22

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
  928 F.3d 226 (2d Cir. 2019) ................................................................ 11

*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013) ............................................................................. 13

*Leventhal v. Vista Unified Sch. Dist.*,
  973 F. Supp. 951 (S.D. Cal. 1997) ..................................................... 13

*Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York*
  *Shipping Ass'n, Inc.*,
  965 F.2d 1224 (2d Cir. 1992) ................................................................ 9

v

*Lusk v. Vill. of Cold Spring,*
475 F.3d 480 (2d Cir. 2007)...................................................................... 16

*MacDonald v. Safir,*
206 F.3d 183 (2d Cir. 2000)...................................................................... 17

*Mahanoy Area Sch. Dist. v. B.L.,*
141 S. Ct. 2038 (2021) .............................................................................. 18

*Mama Bears of Forsyth Cty. v. McCall,*
642 F. Supp. 3d 1338 (N.D. Ga. 2022) .............................................. 14, 18

*Marshall v. Amuso,*
571 F. Supp. 3d 412 (E.D. Pa. 2021).................................................. 14, 18

*Matal v. Tam,*
582 U.S. 218 (2017) ...................................................................... 10, 13, 18

*Minn. Voters All. v. Mansky,*
138 S. Ct. 1876 (2018) .................................................................. 11, 19, 21

*N.Y. Progress & Prot. PAC v. Walsh,*
733 F.3d 483 (2d Cir. 2013)................................................................... 9, 22

*NAACP v. Alabama,*
377 U.S. 288 (1964) ................................................................................. 20

*Nebraska Press Ass'n v. Stuart,*
427 U.S. 539 (1976) ................................................................................. 16

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
460 U.S. 37 (1983) ................................................................................... 11

*Pleasant Grove City v. Summum,*
555 U.S. 460 (2009) ................................................................................... 9

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) ................................................................................. 18

*R.O. v. Ithaca City Sch. Dist.,*
645 F.3d 533 (2d Cir. 2011)..................................................................... 10

*Roberts v. U.S. Jaycees,*
468 U.S. 609 (1984) ................................................................................. 15

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) .................................................................................. 9

*Sam Party of N.Y. v. Kosinski*,
   987 F.3d 267 (2d Cir. 2021) ...................................................................... 22

*Scott v. Meyers*,
   191 F.3d 82 (2d Cir. 1999) ........................................................................ 20

*Slattery v. Hochul*,
   61 F.4th 278 (2d Cir. 2023) ................................................................ 15, 19

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ................................................................................ 18

*Spencer v. Nigrelli*,
   648 F. Supp. 3d 451 (W.D.N.Y. 2022) ..................................................... 23

*Texas v. Johnson*,
   491 U.S. 397 (1989) ................................................................................ 10

*Tyler v. City of Kingston*,
   74 F.4th 57 (2d Cir. 2023) ................................................................ 10, 11

*United States v. Farooq*,
   58 F.4th 687 (2d Cir. 2023) ..................................................................... 16

*United States v. Jackson*,
   390 U.S. 570 (1968) ................................................................................ 15

*Vans, Inc. v. MSCHF Prod. Studio, Inc.*,
   88 F.4th 125 (2d Cir. 2023) ..................................................................... 22

*Velez v. Levy*,
   401 F.3d 75 (2d Cir. 2005) ....................................................................... 17

*W. Va. State Bd. of Education v. Barnette*,
   319 U.S. 624 (1943) .................................................................................. 1

*Wandering Dago, Inc. v. Destito*,
   879 F.3d 20 (2d Cir. 2018) .................................................................. 9, 10

*We the Patriots USA, Inc. v. Hochul*,
   17 F.4th 266 (2d Cir. 2021) ....................................................................... 9

**Statutes and Rules**

CEC 14 Bylaws, art. III, § 1 ................................................................... 2

CEC 14 Bylaws, art. IV, § 2 ......................................................... 2, 7, 13

N.Y.S. Education Law § 2590-e(14) ............................................. 2, 13

New York DOE Regulation D-210 ......................................... passim

**Other Authorities**

Jack Ahern, *Anti-Trans Vote by District 2 Ed Board Draws Fierce Protest*, Our
  Town, Mar. 26, 2024, https://perma.cc/S82B-CSRN ................................................ 6

Jon Levine and Aneeta Bhole, *NYC's Stuyvesant HS newspaper accuses Israel of
  "genocide" while whitewashing Hamas' massacre*, New York Post, Feb. 24, 2024,
  https://perma.cc/RNG7-8QZP .................................................................. 6

Marianna McMurdock, *In private texts, NY Ed Council Reps, Congressional
  Candidate Demean LGBTQ Kids*, Dec. 14, 2023, https://perma.cc/QT3F-3R9Q ..... 6

Michael Elsen Rooney, *As tensions flare in parent councils, NYC sees a surge in
  misconduct complaints*, Chalkbeat New York, March 13, 2024,
  https://perma.cc/B7QN-3W39 ................................................................. 6

## INTRODUCTION

Defendant school officials apparently believe that they can cancel—silence, expel, block, and remove from office—anyone who would dare criticize them or challenge their beliefs.

