UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
DEBORAH ALEXANDER, et al.,                      :
                                                :
        Plaintiffs,                             :
                                                :
        v.                                      :
                                                :
TAJH SUTTON, et al.,                            :
                                                :
        Defendants.                             :
------------------------------------------------------------------------X

### DECLARATION OF DEBORAH ALEXANDER

I, Deborah Alexander, declare and state as follows:

1. I live in New York City, and have a child enrolled in the New York City public schools.

2. I served as an elected member of New York City Community Education Council 30 ("CEC 30") during from 2013 until February 15, 2024. I resigned this position because New York City's Citywide Council on High Schools ("CCHS") elected me to fill a vacancy on that board, which I joined on February 20, 2024. I continue to serve in that position today.

3. I am also a member and the Secretary of Parent Leaders for Accelerated Curriculum and Education NYC ("PLACE"), a group that advocates for improving the academic rigor and standards of K-12 public school curricula.

4. Community Education Council 14 ("CEC 14") endorsed a November 9, 2023, student walkout to protest against Israel. Like many other parents, I attended CEC 14's November 15, 2023 public meeting, held online, to voice my

opposition to that walkout and to its endorsement by CEC 14. But CEC 14 cut off and expelled attendees who shared those views, while allowing speakers expressing pro-walkout and anti-Semitic views to express themselves. Speakers praising CEC 14 President Tajh Sutton were not subjected to the time limit for remarks.

5.  CEC 14 First Vice President Marissa Manzanares, who appeared to have editorial control over attendees' messages in the online meeting's chat section, made explicit CEC 14's demand for "respect" as a condition of attending the meeting, messaging everyone in attendance. At one point, she texted everyone, "If you are not respecting our space you will be removed." Below is a screenshot of Defendant Manzanares's message:



Marissa Manzanares to Everyone   7:00 PM

If you are not respecting our space you will be removed.

6.  I was ejected from the meeting after I commented in the group chat that Sutton was interrupting a speaker. Over my years of service on CEC 30 and activism on school policy, I have been an outspoken opponent of Sutton and of Sutton's political views.

7.  Exhibit D is a true and correct copy of CEC 14's minutes for its December 2023 public meeting, as it appears on CEC 14's official website. I understand from reading this document that for CEC 14's December 18, 2023, public meeting, presided over by Marissa Manzanares in Tajh Sutton's absence, CEC 14 adopted "Community Guidelines" containing the

following "Absolute No's" to govern public comment, which appear in the meeting's minutes:

> This is not a space where we will tolerate antagonistic behavior or any of the following: homophobia, transphobia, misogyny, ableism, racism, or any other forms of oppressive beliefs or behaviors. Anyone who violates this guideline will be removed.
>
> There will be no name-calling of any community members in this space. If you violate this, you will be removed.
>
> If you continually disrespect the community, you will be given 2 warnings before being removed.

8. Exhibit E is a true and correct copy of CEC 14's minutes for its January 2024 public meeting, as it appears on CEC 14's official website. I understand from reading this document that CEC 14 rewrote its rules as "Community Commitments," which read:

> We are committed to intersectional solidarity.
>
> We actively listen with the intent to understand, rather than respond.
>
> We call each other in, and out when appropriate. We are all capable of harm and the degree of harm experienced dictates the tactic used.
>
> Conflict is inevitable, and survivable, within community.
>
> We embrace discomfort. We work to distinguish discomfort from harm. We work to create brave spaces in the hopes they are as safe as possible. We create the conditions to minimize harm and address harm when it happens whether verbal, behavioral or physical.
>
> We watch our jargon and welcome teachable moments.
>
> We believe those closest to the issues are closest to the solutions.

> We distinguish between good faith dialogue and bad faith arguments.
>
> We reserve the right to remove participants causing discord, spreading misinformation and/ or affiliated with hate groups. The DOE may not utilize this practice or standard, but we do.

9. I registered to attend CEC 14's January 24, 2024 public meeting. Admission to that public meeting required people to fill out a form, requiring them to affirm that "By registering I commit to uphold the D14 Community Commitments. These will be announced at the start of every meeting." A true and correct copy of the registration form is attached hereto as Exhibit F.

10. Although I filled out the form as required, my registration was canceled and I was barred from the meeting. Below is a screenshot of the message I received canceling my registration:



11. I re-registered for the meeting, and made it into the waiting room, but was then removed and barred from the meeting. I then re-registered again under a pseudonym, and was admitted to the meeting, though I did not speak. I believe that I was singled out for exclusion from the meeting because Sutton, Manzaners, and CEC 14 disagree with my political views, and because of my involvement with PLACE.

