UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
DEBORAH ALEXANDER, et al.,        : Case No. 1:24-cv-2224-DG-JRC
                                :
           Plaintiffs,         :
                                :
           v.             :
                                :
TAJH SUTTON, et al.,            :
                                :
           Defendants.      :
------------------------------------------------------------------X

DECLARATION OF MAUD MARON

I, Maud Maron, declare and state as follows:

1.      On June 14, 2024, at 4:16 pm, I received an email from the Department of Education, New York City Schools' Office of Family and Community Engagement, containing a PDF document of the "final determination letter" in one of the D-210 proceedings against me.

2.      Attached as Exhibit J is a true and correct copy of the "final determination letter."

3.      This letter, signed by Chancellor Banks, states that I am removed from my elected position as a Member of Community Education Council 2 through June 30, 2025.

4.      Chancellor Banks removed me from my elected office because my political speech—a comment that I gave to the *New York Post* criticizing an editorial—was deemed to violate Regulation D-210.

5.      Chancellor Banks focused on the fact that in commenting on an anonymous editorial published in Stuyvesant High School's paper, *The Spectator*, I stated, "The byline should read coward instead of anonymous. If you are going to repeat revolting Hamas propaganda and transcribe your ignorance and Jew hatred, put your name to it."

6.      As Chancellor Banks put it, I "chose to publish an unnecessarily aggressive, derogatory, and offensive comment about a student in an inflammatory *Post* article about the piece."

7.      I still don't know how Chancellor Banks determines whether political speech is "aggressive, derogatory, [or] offensive," which is a purely subjective judgment, let alone whether speech is "unnecessarily" so.

8.      I don't view the *Post* article as "inflammatory," another subjective judgment, nor did I write, review, edit, or in any way control the *Post* article, beyond speaking to the reporter.

9.      Chancellor Banks distinguished his criticism of anti-Semitism, including specifically the anti-Semitic slogan promoted by CEC 14 ("from the river to the sea, Palestine will be free"), from my comment, because his position

> that we will not tolerate antisemitism or any other form of hate or bigotry in our schools is wholly distinguishable from calling a student a coward or ignorant, or ascribing 'Jew hatred' to that student. In other words, naming and standing against antisemitism is absolutely not the same as engaging in a character attack on an individual student.

10.     I fully stand by my comment to the *Post*. And I was elected to my office precisely because the voters in CEC 2 are aware of my political views. Chancellor

Banks may not agree with my viewpoints, but my voters tend to do so, and I won my election in a fair and open democratic process.

11.     I still do not know who wrote the anonymous editorial.

12.     I did not even know whether the editorial's author was a student when I spoke. Until the *Spectator* later clarified that a student had written the editorial, there was no publicly available information as to whether or not a student had in fact written it. Stuyesant parents had speculated that the piece was published anonymously because a teacher had written it, as students had published pieces about Israel and Hamas under their own names in the months prior.

13.     But student or not, the person who wrote that editorial is indeed an ignorant coward, full of "Jew hatred," and the First Amendment protects my right to say that publicly, including in comments for publication by the *New York Post*.

14.     I am an elected member of Stuyvesant High School's School Leadership Team (SLT). For years, I have directly interacted with many students, including Stuyvesant students who strongly disagree with my views, and I have always addressed them with extreme respectfulness. In fact, almost immediately after my comment to the *Post*, two students came to an SLT meeting and accused me of a great deal of wrongthink, including transphobia. I addressed them at the end of the meeting. Stuyvesant's principal emailed me shortly after the meeting to say, "Thank you for your comment at the end of the meeting. I appreciate the grace you demonstrated in listening to the comments that were made tonight as uncomfortable as it might have been."

15.     I could not have possibly "intimidated" an anonymous person who is not known to me or to the public by criticizing that person, or by criticizing that person's speech.

16.     Chancellor Banks held me responsible for speaking about "an issue that is highly politically charged, in a climate in which harassment and targeting of those who express unpopular opinions is common." I am not responsible for the climate, but I do have a First Amendment right to speak about "an issue that is highly politically charged."

17.     I could not have subjected the anonymous editorialist to any harassment or targeting, because I have never even speculated about the person's identity, which remains a mystery to me. But I have indeed suffered a good deal of harassment and targeting for my opinions, which are not universally popular. The D-210 complaints against me, and Chancellor Banks's removal of me from my elected position, are examples of that.

18.     The very fact that I spoke to the *New York Post* – which Chancellor Banks deems "a tabloid publication whose articles often provoke extreme reactions" – contributed to his decision to remove me from office. But every newspaper in New York City publishes articles that "often provoke extreme reactions," and I have as much of a First Amendment right to speak to the *New York Post* as I do to speak to the *New York Times*, the *Daily News*, or any other publication.

19.     The notion that I "had other avenues" such as the SLT, to address my concerns, is laughable and false. The *Post* reaches one of the widest audiences in

New York City; the SLT meets in a conference room and is not recorded. Additionally, several Jewish parents and pro-Israel parents had been meeting with Stuyvesant Principal Yu for months quietly to implore him to take a stronger stand against antisemitism at Stuyvesant, to no avail. I have as much right to speak publicly, through a newspaper, as I do to speak at school meetings.

20.     Chancellor Banks also removed me from office because of other people's reactions to my comments. He wrote that my statement "was echoed in many of the hostile, intimidating comments accompanying the *Post* article," and that "[p]redictably, [my] conduct," referring to my speech, "provoked a number of other highly offensive and hostile attacks against the anonymous student author and Stuyvesant students in general."

21.     I had no hand in writing or publishing any of the comments that Chancellor Banks dislikes. I cannot control what other people say about my speech. Neither can Chancellor Banks, whose many public statements prompt a great deal of rancorous commentary and discussion, some of which he doubtless finds offensive and inappropriate. If Chancellor Banks held himself to the same standard that he thinks he can hold elected CEC members to, he would have been removed a long time ago.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 17, 2024.

_____
Maud Maron