Not so. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Education v. Barnette*, 319 U.S. 624, 642 (1943).

Defendants' antics—expelling people from public meetings for their views or for associating with disfavored advocacy groups, and barring the expression of "oppressive beliefs," "bad faith arguments," "misinformation," and the like—are flatly unconstitutional. So is Defendants' imposition of a prior restraint on access to official social media sites, leaving decisions on whether to allow people to communicate with their government and with each other up to Defendants' unbridled discretion.

Also unconstitutional—and requiring urgent redress—is Defendants' investigation and threatened expulsion of elected parent leaders based on whether their speech offends their political adversaries. In the United States, the government cannot investigate and remove people from elective office for sharing publicly available information, disputing transgender ideology, condemning as cowardly an anonymous terrorism advocate, or enacting a resolution calling for a school board to reconsider its policies.

Defendants, who are charged with educating the next generation about the basics of our constitutional system and its protection of fundamental civil rights, require remedial instruction on these points. Plaintiffs, and the public at large, are

entitled to preliminary injunctive relief securing their fundamental First Amendment rights.

STATEMENT OF FACTS

*1.    Regulatory background re: Community Education Council 14*

Community Education Council 14 ("CEC 14"), a school board covering New York City public schools' District 14 (Greenpoint and Williamsburg), is required to "[h]old public meetings at least every month with the superintendent during which the public may speak so that parents and the community have a voice and a public forum to air their concerns." N.Y.S. Education Law § 2590-e(14).

"All [CEC 14] meetings shall be open to the public except where otherwise permitted by law." CEC 14 Bylaws, art. III, § 1. At these meetings, "[t]he public shall have the opportunity to comment on resolutions on the agenda prior to Council vote by signing the Speakers' List," but "[d]iscussion and charges relating to the competence or personal conduct of individuals will be ruled out of order. A speaker who is ruled out of order forfeits the balance of his/her time and will be directed to leave the microphone; the Chair may take appropriate measures to enforce the ruling." *Id.* art. IV, § 2.

*2.    Censorship and Exclusion at CEC 14 Public Meetings*

Defendant CEC 14 encouraged students to walk out of their classes on November 9, 2023, to demonstrate against Israel. CEC 14's official Instagram page, @cecd14, advocated participation in this demonstration, and linked to a "toolkit" which included calls for specific political action. Exh. A. The toolkit, Exh. B at 6, linked to a page of suggested chants, Exh. C, rejecting Zionism and calling for "resistance" to Israel. CEC 14 also suggested that it would pass a resolution calling for "[e]nd of the occupation of Palestine" and "the on-going genocide of the Palestinian people" that other districts could use as a model. *See* Exh. B at 7.

2

People who sought to criticize CEC 14's walkout position at the council's November 15, 2023, virtual public meeting were cut off and expelled, while those expressing pro-walkout and anti-Semitic views were allowed to speak. Alexander Decl., ¶ 4. And speakers praising CEC 14 President Tajh Sutton were not subjected to the time limit for remarks. *Id.* CEC 14 First Vice President Marissa Manzanares, who appeared to have editorial control over attendees' messages in the online meeting's chat section, made explicit CEC 14's demand for "respect" as a condition of attending the meeting, messaging everyone in attendance, "If you are not respecting our space you will be removed." *Id.* ¶ 5. Sutton, Manzanares, and CEC 14 ejected Plaintiff Deborah Alexander, an outspoken opponent of Sutton and of Sutton's political views, from the meeting after she commented in the group chat that Sutton was interrupting a speaker. *Id.* ¶ 6.

At its December 18 meeting, presided over by Manzanares, CEC 14 adopted "Community Guidelines" governing public comment. *Id.* ¶ 7. Among other things, these Guidelines prohibited "name-calling," "disrespect," "antagonistic behavior," "homophobia, transphobia, misogyny, ableism, racism, or any other forms of oppressive beliefs or behaviors" and stated that "[a]nyone who violates this guideline will be removed." Exh. D.

CEC 14 later rewrote these as "Community Commitments," also referred to as "Community Agreements," and restricted admission to its public January 24 meeting to those who affirmed that they "commit to uphold the D14 Community Commitments." Exh. F; Alexander Decl., ¶¶ 8-9. The "Commitments" include commitments to "intersectional solidarity," "create the conditions to minimize harm and address harm when it happens whether verbal, behavioral or physical," "believe those closest to the issues are closest to the solutions," and "distinguish between good faith dialogue and bad faith arguments." Exh. E at 1. CEC 14 also reserves the

3

right, under the Commitments, "to remove participants causing discord, spreading misinformation and/ or affiliated with hate groups." *Id.* CEC 14 displayed its Commitments at the start of the meeting, and Defendant Sutton stressed that "[i]f people are not in alignment with our community agreements, they may not be allowed in this space." Alexander Decl., ¶¶ 12-13.

Defendants twice refused Plaintiff Noah Harlan, who is known to hold political views differing from Sutton's and Manzanares' ideologies, admission to the January meeting. Harlan Decl., ¶¶ 9-13. Likewise, Defendants twice blocked Alexander from the meeting, before she joined it under a pseudonym. Alexander Decl., ¶¶ 10-11.