12. I did see a graphic shared with meeting attendees, attached below, referencing the "Community Commitments" as "Community Agreements." Below is that graphic:

**COMMUNITY AGREEMENTS**
- We are committed to intersectional solidarity.
- We actively listen with the intent to understand, rather than respond.
- We call each other in, and out when appropriate. We are all capable of harm and the degree of harm experienced dictates the tactic used.
- Conflict is inevitable, and survivable, within community.
- We embrace discomfort. We work to distinguish discomfort from harm. We work to create brave spaces in the hopes they are as safe as possible. We create the conditions to minimize harm and address harm when it happens whether verbal, behavioral or physical.
- We watch our jargon and welcome teachable moments.
- We believe those closest to the issues are closest to the solutions.
- We distinguish between good faith dialogue and bad faith arguments.
- We reserve the right to remove participants causing discord, spreading misinformation and/ or affiliated with hate groups. The DOE may not have these standards but we do.

13. At the meeting's outset, Tajh Sutton declared, "If people are not in alignment with our community agreements, they may not be allowed in this space."

14. I believe that the "hate groups" referenced in the "community commitments" or "agreements" apparently include PLACE. Tajh Sutton is an ardent foe of PLACE, and has criticized our group repeatedly. I understand that a

5

resolution introduced at the January meeting accuses PLACE of having a "segregationist agenda."

15.  I am blocked from reading and interacting with CEC 14's X account, @council_14. Below is a screenshot of what I see when trying to access CEC 14's X account:



16.  Because I am blocked, I cannot even request permission to follow CEC 14, let alone read the account, or interact with CEC 14 and with those who can visit CEC 14's timeline.

17.  On November 6, 2023, Nina Mickens emailed me "because you have been identified as a subject of a complaint. As such I need to interview you to gather further information."

18.  I responded the same day, "Please let me know what the complaint is and who the complainant is," so that I could "come fully prepared to the interview, and as due process requires."

19. To this, Mickens replied the same day, "The investigative process is confidential so I can not share who filed the complaint. However, I will share the details of the complaint when you are interviewed. At that time, you can feel free to share any information you may feel will be helpful on your behalf."

20. I met Mickens via Zoom on December 8, 2023, for the purpose of being interviewed as part of Mickens' investigation into the D-210 complaint filed against me. Contrary to her email, Mickens did not provide me a copy of the complaint against me, did not tell me the nature of the charges, and did not reveal the name of the complainant.

21. From Mickens' questioning, however, I could infer that Gavin Healy, a member of CEC 2 who had long been critical of PLACE, of me, and of my political views, had probably filed the D-210 complaint. And I can infer that the D-210 complaint alleged that I had "doxed" Healy's child by revealing that the child attended a school in District 2.

22. Healy had joined a private Facebook group that I started and moderated, as a parent, to discuss issues relating to District 30 schools. Within that group, Healy argued against the DOE's use of admissions screening criteria to access Gifted and Talented programs, claiming that such programs promote segregation, injustice, and inequity. Indeed, Healy has argued in public that parents who want to enroll their children in screened programs do so because they want segregation "to wall off their kids from other kids." Nolan Hicks, *Four wealthy Manhattan*

7

*middle schools restore admissions screening*, New York Post, Oct. 6, 2023, https://perma.cc/399Z-5SF5.

23. An X user had lauded and linked to an editorial written by Healy and appearing on the City Limits website, entitled, "Screened Admissions Policies Only Worsen Segregation in NYC Schools." https://perma.cc/TD2A-3FSN. Healy's editorial had criticized the use of screening by District 2 schools, which he claimed "resulted in schools that were richer and whiter than the already rich, white district around them." Healy repeated his allegation that parents who choose screened programs do so because they desire segregation:

> It's easy to pretend to be colorblind when your head is buried in the sand. It's easy to say you know what the community wants when your "community" is meticulously curated. And it's easy for some parents to hide behind a desire for "acceleration" when what they want is control over which kids get to go to school with theirs.

24. I replied to this X post on November 4, writing:

> For all his judgment of D2 Mr. Healy sent his child OUT of his diverse D30 school to a screened G&T program IN District 2, with priority to the whiter, wealthier D2 middle schools. I wonder when Mr. Healy decided screening was bad. The day after his child got into a D2 school?

Below is a screenshot of this X post:



8

25. Mickens confronted me with this post, along with Regulation D-210's prohibition on revealing private information about students. Exhibit G is a true and correct copy of the New York City Department of Education's Regulation D-210, as available on the Department's website.

26. She interrogated me about my affiliation with PLACE, and about my use of social media. Mickens questioned why I wrote my post about Healy, and whether a third party, upon reading Alexander's post, might discern where Healy's child attends school. Mickens also inquired into my "liking" of a post by another PLACE member, Yiatin Chu, that had linked to a DOE website noting which school Healy's child attends.