### 3. CEC 14's Social Media Censorship

CEC 14 maintains a social media account on X (formerly Twitter), @council_14, through which it communicates to the public, and by which it creates a forum for public comment. However, CEC 14's X account is currently locked—meaning, only people approved by CEC 14 can follow the account, read and comment on CEC 14's posts, and share those posts with their own audiences. Harlan Decl., ¶ 13.

CEC 14 has failed to approve Harlan's request to follow its X account, which has been pending for several months. *Id.* ¶ 14. Moreover, CEC 14 has blocked Maron and Alexander from reading and interacting with its X account. Accordingly, Maron and Alexander cannot even request permission to follow CEC 14, let alone read the account, or interact with Defendant CEC 14 and with those who can visit CEC 14's timeline. Alexander Decl., ¶¶ 15-16; Maron Decl., ¶¶ 9-10.

### 4. Regulation D-210

Defendant New York Department of Education ("DOE") enforces Regulation D-210, a "Code of Conduct" governing the speech of CEC members and members of the four Citywide Councils. Exh. G. Regulation D-210 restricts the "verbal . . . acts and behavior" of elected CEC members and Citywide Council on High Schools members,

4

at meetings and during elections, campaigns, and all "other activities," when their speech "creates or would foreseeably create a risk of disruption within the district or school community the Council Member serves and/or interferes" with a council member's duties. *Id.* at 3, Reg. D-210 Definition 3. Council members can be disciplined, suspended, or removed from office, *id.* § III, for, among other things, "speech that serves to harass, intimidate, or threaten," including "frequent verbal abuse and unnecessary aggressive speech," *id.* § II.C; "disrespect towards children," *id.*, § II.D; "derogatory or offensive comments about any DOE student," *id.*; and speech "expos[ing] private or personally identifiable information about a DOE student or a member of such student's family," *id.* § II.E.

The regulation empowers Defendant Equity Compliance Office Nina Mickens to investigate complaints that she believes to allege prohibited conduct. *Id.* § IV.C.2. Following a consultation process with an "Equity Council," *id.* § IV.C.3 & 4, Mickens provides her recommendation to Defendant Chancellor Banks, *id.* § IV.D.1, who then determines the complaint's outcome, *id.* § IV.D.2.

5.      *Plaintiffs targeted under Reg. D-210 for expressing their views*

Mickens has investigated Alexander under Regulation D-210 for stating that one of Alexander's political opponents, Gavin Healy, sent his child to school in District 2. Alexander Decl., ¶¶ 17-21, 24-26. Healy, a resident of District 30, had long criticized supporters of selective public school programs, including Alexander, for allegedly promoting segregations and inequality. *Id.* ¶¶ 22-23, 28. Alexander thought it fair to criticize Healy as a hypocrite, since he sent his child to a District 2 school under a screened admissions program. *Id.* ¶ 27. As an elected member of CEC 2, Healy is required to have a child enrolled in District 2 schools. *Id.* ¶ 29. The DOE and Healy himself have publicly posted the child's school placement on the internet. *Id.* ¶¶ 29, 31.

5

Mickens is also investigating Maron under Regulation D-210 for expressing her views. One investigation relates to Maron's public statements that it is impossible to truly change one's gender and that gender transition is harmful to children. Maron Decl., ¶¶ 11-15. Defendant DOE condemned Maron's views as "despicable" and "not in line with our values," while Defendant Banks declared that Maron's comments are "not acceptable," and stated that he will "take action" against Maron on account of her speech. *Id.* at ¶ 17; *see also* Marianna McMurdock, *In private texts, NY Ed Council Reps, Congressional Candidate Demean LGBTQ Kids*, Dec. 14, 2023, https://perma.cc/QT3F-3R9Q; Michael Elsen Rooney, *As tensions flare in parent councils, NYC sees a surge in misconduct complaints*, Chalkbeat New York, March 13, 2024, https://perma.cc/B7QN-3W39. Another investigation apparently concerns Maron's criticism of an anonymous student newspaper editorialist. Maron Decl., ¶¶ 18-25. Maron called the unknown author a "coward," and declared that "[i]f you are going to repeat revolting Hamas propaganda and transcribe your ignorance and Jew hatred, put your name to it." *Id.* ¶ 23; *see also* Jon Levine and Aneeta Bhole, *NYC's Stuyvesant HS newspaper accuses Israel of "genocide" while whitewashing Hamas' massacre*, New York Post, Feb. 24, 2024, https://perma.cc/RNG7-8QZP.

Maron also fears that Mickens will soon pursue another D-210 investigation against her. CEC 2 approved a resolution Maron sponsored calling on the DOE to review its policies governing the participation of biologically male athletes in female sports. Maron's political opponents have threatened to retaliate against her for endorsing the resolution, which Defendant Banks has already labeled "despicable" and "hateful." Maron Decl., ¶¶ 27-30; Jack Ahern, *Anti-Trans Vote by District 2 Ed Board Draws Fierce Protest*, Our Town, Mar. 26, 2024, https://perma.cc/S82B-CSRN.