27. As I have been on the receiving end of Healy's vituperative criticism, I believe it is fair for me to point out Healy's apparent hypocrisy in criticizing Gifted and Talented screening as inequitable and unjust, and accusing parents who choose screened Gifted and Talented programs as segregationists, when he himself appears to have chosen such a program for his child.

28. That Healy resides within the boundaries of District 30 is no secret. Indeed, the *Queens Chronicle* described him as a "Jackson Heights father" as recently as February 6, 2023.

29. Nor was it confidential information that Healy's child attended a District 2 school at the time of my post. Healy could not have been elected to CEC 2 if he did not have a child enrolled in a District 2 school. The DOE disclosed Healy's child's school during his candidacy. And on June 16, 2023, months before my post,

9

Defendant DOE disclosed that Healy's child attends P.S./I.S. 217, school code 02M217, when it announced that Healy had won his election to CEC 2. Below is a screenshot of that announcement:



30. Since about the filing of the D-210 complaint against me, the DOE's election results web page has been "under construction."

31. As a District 30 resident, Healy could only send his child to that school's Gifted and Talented program, as the school is otherwise zoned for D2 residents. Indeed, Healy publicly declared, "My child has been a student at PS/IS 217 since the 1st grade" when he successfully ran for a position on that school's School Leadership Team. Below is a screenshot of Healy's candidate statement:

10

> **Candidates for SLT Parent Member**
>
> **GAVIN HEALY**
>
> My child has been a student at PS/IS 217 since the 1st grade and is now in 3rd grade (remote). I wish to serve on the SLT to work for its increased transparency and responsiveness to parents. Specifically, as an SLT member, I would:
> - work to ensure that the SLT foregrounds equity
> - work to ensure a trauma-informed and culturally-responsive curriculum
> - support students and families in the IEP process – this should be a cooperative process rather than an adversarial one
> - insist that the SLT conduct all its meetings in compliance with the Chancellor's Regulations and New York State Open Meetings Law – all members of the school community must be given prior notice of the meetings so that they can attend
> - provide updates to the school community of proceedings at the SLT meetings in an inclusive and transparent manner
>
> Thank you,
> Gavin Healy

32. I intend to and would participate in CEC 14's public board meetings, to express my views during the public comment periods on the full range of subjects before that board, whether Sutton, Manzanares, or anyone else agrees with them or not. I reasonably expect to disagree with the Defendants' views on educational policies, curricula, the school budget, school personnel and administration, anti-Semitism, and Israel.

33. I also intend to criticize the competence of CEC 14 members, including Sutton and Manzanares, and of other New York City school officials and employees. For example, I would criticize Defendants for their treatment of public speakers, for conducting meetings virtually instead of in-person, and for their blocking members of the public from accessing CEC 14's social media presence. I would also criticize Defendants for violating the law by not holding meetings on various months, for not keeping or publishing minutes of the July 2023 meeting at which they presumably passed the CEC 14 budget, and for using CEC 14 resources to promote their personal politics.

34. However, I am chilled from speaking at CEC 14 public meetings as I intend. I refrain from trying to access CEC 14's public board meetings, because Defendants have expelled me before on account of my views and have subsequently barred my entry attempts. I also suspect that Defendants have barred me on account of my association with PLACE, since they declare that they won't allow people "affiliated with hate groups" to attend, and a CEC 14 resolution alleges that PLACE is "segregationist."

35. I also refrain from trying to access CEC 14's public board meetings because I do not wish to subscribe to the "community commitments" as required by the entry form. And I reasonably fear that I would be interrupted, censored, subject to discriminatory treatment, and expelled owing to my viewpoints under CEC 14's "community commitments" and "community guidelines" speech codes, and under Article IV, Section 2 of CEC 14's bylaws, which prohibits me from criticizing people.

36. I also intend to, and would, interact with CEC 14's X account by responding to CEC 14 posts and the posts of others conducting discussions under CEC 14's timeline, but I am barred from doing so because Defendants limit account access to approved followers, and have blocked me from the account.

37. I am acutely aware of the proliferation of D-210 complaints—reportedly, over 36 such complaints have been filed this school year already, compared to five filed last year. *See* Rooney, *supra*, https://perma.cc/B7QN-3W39.

38. The threat of D-210 complaints being filed against me in retaliation for expressing my political views has chilled my expression, causing me to alter my

12

public and even private speech. I would speak more, and speak differently than I do now, but for the threat that my words will trigger investigation and removal from office because Defendants and their ideological allies would find them unacceptable. Although I continue to speak regularly about controversial issues, the threats posed by Regulation D-210 weigh on me, and at times impact my choice of words, the viewpoints I would discuss, and the frequency of my speech, including my introduction of resolutions, debate, and voting on the Citywide Committee on High Schools.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 24, 2024.

_____
Deborah Alexander