6.      *The Continuing Impact of Defendants' Policies on Plaintiffs*

Plaintiffs intend to and would participate in CEC 14's public board meetings, to express their views during the public comment periods on the full range of subjects before that board. They reasonably expect to disagree with Defendants' views on educational policies, curricula, the school budget, school personnel and administration, anti-Semitism, and Israel, among other issues. Plaintiffs also intend to criticize the competence of CEC 14 members, including Defendants Sutton and Manzanares, and of other New York City school officials and employees. Alexander Decl., ¶¶ 32-33; Maron Decl., ¶¶ 31-32; Harlan Decl., ¶¶ 15-16.

However, Plaintiffs are all chilled from speaking at CEC 14 public meetings as they intend. Alexander and Harlan refrain from trying to access CEC 14's public board meetings, because Defendants have expelled them before on account of their views and political associations, real and perceived, and have subsequently barred their entry attempts. Alexander Decl., ¶ 34; Harlan Decl., ¶ 17. Maron has not attempted to access CEC 14's public board meetings because she believes she is barred owing to her views, and her associations with Parent Leaders for Accelerated Curriculum and Education (PLACE) and with Moms for Liberty. Maron Decl., ¶ 33. Plaintiffs also refrain from trying to access CEC 14's public board meetings because they do not wish to subscribe to the "community commitments" as required by the entry form. Alexander Decl., ¶ 35; Maron Decl., ¶ 34; Harlan Decl., ¶ 18. And Plaintiffs reasonably fear that they would be interrupted, censored, subject to discriminatory treatment, and expelled owing to their viewpoints under Defendant CEC 14's "community commitments" and "community guidelines" speech codes, and under Article IV, Section 2 of CEC 14's Bylaws. *Id.*

Plaintiffs also intend to, and would, interact with Defendant CEC 14's X account by responding to CEC 14 posts and the posts of others conducting discussions under

7

CEC 14's timeline, but they are barred from doing so because Defendants limit account access to approved followers, refuse to approve Plaintiff Harlan, and indeed, have gone so far as to block Maron and Alexander. Alexander Decl., ¶ 36; Maron Decl., ¶ 35; Harlan Decl., ¶ 19.

The threat of D-210 complaints being filed against them in retaliation for expressing their political views has chilled Plaintiffs' expression, causing them to alter their public and even private speech. Plaintiffs would speak more, and speak differently than they do now, but for the threat that their words will trigger investigation and removal from office because Defendants and their ideological allies would find them unacceptable. Although Plaintiffs continue to speak regularly about controversial issues, the threats posed by Regulation D-210 weigh on Plaintiffs, and at times impact their choice of words, the viewpoints they would discuss, and the frequency of their speech, including Plaintiffs' introduction of resolutions, debate, and voting on their committees. Alexander Decl., ¶ 38; Maron Decl., ¶ 37; Harlan Decl., ¶¶ 21-23. Mickens is proceeding with her D-210 investigations unabated. Maron Decl., ¶ 26; Exh. H.ummary of Argument

Defendants' rules and behavior are indefensible. Excluding people from public meetings based on their viewpoints and political associations, prohibiting speakers from criticizing government employees and officials, demanding that people refrain from expressing "oppressive beliefs"—none of this is remotely compatible with the First Amendment's protections of free speech, petition, and association, or with the constitutional proscription against vague laws. Exercising unbridled discretion in restricting access to an official social media page is a textbook unconstitutional prior restraint. Nor can the government investigate and punish elected board members for expressing views that Chancellor Banks finds offensive.

Given Plaintiffs' overwhelming case on the merits, it follows that they have established all the elements entitling them to preliminary injunctive relief.

**ARGUMENT**

The standard for issuance of a temporary restraining order and a preliminary injunction are the same. *Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). A plaintiff seeking such relief must show: (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury in the absence of preliminary relief; (3) that the balance of equities favors relief; and (4) that relief is in the public interest. *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021). "When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021).

Accordingly, "in the First Amendment context . . . the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

I.   PLAINTIFFS WILL SUCCEED ON THE MERITS

    A.  The First Amendment forbids Defendants from discriminating against speech on the basis of viewpoint

The government cannot discriminate against speech on the basis of viewpoint. "[A]ny restriction based on the content of the speech must satisfy strict scrutiny," but "restrictions based on viewpoint are prohibited." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (citations omitted). "The government discriminates against viewpoints when it disfavors certain speech because of 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)).

9

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "[D]isfavoring ideas that offend discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) (internal quotation marks omitted). "[I]n the sense relevant here, that is viewpoint discrimination: Giving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017) (Alito, J., concurring). "We have said time and again that the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Id.* at 244 (internal quotation marks omitted). Even "ethnic slurs are used to express a variety of opinions and obtain a variety of effects," so these "potentially offensive words" receive no less protection than other viewpoints. *Wandering Dago*, 879 F.3d at 33. "[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." *Cohen v. California*, 403 U.S. 15, 26 (1971).

> B. Defendants' restrictions on access and speech at CEC 14's meetings and social media spaces unlawfully discriminate against speech and petition based on content and viewpoint.

The First Amendment's prohibition of viewpoint discrimination applies with full force at CEC 14 public meetings and on CEC 14's social media sites. "The level of scrutiny applied to a restriction on speech depends upon the nature of the forum in which the speech occurs." *R.O. v. Ithaca City Sch. Dist.*, 645 F.3d 533, 539 (2d Cir. 2011). "A limited public forum is created when the government opens a non-public forum for public expression but limits expressive activity to certain kinds of speakers or the discussion of particular subjects." *Tyler v. City of Kingston*, 74 F.4th 57, 61 (2d Cir. 2023) (cleaned up).

10

School board meetings at which the public can comment on school operation and governance—such as the meetings of CEC 14 at issue—are paradigmatic examples of limited public fora. *See, e.g.*, *Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 545 (2d Cir. 2002); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 & n.7 (1983). CEC 14's social media accounts, including its X account, @council_14, constitute limited or designated public fora, because Defendants created these accounts in their capacity as elected officeholders to engage with the public and solicit feedback. *See, e.g.*, *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019) (limited public forum), *vacated as moot sub nom. Biden v. Knight First Amdt. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021); *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1179 (9th Cir. 2022) (designated public forum), *vacated on other grounds*, 218 L. Ed. 2d. 138 (2024).

Speech restrictions in a limited public forum must be "reasonable in light of the purpose served by the forum and [] viewpoint neutral." *Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, 127 F.3d 207, 211-12 (2d. Cir. 1997) (citation and quotation marks omitted); *see also Tyler*, 74 F.4th at 61 (similar). "[I]n a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Hotel Emples.*, 311 F.3d at 545-46 (citation and quotation marks omitted). Government entities "may not censor, retaliate, or otherwise chill" speech in a limited forum based on "the viewpoints expressed." *Husain v. Springer*, 494 F.3d 108, 124, 128 n.14 (2d Cir. 2007). And even were CEC 14's meetings deemed nonpublic, viewpoint discrimination in accessing nonpublic fora is also forbidden. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885-86 (2018).

11

The restrictions at CEC 14's public meetings and social media spaces implicate not only the Free Speech Clause, but also the right to petition the government—the right of "citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). The freedoms to speak and petition are "cognate rights" which usually employing the same analysis, although there may be cases "where the special concerns of the Petition Clause would provide a sound basis for a distinct analysis" that extends "further than the right to speak." *Id.* at 388-89.

Sutton, Manzanares, and CEC 14 believe that they can treat public school board meetings and official social media accounts like their private political clubs. They block and refuse to approve Plaintiffs' access to CEC 14's X page, Alexander Decl., ¶ 15; Harlan Decl., ¶ 14; Maron Decl., ¶ 35, and they have expelled or excluded numerous speakers, including Plaintiffs, based on viewpoint and association, Alexander Decl., ¶¶ 10-11; Harlan Decl., ¶¶ 9-13. At CEC 14's November meeting, for instance, parents were silenced and kicked out for expressing pro-Israel sentiments and opposing anti-Semitism. Alexander Dec., ¶¶ 4-6. In contrast, speakers who championed Sutton and the Palestinian cause were allowed to speak and even to continue speaking past their time limit. *Id.*

Not content to simply act on their political biases, CEC 14 and its defendant officers have since codified their discriminatory practices. Defendants now *explicitly* discriminate based on viewpoint, in great and extensive detail, in deciding who to admit to or expel from public meetings, and what they are allowed or forbidden to say when there.

Anyone who wishes to attend these meetings must "commit to uphold the D14 Community Commitments," Exh. F, which acknowledge that CEC 14 "reserve[s] the right to remove participants causing discord, spreading misinformation and/ or

affiliated with hate groups." Exh. E. Plaintiffs, that is, must accept a limitation on their First Amendment rights as a condition for exercising those rights at all. *Cf. Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013).

Because CEC 14's public meetings exist "so that parents and the community have a voice and a public forum to air their concerns," N.Y.S. Education Law § 2590-e(14), Defendants may not bar speakers from airing concerns about the "competence or personal conduct of individuals." CEC 14 Bylaws, art. IV, § 2.

> Debate over public issues, including the qualifications and performance of public officials (such as a school superintendent), lies at the heart of the First Amendment. Central to these principles is the ability to question and challenge the fitness of the administrative leader of a school district, especially in a forum created specifically to foster discussion about a community's school system.

*Leventhal v. Vista Unified Sch. Dist.*, 973 F. Supp. 951, 958 (S.D. Cal. 1997) (internal quotation marks and citations omitted); *see also Bach v. Sch. Bd. of Va. Beach*, 139 F. Supp. 2d 738, 743 (E.D. Va. 2001) (similar).

Even were this rule construed as content-based, forbidding all viewpoints with respect to people, it is nonetheless viewpoint based in practice. Defendants allow speakers to, for instance, praise Sutton's leadership or her pro-Palestinian activism, while silencing Sutton's speakers. *See, e.g.*, Alexander Decl., ¶¶ 4-6. "By mandating positivity," the Bylaws "silence dissent and distort the marketplace of ideas." *Matal*, 582 U.S. at 249 (Kennedy J., concurring in part).

Likewise, there can be no clearer example of viewpoint discrimination than the various prohibitions and restrictions Defendants impose at CEC 14's public meetings. Prohibitions of "name-calling," "disrespect[ing] the community," "antagonistic behavior," "homophobia, transphobia, misogyny, ableism, racism, or any other forms of oppressive beliefs or behaviors," Exh. D, are obviously unconstitutional viewpoint discrimination, as are the enforced commitments to

13

"intersectional solidarity," to "create the conditions to minimize . . . verbal . . . harm," to "believe" that some people "are closest to the solutions," and "to distinguish between good faith dialogue and bad faith arguments." Exh. E. The First Amendment simply does not tolerate "commitments" granting Defendants the power to exclude or expel anyone they believed to be "causing discord, spreading misinformation," or "affiliat[ing] with hate groups." *Id.* These prohibitions do not serve to confine the forum to the limited purposes for which it was created, but rather, to suppress ideologies and opinions which Defendants dislike.

Courts routinely enjoin such measures. The Sixth Circuit facially invalidated a school board's prohibition of so-called "antagonistic," "abusive" and "personally directed" speech "because it opposes, or offends, the Board or members of the public, in violation of the First Amendment." *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 895 (6th Cir. 2021). Relying on *Ison*, the Eastern District of Pennsylvania preliminarily enjoined a school board's similar policy as a form of impermissible viewpoint discrimination. *Marshall v. Amuso*, 571 F. Supp. 3d 412, 422-23 (E.D. Pa. 2021); *see also Mama Bears of Forsyth Cty. v. McCall*, 642 F. Supp. 3d 1338, 1349-51 (N.D. Ga. 2022) (unconstitutional for school board to require "respectful" speech); *Anderson v. Hansen*, 489 F. Supp. 3d 836, 842 (E.D. Wis. 2020) ("[B]asic First Amendment principles prevent the District from subjecting the plaintiff to adverse action for no other reason than it considered her speech at the board meeting intolerant, offensive, or hateful."). This case is no different.

C. Defendants violate the First Amendment freedoms of assembly and association by barring members of so-called "hate groups" from public meetings.

"The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937). Moreover, courts have long "'recognized a right to associate for the purpose

14

of engaging in those activities protected by the First Amendment' because '[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed.'" *Slattery v. Hochul*, 61 F.4th 278, 286 (2d Cir. 2023) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 622 (1984)). American citizens possess a "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622.

The government cannot punish people for "mere participation in a peaceable assembly." *De Jonge*, 299 U.S. at 365. Indeed, as a general mater, the government may not "chill the assertion of constitutional rights by penalizing those who choose to exercise them." *United States v. Jackson*, 390 U.S. 570, 581 (1968). Yet that is exactly what Defendants do by "reserv[ing] the right to remove participants . . . affiliated with hate groups" from CEC 14 meetings. Exh. E. Under Defendants' rule, Plaintiffs may exercise their rights to assemble at, speak, and petition at school board meetings, or they may join "hate groups," but not both; even assembling at the school board meeting to protest silently is prohibited. The violation is plain.

Defendants' "hate group" restriction also flunks the general "three-part inquiry for evaluating expressive association claims:" "whether [the plaintiff] engaged in expressive association," "whether the state action at issue significantly affected the group's ability to advocate its viewpoints," and whether "the state's interest implicated in its action [weighed] against the burden imposed on the associational expression" satisfies "strict scrutiny." *Slattery*, 61 F.4th at 287. First, advocacy groups such as PLACE or Moms for Liberty, to which Plaintiffs belong or are suspected of belonging, are unquestionably expressive political associations. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Second, Defendants appear to have

these groups specifically in mind when condemning "hate" groups. Alexander Decl., ¶ 14; Maron Decl., ¶ 7; Harlan Decl., ¶ 17. Excluding anyone suspected of belonging to PLACE and Moms for Liberty from school board meetings severely impacts these groups' abilities to advocate for their views. And Defendants have no interest, let alone a compelling one, in imposing this restriction.

###### D. Defendants' practice of locking CEC 14's official X account is an unconstitutional prior restraint.

Because locking CEC 14's official X account "condition[s] the exercise of expressive activity on official permission, [it] constitute[s] a 'prior restraint' on speech." *Beal v. Stern*, 184 F.3d 117, 124 (2d Cir. 1999). "The essence of prior restraints are that they give public officials the power to deny use of a forum in advance of actual expression." *Id.* (citation and internal quotation marks omitted).

"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Id.* (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)). "[T]here is a heavy presumption against the constitutional validity of any imposition of a prior restraint." *United States v. Farooq*, 58 F.4th 687, 696 (2d Cir. 2023) (internal quotation marks and brackets omitted). While government may impose content-neutral time, place, or manner restrictions, such laws cannot "delegate overly broad licensing discretion to government officials." *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 493 (2d Cir. 2007) (internal quotation marks omitted). "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Id.* (citation and quotation omitted).

16

Moreover, prior restraints must include "three safeguards to ensure expeditious decisionmaking." *MacDonald v. Safir*, 206 F.3d 183, 194 (2d Cir. 2000) (internal quotation marks omitted).

> (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

*Id.* (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990)).

Defendants' practice of screening access to CEC 14's X account, a public forum, is an unconstitutional prior restraint. Their decisions to admit or deny access to the forum is left entirely to their wholly arbitrary, unbridled discretion, and as Harlan's case demonstrates, Defendants' practices are entirely bereft of procedural safeguards to ensure expeditious, reviewable decisionmaking. Defendants must be ordered to unlock their X account.

      E.  Regulation D-210 discriminates against speech based on viewpoint.

Regulation D-210 facially discriminates on the basis of content and viewpoint. It explicitly targets speech—"verbal . . . acts and behavior, including a Council Member's use of oral and written language"—not in any particular forum, but just about anywhere: at all "events hosted" by the CEC, during "elections and campaigns," at "public appearances . . . a Council Member attends in their official capacity," and at all "other activities." Reg. D-210, Definition 3. Targeted speech need not cause any prohibited action; Defendants regulate speech that "does not rise to the level of a violation of federal, state or local discrimination laws." *Id.* § I.A.

But the First Amendment "bars state officials from stripping elected representatives of their office based on the political views of such representatives." *Velez v. Levy*, 401 F.3d 75, 98 (2d Cir. 2005). And Regulation D-210's speech prohibitions fare no better under the First Amendment than did bans on

"antagonistic," "abusive," or "uncivil" speech and the like in *Ison*, *Marshall,* or *Mama Bears.* The First Amendment protects "verbal abuse," even if one's political opponents think it too "frequent," *id.* § II.C, and it protects "aggressive speech," whatever that means, even if one's political opponents (predictably) view it as "unnecessary," *id.*; *see, e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992). The First Amendment also protects "[d]isrespect towards children," including "derogatory or offensive comments about" students. Reg. D-210, § II.D. "Government's disapproval of a subset of messages it finds offensive" is "the essence of viewpoint discrimination." *Matal*, 582 U.S. at 249 (Kennedy J., concurring in part). Likewise, the First Amendment protects the sharing of "private or personally identifiable information about a DOE student or a member of such student's family." Reg. D-210, § II.E.

Because Regulation D-210 is facially unconstitutional, it follows that its applications are unconstitutional. If Defendants cannot punish *students* for vulgar speech about school and each other, *see Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021), surely they cannot punish elected adult school board members for disagreeing with unspecified students, in the abstract, about gender ideology, or criticizing an unknown student for anonymously authoring an opinion piece.

      F.   CEC 14's Bylaws, Community Guidelines, Community Commitments, and Regulation D-210, are all unduly vague.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A regulation can be "impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S.

703, 732 (2000) (citation omitted). "Where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (cleaned up).

Void-for-vagueness doctrine "guards against arbitrary or discriminatory law enforcement and guarantees that ordinary people have fair notice of the conduct a statute proscribes." *Slattery*, 61 F.4th at 294 (internal quotation omitted). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253-54 (2012). "It is self-evident that an indeterminate prohibition carries with it the opportunity for abuse, especially where it has received a virtually open-ended interpretation," so official discretion "must be guided by objective, workable standards." *Minn. Voters All.*, 138 S. Ct. at 1891 (cleaned up). As a result, vagueness doctrine receives its "sternest application" when a law "threatens to inhibit the exercise of constitutionally protected rights, particularly those protected by the First Amendment." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 396 (2d Cir. 2004) (internal quotation marks omitted).

Defendants' policies provide no objective, workable standard for evaluating what speech is permitted. Rather, CEC 14's prohibitions of "homophobia, transphobia, misogyny, ableism, racism, or any other forms of oppressive beliefs," "name-calling of community members," "disrespect[ing] the community," "verbal harm," "bad faith arguments," "discord," and "misinformation," Exh. D; Exh. E, are each unduly vague and inherently subjective. These phrases serve only to authorize Defendants' arbitrary censorship of disfavored speech. Is any speech that causes a listener to feel disrespected or fearful proscribed? Sutton and her allies exploit the

indeterminate nature of these policies to exclude and expel anyone suspected of political beliefs and associations that they dislike.

Similarly, D-210 forbids subjective categories such as "speech that serves to harass, intimidate, or threaten," including "frequent verbal abuse and unnecessary aggressive speech," Reg. D-210, § II.C, "disrespect," *id.* § II.D, and "derogatory or offensive comments," *id.* And just about any speech about another human being arguably relates to "private" matter or can "personally identif[y]" that person. *Id.* § II.E. Indeed, Defendant Mickens investigated Alexander merely for referring to the fact that a CEC 2 member has a child in a District 2 school—a basic legal requirement of holding office. Alexander could not have had notice that D-210 forbids such speech, considering its unremarkable nature and the fact the relevant officeholder and Defendant DOE both freely discussed this fact.

### G. CEC 14's Bylaws, Community Guidelines, Community Commitments, and Regulation D-210 are all overbroad.

Speech regulations may not "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964). A restriction may impermissibly "chill protected speech" if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Adams v. Zelotes*, 606 F.3d 34, 37-38 (2d Cir. 2010) (citations and quotation marks omitted). "Even legitimate governmental efforts to regulate speech may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Scott v. Meyers*, 191 F.3d 82, 87-88 (2d Cir. 1999) (cleaned up). Prohibiting "words offensive to some who hear them [] sweeps too broadly." *Gooding v. Wilson*, 405 U.S. 518, 527 (1972).

Defendants' policies are overbroad. They do not merely forbid well-established categories of unprotected speech, such as fighting words, obscenity, or true threats.

20

Instead, Defendants ban boundless categories such as "causing discord," Exh. E, "verbal" "harm," *id.*, and "frequent verbal abuse and unnecessary aggressive speech," Reg. D-210, § II.C. There are no "objective, workable standards," and an official's "own politics may shape his views on what counts." *Minn. Voters All.*, 138 S. Ct. at 1881. Vacuous terms with such "uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked" and thus chill speech. *Grayned*, 408 U.S. at 109 (cleaned up).

These policies are overbroad and sweep in vast amounts of protected expression. By implementing and enforcing these polices, and by investigating and acting upon D-210 complaints lodged against Plaintiffs on the basis of their viewpoints, Defendants deprive Plaintiffs of constitutional freedoms.

## II.   DEFENDANTS IRREPARABLY DAMAGE PLAINTIFFS BY SUPPRESSING THEIR FIRST AMENDMENT RIGHTS

Unless this Court grants injunctive relief, Defendants will continue to chill Plaintiffs from speaking, petitioning, and associating freely. Indeed, further harm to Alexander and Maron may be imminent. Mickens is investigating them both, and has just told Maron, even after this lawsuit was filed, that she will proceed with the charges. Maron Decl., ¶ 26; Exh. H. Again, Defendant DOE condemned Maron's views as "despicable" and "not in line with our values," while Defendant Banks declared that Maron's comments are "not acceptable," and stated that he will "take action" against Maron on account of her speech. Maron Decl., at ¶ 17.

There is no need to wait for that "action." "It is well established that the 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Kamerling v. Massanari*, 295 F.3d 206, 214-15 (2d Cir. 2002) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Kane*, 19 F.4th

at 171 ("those who are unable to exercise their First Amendment rights are irreparably injured *per se*"). Injunctive relief is required to address this injury now.

III.   PROTECTING FIRST AMENDMENT RIGHTS IS ALWAYS IN THE PUBLIC INTEREST, SO THE BALANCE OF EQUITIES HEAVILY FAVORS PLAINTIFFS

"In a suit against the government, balancing of the equities merges into [] consideration of the public interest." *Sam Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021). "Securing First Amendment rights is in the public interest" because "the government does not have an interest in the enforcement of an unconstitutional law. *N.Y. Progress*, 733 F.3d at 488 (cleaned up). Moreover, "the core value protected by the Free Speech Clause of the First Amendment is the public interest in having free and unhindered debate on matters of public importance," such as the management of local schools. *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (cleaned up). Denying injunctive relief would leave Defendants free to violate the First Amendment rights of Plaintiffs and the public by continuing to enforce their unconstitutional policies. In contrast, without these policies, Defendants can still conduct CEC 14 meetings and perform all the administrative duties of a school board and education department. Defendants suffer no legitimate harm from having their unconstitutional policies and practices enjoined.

IV.   THIS COURT SHOULD WAIVE THE RULE 65(C) SECURITY REQUIREMENT

The Court should not require Plaintiffs to post a bond. "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm" if the court "make[s] this determination before it enter[s] the preliminary injunction." *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (citations omitted); *see also Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 143 (2d Cir. 2023). Here, Plaintiffs have a high probably of success. Moreover, Defendants will

not suffer monetary damages or any harm by being commanded to respect Plaintiffs' First Amendment rights. *See Spencer v. Nigrelli*, 648 F. Supp. 3d 451, 470 (W.D.N.Y. 2022) (dispensing with bond requirement due to the First Amendment interests in case). This Court should therefore impose no bond requirement.

## CONCLUSION

This Court should grant Plaintiffs' motion for a temporary restraining order and preliminary injunction.

Dated: April 15, 2024                    Respectfully submitted,

*/s/ Dennis J. Saffran*                  /s/ *Alan Gura*
Dennis J. Saffran                        Alan Gura*
New York Bar No. 1724376                 D.C. Bar No. 453,449
LAW OFFICE OF DENNIS J. SAFFRAN          Nathan J. Ristuccia*†
38-18 West Dr.                           Virginia Bar No. 98372
Douglaston, NY 11363                     INSTITUTE FOR FREE SPEECH
Tel: (718) 428-7156                      1150 Connecticut Ave., NW
djsaffran@gmail.com                      Suite 801
                                         Washington, D.C. 20036
                                         Tel: (202) 301-3300
                                         Fax: (202) 301-3399
                                         agura@ifs.org
                                         nristuccia@ifs.org

                                         *Pro hac vice*

                                         † Not a D.C. bar member. Practice
                                         in D.C. authorized by D.C. Ct. App.
                                         R. 49(c)(3).

                                         *Counsel for Plaintiffs*