UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
Deborah Alexander, Maud Maron, and
Noah Harlan,

                                                                    **MEMORANDUM & ORDER**

                        Plaintiffs,                                 24-CV-02224 (DG) (JRC)


              -against-


Tajh Sutton, *President, Community Education
Council 14, in her official and individual capacities*,
Marissa Manzanares, *First Vice President,
Community Education Council 14, in her official and
individual capacities*, David C. Banks, *Chancellor,
New York City Public Schools, in his official and
individual capacities*, Nina S. Mickens, *Equity
Compliance Officer, in her official and individual
capacities*, Community Education Council 14, and
New York City Department of Education,

                        Defendants.
---------------------------------------------------------------X
DIANE GUJARATI, United States District Judge:

        On March 26, 2024, Plaintiffs Deborah Alexander, Maud Maron, and Noah Harlan

(collectively, "Plaintiffs") commenced this action against Defendants Tajh Sutton, President,

Community Education Council 14, in her official and individual capacities; Marissa Manzanares,

First Vice President, Community Education Council 14, in her official and individual capacities;

David C. Banks, Chancellor, New York City Public Schools, in his official and individual

capacities; Nina S. Mickens, Equity Compliance Officer, in her official and individual capacities;

Community Education Council 14 ("CEC 14"); and New York City Department of Education

("DOE").  *See* Complaint ("Compl."), ECF No. 1.  The Court herein refers to Defendants Sutton

and Manzanares in their individual capacities, together, as the "Individual Defendants" and refers

to all other Defendants and Defendants Sutton and Manzanares in their official capacities,

collectively, as the "City Defendants."  The Court refers to the City Defendants and the

Individual Defendants, together, as "Defendants."[1]

Plaintiffs principally allege, in summary, that Defendants' various policies and practices – namely, with respect to CEC 14's meetings and CEC 14's X account – and Defendants' implementation and enforcement of "D-210 – Citywide and Community Education Council Code of Conduct and Complaint Procedures: Anti-Discrimination and Anti-Harassment Policy" ("Regulation D-210") violate the First and Fourteenth Amendments to the United States Constitution.  *See generally* Compl.  Plaintiffs assert various facial and as-applied challenges. *See generally* Compl.

The Complaint is brought in nine Counts, titled as follows: (1) Access to Public Meetings, U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983, Against Defendants Sutton, Manzanares, and CEC 14; (2) Content and Viewpoint Discrimination – Public Meetings, U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983, Against Defendants Sutton, Manzanares, and CEC 14; (3) Vagueness – Speech Code, U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983, Against Defendants Sutton, Manzanares, and CEC 14; (4) Overbreadth – Speech Code, U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983, Against Defendants Sutton, Manzanares, and CEC 14; (5) Prior Restraint – X, U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983, Against Defendants Sutton, Manzanares, and CEC 14; (6) Viewpoint Discrimination – X, U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983, Against Defendants Sutton, Manzanares, and CEC 14; (7) Viewpoint Discrimination – Regulation D-210, U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983, Against Defendants Banks, Mickens, and DOE; (8) Vagueness – Regulation D-210, U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983, Against Defendants Banks, Mickens, and DOE; and (9) Overbreadth – Regulation D-210, U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983, Against Defendants Banks,

---

[1]   Familiarity with the procedural history and background of this action is assumed herein.

Mickens, and DOE.  *See* Compl. ¶¶ 83-127.

On April 15, 2024, Plaintiffs filed a Motion for a Temporary Restraining Order and a Preliminary Injunction (the "Motion"), ECF No. 13, together with supporting documents, including Plaintiffs' proposed Order to Show Cause, ECF No. 13-1; Plaintiffs' Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Pls.' Br."), ECF No. 13-2; and Declarations of Deborah Alexander ("Alexander Decl."), ECF No. 13-3, Maud Maron ("Maron Decl."), ECF No. 13-4, Noah Harlan ("Harlan Decl."), ECF No. 13-5, and Alan Gura, ECF No. 13-14.[2]  On April 16, 2024, Plaintiffs filed an additional Declaration of Alan Gura, ECF No. 15 (discussing, *inter alia*, the scheduling of the April 2024 CEC 14 meeting).

The Motion, brought pursuant to Rule 65 of the Federal Rules of Civil Procedure, seeks to have the Court enjoin Defendants, and all those acting in concert with them, from:

(1)  [D]iscriminating against speakers at CEC 14's public meetings on the basis of viewpoint and political association, including but not limited to the enforcement of CEC 14's "Community Guidelines," "Community Commitments," and Article IV, § 2 of CEC 14's By-Laws;

(2)  Restricting access to CEC 14's official X account to users approved by Defendants;

(3)  Blocking access to CEC 14's official X account based upon users' viewpoints and political associations; and

(4)  Implementing or enforcing DOE's Regulation D-210, including conducting any investigation or disciplining or removing from office any Community Education Council or Citywide Council member on the basis that the accused engaged in "frequent verbal abuse and unnecessary aggressive speech that serves to intimidate and causes others to have concern for their personal

---

[2]  Together with the Alexander, Maron, and Harlan Declarations, Plaintiffs submitted eight exhibits ("Pls.' Exs.").  *See* ECF Nos. 13-6 to 13-13.  In citing to these exhibits, the Court uses the letters assigned to the exhibits in the Alexander, Maron, and Harlan Declarations. The Court also uses "Pls.' Ex." and the assigned letters to refer to those exhibits attached to additional declarations submitted by Plaintiffs, discussed below.

safety," Reg. D-210, § II.C, or expressed "disrespect towards children," *id.* § II.D, or "derogatory or offensive comments about any DOE student," *id.*, or speech "that would publicly reveal, share or expose private or personally identifiable information about a DOE student or a member of such student's family without their consent," *id.* § II.E.

*See* Motion at 1-2.[3]

By Order dated April 16, 2024, the Court, *inter alia*, directed Defendants to respond to the Motion by 5:00 p.m. on April 17, 2024.  *See* April 16, 2024 Order.  On April 17, 2024, shortly after 5:00 p.m., counsel for Defendants DOE and Banks filed a letter response to the Motion.  *See* ECF No. 20 (stating, *inter alia*, that "[a]t this juncture, this Office cannot respond to items 1-3 . . . due to outstanding representation determinations" with respect to Defendants Sutton, Manzanares, and CEC 14 and that, with respect to the fourth item of relief sought, Defendants DOE and Banks "oppose Plaintiffs' attempt to have this Court enjoin DOE's investigations of possible violations of Chancellor's Regulation D-210, or efforts to enforce that Regulation").

On April 18, 2024, Plaintiffs filed an additional Declaration of Maud Maron.  *See* April 18, 2024 Maron Decl., ECF No. 21 (declaring, *inter alia*, that Plaintiff Maron had been "found guilty under Regulation D-210" – specifically, "of making 'derogatory and offensive comments' about an unspecified student, and 'conduct that serves to harass, intimidate, or threaten, including but not limited to frequent verbal abuse and unnecessary aggressive speech that serves to intimidate and cause others to have concern for their personal safety'").[4]  Also on April 18,

---

[3]  Plaintiffs appear to use the term "political association" to refer to association with certain groups holding particular viewpoints with respect to, *inter alia*, education policy.  For the purpose of the analysis herein, the Court adopts Plaintiffs' usage, which does not appear to be challenged by Defendants.

[4]  Together with the April 18, 2024 Maron Declaration, Plaintiffs submitted one exhibit.  *See* Pls.' Ex. I, ECF No. 21-1.

2024, Plaintiffs filed a letter in reply to the April 17, 2024 letter filed by Defendants DOE and

Banks. *See* ECF No. 22.

Later on April 18, 2024, the Court held a telephone conference, at which the parties were

heard on the Motion. As set forth on the record, the Motion was denied to the extent that it

sought a temporary restraining order and a schedule was set for additional briefing with respect

to Plaintiffs' request for a preliminary injunction. *See* April 18, 2024 Minute Entry and Order.

On May 7, 2024, Defendant Sutton filed a Memorandum of Law in Opposition to Motion

for Preliminary Injunction ("Sutton Br."), ECF No. 31. On May 8, 2024, the City Defendants

filed an Opposition to Plaintiffs' Motion for a Preliminary Injunction ("City Br."), ECF No. 32,

together with supporting documents, including Declarations of Toni Gantz ("Gantz Decl."), ECF

No. 32-1, and Nina Mickens ("Mickens Decl."), ECF No. 32-2. On May 9, 2024, the City

Defendants refiled the Gantz Declaration, at ECF Number 33, and the Mickens Declaration, at

ECF Number 34, and filed a letter stating that "[t]o provide the Court with more organized

documents to navigate the exhibits as to their respective Declarations, [the City Defendants]

submit the Declarations with their corresponding, numbered exhibits included," *see* ECF No.

35.[5]

On May 15, 2024, Plaintiffs filed a Memorandum in Reply to Defendant Sutton's

Opposition to Motion for Preliminary Injunction ("Pls.' Reply to Sutton"), ECF No. 36, and a

Memorandum in Reply to DOE Defendants' Opposition to Motion for Preliminary Injunction

("Pls.' Reply to City"), ECF No. 37.

---

[5]   Together with the Gantz Declaration, the City Defendants submitted five exhibits ("Gantz
Exs."). *See* ECF Nos. 33-1 to 33-5. In citing to these exhibits, the Court uses the numbers
assigned to the exhibits in the Gantz Declaration. Together with the Mickens Declaration, the
City Defendants submitted four exhibits. *See* ECF Nos. 34-1 to 34-4.

On May 20, 2024, the Individual Defendants and the City Defendants filed their respective Answers.  *See* ECF Nos. 39, 41.  On June 10, 2024, the Individual Defendants filed an Amended Answer.  *See* ECF No. 43.

On June 14, 2024, Plaintiffs, "on behalf of all the parties," filed a letter motion requesting "an administrative order staying the proceedings, apart from the preliminary injunction motion, until either 30 days following the Court's decision of that motion or, should any party appeal from that decision, until that appeal's resolution."  *See* Joint Motion to Stay Proceedings, ECF No. 44 at 1.

On June 17, 2024, Plaintiffs filed another Declaration of Maud Maron.  *See* June 17, 2024 Maron Decl., ECF No. 45 (declaring, *inter alia*, that Plaintiff Maron received a "final determination letter" signed by Defendant Banks, stating that Plaintiff Maron is "removed from [her] elected position as a Member of Community Education Council 2 through June 30, 2025").[6]  Also on June 17, 2024, Plaintiffs filed a submission titled "Notice Re: Plaintiffs' Motion for Preliminary Injunction."  *See* ECF No. 46 (stating, *inter alia*, that "Plaintiffs' preliminary injunction motion now encompasses a request to immediately reinstate Maron to her elected office" and requesting that, "at a minimum, the Court enjoin Defendants from filling Maron's vacant seat pending an appeal").

On June 18, 2024, the Court held oral argument on Plaintiffs' request for a preliminary injunction.[7]  As set forth on the record, the Court denied the oral requests made by counsel for

---

[6]   Together with the June 17, 2024 Maron Declaration, Plaintiffs submitted one exhibit.  *See* Pls.' Ex. J (Defendant Banks's June 14, 2024 letter), ECF No. 45-1.

[7]   No party requested oral argument, but, as set forth on the record, the Court scheduled oral argument in light of certain of the arguments and representations contained in the parties' briefing and in light of the fact that it appeared from the briefing that certain issues that had been in dispute were no longer being contested or at least had been narrowed.  *See* Tr. at 5.  At

the Individual Defendants for an adjournment and for an evidentiary hearing, denied the Joint

Motion to Stay Proceedings, and set a deadline of June 20, 2024 for the filing of a letter

addressing the processes following a CEC member's removal.  *See* June 18, 2024 Minute Entry;

Transcript of June 18, 2024 Oral Argument ("Tr.").

On June 20, 2024, the City Defendants filed the letter addressing the appeals process

available to Plaintiff Maron following the issuance of Defendant Banks's order removing

Plaintiff Maron from Community Education Council 2 ("CEC 2").  *See generally* ECF No. 49

(attaching letter dated June 14, 2024 and signed by Defendant Banks, setting forth the removal of

Defendant Sutton from CEC 14 through June 30, 2025, effective immediately, ECF No. 49-1).

On June 26, 2024, the parties appeared before Magistrate Judge James R. Cho for a

conference, at which, *inter alia*, discussion was held regarding Plaintiff Maron's request to stay

the filling of her CEC 2 seat and Plaintiff Maron was encouraged to seek a stay in the first

instance through the process outlined in ECF No. 49.  *See* June 26, 2024 Minute Entry; *see also*

ECF No. 52 (transcript of June 26, 2024 conference).

On June 27, 2024, Plaintiffs filed a submission titled "Notice Re: Filing of

Administrative Appeal and Petition for Stay."  *See* ECF No. 54 (stating, *inter alia*, that Plaintiff

Maron "submitted [an] application for a stay, and its attendant administrative appeal" and that

the Panel for Education Policy ("PEP") "which would review this appeal and application had

already passed a resolution calling for Defendant Banks to remove [Plaintiff Maron] from

office," and attaching June 27, 2024 Declaration of Maud Maron, ECF No. 54-1).[8]

---

the outset of the proceeding on June 18, 2024, discussion was held regarding specifics of
representation of various Defendants.  *See* Tr. at 5-18.  The representation issues discussed
appear to have since been resolved.

[8]  Together with the June 27, 2024 Maron Declaration, Plaintiffs submitted two exhibits.  *See*

On July 23, 2024, Plaintiffs filed a submission titled "Notice Re: Preliminary Injunction," in which Plaintiffs state, *inter alia*, that New York City Public Schools General Counsel Liz Vladeck claimed that Plaintiff Maron's appeal was not properly submitted due to several procedural defects; that PEP has denied Plaintiff Maron's request to expedite the appeal and her application for a stay; that two of the three PEP panelists assigned to Plaintiff Maron's appeal previously voted in favor of PEP's resolution calling on Defendant Banks to remove Plaintiff Maron from office under Regulation D-210; and that "DOE Defendants have indicated to the members of CEC 2 that if they do not fill [Plaintiff] Maron's seat within sixty days of her removal, Defendant Banks could fill that seat himself." *See generally* ECF No. 55 (attaching July 22, 2024 Declaration of Maud Maron, ECF No. 55-1; July 17, 2024 Declaration of Leonard Silverman, ECF No. 55-2; and July 22, 2024 Declaration of Alan Gura, ECF No. 55-3).[9]

On July 26, 2024, the parties filed a Joint Status Report, indicating, *inter alia*, that Plaintiff Maron submitted to PEP an administrative appeal of and petition to stay her removal from office; that on July 11, 2024, PEP denied Plaintiff Maron's request to expedite the appeal and her application for a stay; that as of July 19, 2024, briefing in Plaintiff Maron's appeal was complete; that as of the filing of the Joint Status Report, Plaintiff Maron's appeal remained pending; and that a decision from PEP was expected by August 19, 2024. *See* Joint Status Report, ECF No. 60 (corrected); *see also* ECF No. 59.[10]

---

Pls.' Exs. K, L, ECF Nos. 54-2, 54-3.

[9]    Together with the July 22, 2024 Gura Declaration, Plaintiffs submitted six exhibits.  *See* Pls.' Exs. M-R, ECF Nos. 55-4 to 55-9.

[10]   The Joint Status Report also states that the Individual Defendants "request that any preliminary relief extended to Maron regarding CEC 2 be identically extended to Sutton regarding CEC 14" and that "[the City] Defendants' counsel object to this request as not properly before this Court, especially given that neither Sutton's removal nor the basis for it is

On July 30, 2024, the City Defendants filed an additional letter. *See* ECF No. 61.[11]

On August 27, 2024, the parties again appeared before Judge Cho, who ordered, *inter alia*, that, by 5:00 p.m. on August 28, 2024, each party file a status report. *See* August 27, 2024 Minute Entry.

On August 28, 2024, Plaintiffs filed a submission titled "Status Report and Notice Re: Preliminary Injunction," in which Plaintiffs state that on August 19, 2024, PEP affirmed Defendant Banks's order removing Plaintiff Maron from elective office and that Plaintiff Maron will not pursue any further administrative or state judicial remedies. *See* ECF No. 63.[12]

Also on August 28, 2024, the City Defendants filed a letter, stating, *inter alia*, that "[i]n connection with the DOE's anticipated revision of Sections II(C) and (D), which are the D-210 provisions at issue in Ms. Maron's removal, the Chancellor has waived enforcement of those provisions effective August 28, 2024, pending review" and that "the Chancellor has taken the immediate step of waiving enforcement while DOE prepares to post revisions in an effort to address Plaintiffs' concerns." *See generally* ECF No. 64. Also on August 28, 2024, the Individual Defendants submitted a Status Report. *See* ECF No. 65.

On August 29, 2024, Plaintiffs filed a letter in response to the City Defendants' August 28, 2024 letter. *See* ECF No. 66 (arguing, *inter alia*, that "if Defendants truly wanted to suspend Regulation D-210's enforcement, they would begin by un-enforcing it against Maud Maron,"

---

at issue in this litigation." *See* ECF No. 60 ¶ 8. The request that any preliminary relief extended to Plaintiff Maron regarding CEC 2 be identically extended to Defendant Sutton regarding CEC 14 is not properly before the Court and is not addressed herein.

[11] Together with the letter, the City Defendants submitted two exhibits. *See* ECF Nos. 61-1, 61-2.

[12] Together with the Status Report and Notice Re: Preliminary Injunction, Plaintiffs submitted one exhibit. *See* Pls.' Ex. S, ECF No. 63-1.

"[b]ut they haven't;" that Defendants cannot guarantee that any revision of Regulation D-210 will ever occur; that "[e]ven if Defendant Banks restored Maron to her office, a court order is necessary to ensure that Defendants will not return to their old ways" (alteration accepted) (quotation omitted); and that Plaintiffs require immediate relief).[13]

* * *

Upon consideration of the record to date, including the parties' submissions and the June 18, 2024 oral argument, the Court grants Plaintiffs' request for a preliminary injunction for the reasons and to the extent set forth below.

## BACKGROUND[14]

### I.    Plaintiffs

Plaintiff Deborah Alexander lives in New York City and has a child enrolled in the New York City public schools.  *See* Alexander Decl. ¶ 1.  Plaintiff Alexander served as an elected member of Community Education Council 30 ("CEC 30") from 2013 until February 15, 2024.  *See* Alexander Decl. ¶ 2.  Plaintiff Alexander resigned from her position on CEC 30 because New York City's Citywide Council on High Schools elected her to fill a vacancy on that board, which she joined on February 20, 2024 and on which she continues to serve.  *See* Alexander Decl. ¶ 2.  Plaintiff Alexander is also a member and the Secretary of Parent Leaders for Accelerated Curriculum and Education NYC ("PLACE"), a group that Plaintiff Alexander declares advocates for improving the academic rigor and standards of K-12 public school curricula.  *See* Alexander Decl. ¶ 3.

Plaintiff Maud Maron lives in New York City and has four children enrolled in the New

---

[13]  The Court has considered all of the filings to date in this action, including those not specifically addressed herein.

[14]  The following facts are undisputed unless otherwise noted.

York City public schools. *See* Maron Decl. ¶ 1. Plaintiff Maron – before her removal – served as an elected member of CEC 2, is a founder of PLACE, and is associated with Moms for Liberty. *See* Maron Decl. ¶¶ 2, 33.

Plaintiff Noah Harlan lives in New York City and has two children enrolled in the New York City public schools. *See* Harlan Decl. ¶ 1. Plaintiff Harlan serves as an elected member of Community Education Council 1. *See* Harlan Decl. ¶ 2. Plaintiff Harlan declares that although he has never been a PLACE member and does not share all of that group's views, the group has endorsed his CEC candidacies. *See* Harlan Decl. ¶ 10.

## II.  Community District Education Councils

New York Education Law Section 2590-c ("Section 2590-c") sets forth that each community district shall be governed by a community district education council ("CEC"). *See* N.Y. Educ. Law § 2590-c(1). Section 2590-c sets forth that the community councils shall consist of twelve voting members and two non-voting members, as specified in Section 2590-c(1). CEC members are not paid a salary or stipend but are reimbursed for all actual and necessary expenses directly related to the duties and responsibilities of the CEC. *See* N.Y. Educ. Law § 2590-c(1).

CECs have various powers and duties, including "promot[ing] achievement of educational standards and objectives relating to the instruction of students," *see* N.Y. Educ. Law § 2590-e(3); "[h]old[ing] public meetings at least every month with the superintendent during which the public may speak so that parents and the community have a voice and a public forum to air their concerns," *see* N.Y. Educ. Law § 2590-e(14); and "[p]rovid[ing] input . . . to the chancellor and the city board on matters of concern to the district," *see* N.Y. Educ. Law § 2590-e(18). CECs have no executive or administrative powers or functions. *See* N.Y. Educ. Law § 2590-e. New York Education Law Section 2590-d sets forth that CECs "shall prescribe such

by-laws and regulations as may be necessary to make effectual the provisions of [New York Education Law] and for the conduct of the proceedings of said board," *see* N.Y. Educ. Law § 2590-d(2), and that such by-laws shall include, *inter alia*, the requirement that "all meetings of [CECs] be subject to article seven of the public officers law," *see* N.Y. Educ. Law § 2590-d(2)(d).  Article seven of the public officers law ("Open Meetings Law") requires, *inter alia*, that "[e]very meeting of a public body shall be open to the general public, except that an executive session of such body may be called and business transacted thereat in accordance with section ninety-five of [article seven]," *see* N.Y. Pub. Off. Law § 103(a) (footnote omitted), and that "[a] public body shall provide an opportunity for the public to attend, listen and observe meetings in at least one physical location at which a member participates," *see* N.Y. Pub. Off. Law § 103(c). CECs "often create, administer, and maintain their own social media accounts, such as on Facebook, Instagram, or X (formerly known as Twitter)."  *See* Gantz Decl. ¶ 4.  DOE does not host, oversee, or exercise control over CEC social media accounts.  *See* Gantz Decl. ¶ 5.

## III.     Regulation D-210 and Appeals of Disciplinary Action

Regulation D-210 was issued on December 22, 2021.  *See* Regulation D-210 at 1, Pls.' Ex. G.[15]  Regulation D-210 "sets forth [DOE's] Anti-Discrimination and Anti-Harassment policy governing the conduct of the elected and appointed members of the Community and Citywide Education Councils and establishes a procedure for the filing and resolution of complaints of violation of [the] regulation."  *See* Regulation D-210 at 1.  The Introduction of Regulation D-210 sets forth, *inter alia*, that "[i]t is the policy of the DOE to develop and maintain a positive and

---

[15]  Defendant Mickens declares that "Regulation D-210 was promulgated in response to a request by CEC members and other parents for a regulation that would address discriminatory and harassing conduct by CEC members, and facilitate the CECs' ability to perform their functions."  *See* Mickens Decl. ¶ 9.

supportive environment for elected and appointed parent leaders that is free of discrimination, harassment, bias, racism, and intimidation;" that "[t]he DOE is committed to the treatment of all parents with respect and dignity and the provision of opportunities for fair and just participation and parent engagement;" that "[t]he DOE is committed to affirming diverse racial, linguistic and cultural identities in parent leadership, elevating and centering historically marginalized voices, and empowering parents as agents of social change;" and that "[a]s elected or appointed parent leaders, Council Members have the duty to observe a high standard of ethics, integrity and decorum" and "are expected to be exemplary role models on the councils and in the communities in which they serve, and to fulfill their responsibilities in a way that respects the rights of all parents and students they serve." *See* Regulation D-210 at 1.

Regulation D-210 sets forth a Code of Conduct, which specifies, *inter alia*, that "Council Members shall not engage in conduct that serves to harass, intimidate, or threaten, including but not limited to frequent verbal abuse and unnecessary aggressive speech that serves to intimidate and causes others to have concern for their personal safety," *see* Regulation D-210 § II(C); that "Council Members shall not engage in conduct involving derogatory or offensive comments about any DOE student," *see* Regulation D-210 § II(D); and that "Council Members shall not engage in conduct that would publicly reveal, share or expose private or personally identifiable information about a DOE student or a member of such student's family without their consent," *see* Regulation D-210 § II(E). As set forth above, effective August 28, 2024, the Chancellor has waived enforcement of Sections II(C) and II(D) of Regulation D-210, pending review. *See* ECF No. 64 at 2-3.[16]

---

[16] As noted by the Court at the June 18, 2024 oral argument, *see* Tr. at 35-36, Plaintiffs include expressions of "disrespect towards children" as a category of conduct prohibited by Regulation D-210, but "disrespect towards children" does not appear to be an explicit

Regulation D-210 provides that "[c]onduct refers to verbal and physical acts and behavior, including a Council Member's use of oral and written language, when it occurs during or at (a) [CEC] meetings, (b) events hosted by the [CEC], (c) [CEC] elections and campaigns, (d) public appearances and events a Council Member attends in their official capacity, and (e) other activities when such conduct creates or would foreseeably create a risk of disruption within the district or school community the Council Member serves and/or interferes with the functioning of the [CEC] or the performance of the Council Member's [CEC] duties." *See* Regulation D-210 at 2.

Regulation D-210 also provides that "[p]ersonally identifiable information includes but is not limited to name, age, home or work address, telephone number, date of birth, citizenship status, racial or religious affiliation, employer and employment status, names of schools attended by children, and children's educational placement or program." *See* Regulation D-210 at 2.

Regulation D-210 also sets forth, *inter alia*, that "[c]orrective or disciplinary action may be appropriate when a Council Member's conduct violates this regulation, or any other applicable provision of law, by-laws, rules or regulations, standards, directives and agreements;" that "[a]ny corrective or disciplinary action shall be taken consistent with Education Law Section 2590-l and may include, but is not limited to, issuance of an order to cease improper conduct or take required action, or suspension or removal of a member;" and that "Council Members who have been removed from office for their conduct may be prohibited from subsequently serving on any Council, or school or district Title I Parent Advisory Council." *See* Regulation D-210

---

restriction under Regulation D-210, which states only that "[t]he DOE does not tolerate disrespect towards children," *see* Regulation D-210 § II(D).  The Court herein refers to the portion of Section II(D) that sets forth that "Council Members shall not engage in conduct involving derogatory or offensive comments about any DOE student" as the "challenged portion of Section II(D)."

§ III.

Regulation D-210 sets forth a Complaint Process, which contains procedures for the filing of a complaint; the initial response to the complaint by the Equity Compliance Officer ("ECO");[17] the investigation of a complaint by the ECO and the review of the ECO's findings and recommendations by the Office of Family and Community Engagement ("FACE") Equity Council;[18] the issuance of a written determination by the Chancellor or designee; and the opportunity for conciliation for a CEC member subject to corrective or disciplinary action. *See* Regulation D-210 § IV.

New York Education Law Section 2590-l sets forth procedures for the filing of an appeal of an order suspending or removing a CEC member, *see* N.Y. Educ. Law § 2590-l(2), and New York Education Department regulations set forth procedures for the filing of an application for a stay of the enforcement of any order of the Chancellor, *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 113.7, and set forth the timing of the final determination of an appeal, *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 113.23.

## IV.   CEC 14 Bylaws, Community Guidelines, and Community Commitments

Article IV § 2 of CEC 14's Bylaws provides in relevant part:

- The public shall have the opportunity to comment on resolutions on the agenda prior to Council vote by signing the Speakers' List.  In addition, the

---

[17] Pursuant to Regulation D-210's definitions, the ECO is "a designated DOE employee responsible for the receipt, response, processing, and investigation of complaints alleging violations of [Regulation D-210]."  *See* Regulation D-210 at 2.

[18] Pursuant to Regulation D-210's definitions, the FACE Equity Council is "a team of parent leaders from the Councils and Chancellor's Parent Advisory Council appointed by FACE that shall provide recommendations to FACE on the hiring and retention of the ECO and may provide recommendations on the resolution of complaints submitted to the ECO."  *See* Regulation D-210 at 2.  The Court notes that FACE is referred to in Regulation D-210 as the "Office of Family and Community *Empowerment*."  *See* Regulation D-210 at 2 (emphasis added).

Public Speakers Session shall be conducted without agenda or other formalities, subject to the Council's prerogative to require speakers to have signed the Speakers' List and to manage time.

- Speaking time is limited to 3 minutes per person, including questions and answers. The time may be extended at the discretion of the Chair, and may be limited if necessary to allow all persons who have signed the Speakers' List to speak.

- Discussion and charges relating to the competence or personal conduct of individuals will be ruled out of order. A speaker who is ruled out of order forfeits the balance of his/her time and will be directed to leave the microphone; the Chair may take appropriate measures to enforce the ruling.

*See* Compl. ¶ 13. Plaintiffs declare that they understand that for CEC 14's December 18, 2023 public meeting, CEC 14 adopted "Community Guidelines." *See* Alexander Decl. ¶ 7; *see also* Maron Decl. ¶ 5; Harlan Decl. ¶ 8. The Community Guidelines provide:

- Be respectful when someone else is speaking. Everyone has something important to contribute.

- When making comments in chat, use "I" statements. No one speaks for an entire group of people.

- People can disagree. Differences in perspectives foster our learning.

- There's time for public comment at the end. Be concise to make room for others. You will be limited to 2min.

*See* Pls.' Ex. D at 1-2. CEC 14's Community Guidelines also provide a list of "Absolute no's," as follows:

- This is not a space where we will tolerate antagonistic behavior or any of the following: homophobia, transphobia, misogyny, ableism, racism, or any other forms of oppressive beliefs or behaviors. Anyone who violates this guideline will be removed.

- There will be no name-calling of any community members in this space. If you violate this, you will be removed.

- If you continually disrespect the community, you will be given 2 warnings before being removed.

*See* Pls.' Ex. D at 2; *see also* Alexander Decl. ¶ 7; Maron Decl. ¶ 5; Harlan Decl. ¶ 8.

Plaintiffs further declare that they understand that CEC 14 rewrote its rules as "Community Commitments" in connection with the January 2024 public meeting. *See* Alexander Decl. ¶ 8; *see also* Maron Decl. ¶ 6; Harlan Decl. ¶ 9. The Community Commitments, also referred to as the "Community Agreements," *see* Alexander Decl. ¶ 12, provide:

- We are committed to intersectional solidarity.

- We actively listen with the intent to understand, rather than respond.

- We call each other in, and out when appropriate. We are all capable of harm and the degree of harm experienced dictates the tactic used.

- Conflict is inevitable, and survivable, within community.

- We embrace discomfort. We work to distinguish discomfort from harm. We work to create brave spaces in the hopes they are as safe as possible. We create the conditions to minimize harm and address harm when it happens whether verbal, behavioral or physical.

- We watch our jargon and welcome teachable moments.

- We believe those closest to the issues are closest to the solutions.

- We distinguish between good faith dialogue and bad faith arguments.

- We reserve the right to remove participants causing discord, spreading misinformation and/or affiliated with hate groups. The DOE may not utilize this practice or standard, but we do.

*See* Pls.' Ex. E at 1; *see also* Alexander Decl. ¶¶ 8, 12; Maron Decl. ¶ 6; Harlan Decl. ¶ 9. Plaintiff Alexander declares that admission to CEC 14's January 24, 2024 public meeting required people to fill out a form, requiring them to affirm that "[b]y registering I commit to uphold the D14 Community Commitments." *See* Alexander Decl. ¶ 9; *see also* Pls.' Ex. F (registration form).

V.      **Relevant Events**

A.      **CEC 14 Meetings**

Plaintiff Alexander declares that CEC 14 endorsed a November 9, 2023 student walkout

to protest against Israel.  *See* Alexander Decl. ¶ 4; *see also* Harlan Decl. ¶ 3.  Plaintiff Alexander

further declares that, like many other parents, she attended CEC 14's November 15, 2023 public

meeting, held online, to voice her opposition to that walkout and to its endorsement by CEC 14;

that CEC 14 cut off and expelled attendees who opposed the walkout and its endorsement by

CEC 14, while allowing speakers expressing pro-walkout and anti-Semitic views to express

themselves; and that speakers praising Defendant Sutton were not subjected to the time limit for

remarks.  *See* Alexander Decl. ¶ 4.  Plaintiff Alexander declares that Defendant Manzanares,

who appeared to have editorial control over attendees' messages in the online meeting's chat

section, made explicit CEC 14's demand for "respect" as a condition of attending the meeting,

messaging everyone in attendance, at one point texting everyone: "If you are not respecting our

space you will be removed."  *See* Alexander Decl. ¶ 5.  Plaintiff Alexander declares that she was

ejected from the meeting after commenting in the group chat that Defendant Sutton was

interrupting a speaker, and that Plaintiff Alexander, over her years of service on CEC 30 and

activism on school policy, has been an outspoken opponent of Defendant Sutton and of

Defendant Sutton's political views.  *See* Alexander Decl. ¶ 6.

Plaintiff Alexander further declares that she registered to attend CEC 14's January 24,

2024 public meeting and that although she filled out the required form, her registration for the

meeting was cancelled and she was barred from the meeting.  *See* Alexander Decl. ¶¶ 9-10.

Plaintiff Alexander declares that she re-registered for the meeting and made it into the waiting

room but was then removed and barred from the meeting.  *See* Alexander Decl. ¶ 11.  Plaintiff

18

Alexander declares that she then re-registered again under a pseudonym and was admitted to the meeting, though she did not speak.  *See* Alexander Decl. ¶ 11.  Plaintiff Alexander declares that she believes that she was singled out for exclusion because Defendants Sutton, Manzanares, and CEC 14 disagree with her political views and because of her involvement with PLACE.  *See* Alexander Decl. ¶ 11.

Plaintiff Alexander declares that she saw a graphic shared with meeting attendees referencing the Community Agreements and that at the meeting's outset, Defendant Sutton declared that "[i]f people are not in alignment with our community agreements, they may not be allowed in this space."  *See* Alexander Decl. ¶¶ 12-13.  Plaintiff Alexander declares that she believes that the "hate groups" referenced in the Community Agreements apparently include PLACE; that Defendant Sutton "is an ardent foe of PLACE, and has criticized [the] group repeatedly;" and that Plaintiff Alexander understands that a resolution introduced at the January meeting accuses PLACE of having a "segregationist agenda."  *See* Alexander Decl. ¶ 14.

Plaintiff Harlan declares that he tried to join CEC 14's January 24, 2024 public meeting and that although he filled out the registration form as required, he was left in the waiting room, then refused admission.  *See* Harlan Decl. ¶¶ 11-12.  Plaintiff Harlan declares that he believes he was blocked on account of his political views and that when he tried to rejoin the meeting, he was excluded again because he was blocked by the host.  *See* Harlan Decl. ¶ 12.

Plaintiffs declare, *inter alia*, that they intend to and would participate in CEC 14's public board meetings to express their views during the public comment periods on the full range of subjects before that board; that they reasonably expect to disagree with Defendants' views on, *inter alia*, educational policies, curricula, the school budget, school personnel and administration, anti-Semitism, and Israel; that they intend to criticize the competence of CEC 14 members and

would, for example, criticize Defendants for, *inter alia*, their treatment of public speakers, conducting meetings virtually instead of in-person, and blocking members of the public from accessing CEC 14's social media presence; that they are chilled from speaking at CEC 14 public meetings as they intend; and that they refrain from trying to access CEC 14's public board meetings because they do not wish to subscribe to the Community Commitments as required by the entry form and reasonably fear that they would be interrupted, censored, subject to discriminatory treatment, and expelled owing to their viewpoints under CEC 14's Community Commitments and Community Guidelines.  *See* Alexander Decl. ¶¶ 32-35; Maron Decl. ¶¶ 31-34; Harlan Decl. ¶¶ 15-18.

### B.    CEC 14 X Account

Plaintiffs Maron and Alexander declare that they were blocked from reading and interacting with CEC 14's X account and that because they are blocked, they cannot even request permission to follow CEC 14, let alone read the account, or interact with CEC 14 and with those who can visit CEC 14's timeline.  *See* Alexander Decl. ¶¶ 15-16; Maron Decl. ¶¶ 9-10.  Plaintiff Harlan declares that CEC 14's X account is currently locked and his request for approval to follow CEC's 14 X account has remained pending for several months.  *See* Harlan Decl. ¶¶ 13-14.

Plaintiffs declare that they intend to, and would, interact with CEC 14's X account by responding to CEC 14 posts and the posts of others conducting discussions under CEC 14's timeline, but for being barred from doing so.  *See* Alexander Decl. ¶ 36; Maron Decl. ¶ 35; Harlan Decl. ¶ 19.

### C.    Maron Investigation

Plaintiff Maron declares that, on December 14, 2023, "The 74 Million" website published

an article revealing and criticizing text messages that Plaintiff Maron and others had sent to a private WhatsApp group and highlighted Plaintiff Maron's statements describing the "rapid rise in trans-identifying children as a 'social contagion,'" decrying the "use of drugs and medical procedures to change children's sex," and criticizing "anti-racism." *See Maron Decl.* ¶¶ 14-16. Plaintiff Maron declares that a DOE spokesperson declared that Plaintiff Maron's comments are "despicable" and "not in line with our values," and that Defendant Banks "directly threatened [her] position because he disagrees with [her] viewpoints." *See Maron Decl.* ¶ 17 (quotation omitted).

Defendant Mickens declares that DOE received complaints against Plaintiff Maron between October 2023 and March 2024 regarding alleged violations of Regulation D-210. *See Mickens Decl.* ¶ 12. Defendant Mickens declares that, on February 8, 2024, Defendant Mickens contacted Plaintiff Maron regarding the complaints and, on March 8, 2024, advised Plaintiff Maron that the allegations related to her comments about the LGBTQI+ community. *See Mickens Decl.* ¶ 14; *see also Maron Decl.* ¶¶ 11-13. Defendant Mickens declares that, on March 11, 2024, Plaintiff Maron advised that she was available for an interview on March 22, 2024 and that on March 20, 2024, Defendant Mickens advised Plaintiff Maron that an additional complaint against Plaintiff Maron would also be discussed at the interview and that this complaint concerned Plaintiff Maron's alleged statements about a Stuyvesant High School student. *See Mickens Decl.* ¶¶ 15-16; *see also Maron Decl.* ¶¶ 18-24 (declaring, *inter alia*, that on February 16, 2024, the student newspaper at Stuyvesant High School published an anonymous full page editorial titled, "Black and White: The Withheld Story of Palestine and Israel" and that Plaintiff Maron told the *New York Post*, in reference to that editorial, that "[t]he byline should read coward instead of anonymous;" that "[i]f you are going to repeat revolting Hamas propaganda

and transcribe your ignorance and Jew hatred, put your name to it;" and that "Principal Yu should address the school and explain to Jewish students why this factually inaccurate bile was published on the school paper anonymously," and declaring that Plaintiff Maron "do[es] not know the author's identity" or "whether the author was a student, a staff member, or some other person").[19]

Ms. Gantz declares that, on April 17, 2024, Deputy Chancellor of FACE and External Affairs Kenita D. Lloyd issued a determination of a complaint filed under Regulation D-210 against Plaintiff Maron, which complaint concerned Plaintiff Maron's statements as quoted in the *New York Post* article. *See* Gantz Decl. ¶¶ 11-12. The determination stated that there was "a reasonable basis to conclude that [Plaintiff Maron] engaged in conduct that constitutes a violation of Chancellor's Regulation D-210" and ordered Plaintiff Maron "to cease engaging in conduct involving derogatory or offensive comments about any New York City Public School student, and conduct that serves to harass, intimidate, or threaten, including but not limited to frequent verbal abuse and unnecessary aggressive speech that serves to intimidate and cause others to have concern for their personal safety, which is prohibited by Chancellor's Regulation D-210(II)(C & D)." *See* Gantz Ex. 3; *see also* April 18, 2024 Maron Decl. ¶¶ 1, 3 (declaring that, on April 17, 2024, she received an email from DOE notifying her that she had been "found guilty" under Regulation D-210).

Ms. Gantz declares that, on or about April 18, 2024, Plaintiff Maron requested

---

[19] Plaintiff Maron also declares that she "reasonably fear[s] that another D-210 complaint against [her] is in the works" following CEC 2's approval of a resolution that she introduced, which resolution is titled "Resolution Calling for a Comprehensive Review and Redrafting of NYCPS Guidelines on Gender with Regard to the Application and Impact on Female Athletes Participating in Physical Education, Intramural and Competitive Public School Athletic League (PSAL) Sports." *See* Maron Decl. ¶ 27; *see also* Maron Decl. ¶¶ 28-30.

clarification as to the conduct at issue in the determination and that on the same day, FACE replied that the decision concerned Plaintiff Maron's comments in the *New York Post* article. *See* Gantz Decl. ¶ 14; *see also* Gantz Ex. 4 at 1.

Plaintiff Maron declares that, on June 14, 2024, she received an email from FACE "containing a PDF document of the 'final determination letter' in one of the D-210 proceedings against [her]."  *See* June 17, 2024 Maron Decl. ¶ 1.  The letter, dated June 14, 2024 and signed by Defendant Banks, stated, *inter alia*, that "[t]he investigation found that [Plaintiff Maron's] statement to the *Post* constituted conduct involving derogatory and offensive comments about a student, and unnecessary aggressive speech that served to intimidate and cause others to have concern for their personal safety;" that the "statement was further found to have created a foreseeable risk of disruption within the district and school community, especially in light of the highly public forum in which it was made;" that "[b]ased on [Defendant Banks's] review and for the reasons set forth [in the letter], [Defendant Banks] find[s] the appropriate disciplinary action is [Plaintiff Maron's] removal from CEC 2 for the remainder of the current term;" and that Defendant Banks was removing Plaintiff Maron as a member of CEC 2 through June 30, 2025, "effective immediately," pursuant to his authority under New York Education Law Section 2590-l.  *See generally* Pls.' Ex. J.[20]

By letter dated June 27, 2024, Plaintiff Maron appealed Defendant Banks's June 14, 2024 order; applied for a stay of enforcement of the June 14, 2024 order; and requested an expedited review of the appeal.  *See generally* Pls.' Ex. K.  By Order dated July 11, 2024, PEP denied

---

[20]  The letter also stated that Plaintiff Maron had attended a conciliation, at which Deputy Chancellor Lloyd reviewed the basis for the Regulation D-210 determination and that Plaintiff Maron "ultimately stood by and defended [her] statement."  *See* Pls.' Ex. J at 2.

Plaintiff Maron's request to expedite the appeal and her application for a stay.  *See* Pls.' Ex. Q.

By Order dated August 19, 2024, PEP affirmed Defendant Banks's June 14, 2024 order.  *See*

Pls.' Ex. S.[21]

> D.   **Alexander Investigation**

Defendant Mickens declares that, on or about October 10, 2023, FACE received a

complaint alleging that Plaintiff Alexander, then a CEC 30 member, had violated Regulation D-

210.  *See* Mickens Decl. ¶ 20.  Defendant Mickens declares that, on December 8, 2023, during an

interview with Plaintiff Alexander, Defendant Mickens disclosed that the allegations related to a

social media post that Plaintiff Alexander published and her "liking" of a separate, related post,

both of which concerned information about the child of another CEC member.  *See* Mickens

Decl. ¶ 21.  Plaintiff Alexander declares that she had commented on an X user's post about an

editorial written by Gavin Healy – a member of CEC 2 who Plaintiff Alexander declares had

long been critical of PLACE, of Plaintiff Alexander, and of Plaintiff Alexander's political views

– the following:

> For all his judgment of D2 Mr. Healy sent his child OUT of his diverse D30 school
> to a screened G&T program IN District 2, with priority to the whiter, wealthier D2
> middle schools.  I wonder when Mr. Healy decided screening was bad.  The day
> after his child got into a D2 school?

*See* Alexander Decl. ¶¶ 21, 23-24.  Defendant Mickens declares that, during the December 8,

2023 interview with Plaintiff Alexander, Defendant Mickens presented the relevant social media

posts to Plaintiff Alexander; gave Plaintiff Alexander an opportunity to respond to the

allegations; and identified the relevant provisions of Regulation D-210 implicated by the

---

[21]  As noted above, Plaintiff Maron states that she "will not pursue any further administrative or
state judicial remedies."  *See* ECF No. 63.  The City Defendants state that, "[s]hould Ms.
Maron still wish to challenge her removal, her next step is to appeal the PEP's determination
to the Commissioner of Education of the State of New York."  *See* ECF No. 64 at 1-2.

allegations.  *See* Mickens Decl. ¶ 21.  Defendant Mickens further declares that following the interview, Plaintiff Alexander provided Defendant Mickens with additional information regarding the allegations, including evidence that the information at issue had been previously publicly disclosed.  *See* Mickens Decl. ¶ 22.  Plaintiff Alexander declares that Defendant Mickens "interrogated [Plaintiff Alexander] about [her] affiliation with PLACE;" "questioned why [Plaintiff Alexander] wrote [her] post about Healy, and whether a third party, upon reading Alexander's post, might discern where Healy's child attends school."  *See* Alexander Decl. ¶ 26 (also declaring that Defendant Mickens inquired into Plaintiff Alexander's "liking" of a post by another PLACE member, Yiatin Chu, that had linked to a DOE website noting which school Healy's child attends).  Plaintiff Alexander further declares that the fact that "Healy resides within the boundaries of District 30 is no secret;" that "the *Queens Chronicle* described him as a 'Jackson Heights father' as recently as February 6, 2023;" that it was not "confidential information that Healy's child attended a District 2 school at the time of [Plaintiff Alexander's] post;" and that "on June 16, 2023, months before [Plaintiff Alexander's] post, Defendant DOE disclosed that Healy's child attends P.S./I.S. 217, school code 02M217, when it announced that Healy had won his election to CEC 2."  *See* Alexander Decl. ¶¶ 28-29 (reproducing screenshot). On or about May 3, 2024, Deputy Chancellor Lloyd issued a determination finding that there was a reasonable basis to conclude that Plaintiff Alexander did not engage in conduct that violated Regulation D-210.  *See* Gantz Decl. ¶ 17; *see also* Gantz Ex. 5.

Plaintiff Alexander declares that "[t]he threat of D-210 complaints being filed against [her] in retaliation for expressing [her] political views has chilled [her] expression, causing [her] to alter [her] public and even private speech."  *See* Alexander Decl. ¶ 38.

### E.     Sutton Investigation

On or about April 17, 2024, Deputy Chancellor Lloyd issued a determination finding that there was a "reasonable basis to conclude that [Defendant Sutton] engaged in conduct that constitutes a violation of [Regulation D-210], based on [Defendant Sutton's] dissemination of materials containing harassing and discriminatory content in connection with a walkout that took place on November 9, 2023.  *See* Gantz Ex. 1; *see also* Gantz Decl. ¶ 7.

In addition, in a letter to Defendant Sutton dated April 16, 2024 and issued on April 17, 2024, Defendant Banks stated, *inter alia*, that CEC 14 has "not held a meeting in compliance with the OML since June 2023," that CEC 14 has "failed to conduct its monthly public meeting for two consecutive months (February and March 2024)," that "the manner in which [CEC 14] has held its meetings between November 2023 and January 2024 has resulted in numerous complaints about exclusion and removal of participants," and that "it appears that [CEC 14] under [Defendant Sutton's] leadership and direction is only selectively representing the district's parent community, blocking attendance and participation at its meetings on questionable grounds, and not responding to or addressing parent concerns;" Defendant Banks ordered that Defendant Sutton "cease further improper conduct;" and Defendant Banks directed Defendant Sutton to appear for a conciliation meeting.  *See* Gantz Ex. 2 at 1-3; *see also* Gantz Decl. ¶¶ 8-10.

As set forth in a letter dated June 14, 2024, Defendant Banks concluded that under Defendant Sutton's leadership, CEC 14 had failed to comply with numerous legal requirements, including failing to comply with Open Meetings Law requirements, and that given the numerous violations of law and regulations as set forth in the letter, the appropriate disciplinary action was Defendant Sutton's removal from CEC 14 for the remainder of the current term, and Defendant

Banks ordered that Defendant Sutton be removed from CEC 14 through June 30, 2025, effective

immediately.  *See generally* ECF No. 49-1.

## DISCUSSION

### I.    Standard for Entry of a Preliminary Injunction

"When a preliminary injunction will affect government action taken in the public interest

pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable

harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest

weighing in favor of granting the injunction."  *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir.

2021) (quoting *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020)); *see also We

The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir.) ("When the government is a party

to the suit, our inquiries into the public interest and the balance of the equities merge."), *opinion

clarified*, 17 F.4th 368 (2d Cir. 2021), *cert. denied sub nom. Dr. A. v. Hochul*, 142 S. Ct. 2569

(2022); *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021); *Metro. Taxicab Bd. of

Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010).  The party seeking injunctive relief

"need only show a likelihood of success on the merits of at least one of [its] claims."  *Home It,

Inc. v. Wen*, No. 19-CV-07070, 2020 WL 353098, at *5 (E.D.N.Y. Jan. 21, 2020) (quotation

omitted).

"It is well established that the 'loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury.'"  *Kamerling v. Massanari*, 295

F.3d 206, 214-15 (2d Cir. 2002) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  "Where a

plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature

of the harm may be presumed."  *Bronx Household of Faith v. Bd. of Educ. of N.Y.*, 331 F.3d 342,

349 (2d Cir. 2003).  "Because the deprivation of First Amendment rights is an irreparable harm,

in First Amendment cases 'the likelihood of success on the merits is the dominant, if not the dispositive, factor.'" *Agudath*, 983 F.3d at 637 (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)).

Further, "securing First Amendment rights is in the public interest." *N.Y. Progress*, 733 F.3d at 488. "No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath*, 983 F.3d at 637.

Courts refer to preliminary injunctions as "prohibitory" or "mandatory." *See N. Am. Soccer League*, *LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id*. (citing *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)). Because mandatory injunctions alter the status quo, a party seeking a mandatory injunction must meet a heightened legal standard by making "a strong showing of irreparable harm" and demonstrating "a clear or substantial likelihood of success on the merits." *See Hester*, 985 F.3d at 176 (quotation omitted); *see also N. Am. Soccer League*, 883 F.3d at 37.[22]

"On a motion for preliminary injunction, where 'essential facts are in dispute, there must be a hearing and appropriate findings of fact must be made.'" *In re Defend H20 v. Town Bd. of East Hampton*, 147 F. Supp. 3d. 80, 96 (E.D.N.Y. 2015) (ellipsis omitted) (quoting *Republic of Philippines v. N.Y. Land Co.*, 852 F.2d 33, 37 (2d Cir. 1988)). "However, 'it is not a rigid

---

[22] For purposes of this analysis, the status quo is "the last actual, peaceable uncontested status which preceded the pending controversy." *See N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014)); *see also Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-00181, 2020 WL 915824, at *8 (S.D.N.Y. Feb. 26, 2020) ("The Second Circuit has repeatedly explained that, for purposes of granting a preliminary injunction, the 'status quo' is not simply the status quo in the moment before relief is granted. Rather, it refers to 'the last actual, peaceable uncontested status which preceded the pending controversy.'" (quoting *N. Am. Soccer League*, 883 F.3d at 37)).

requirement that oral testimony be taken on a motion for a preliminary injunction.'" *Id.* (alteration accepted) (quoting *Republic of Philippines*, 852 F.2d at 37). "Significantly, 'an evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case or when the disputed facts are amenable to complete resolution on a paper record.'" *Id.* (alteration accepted) (ellipsis omitted) (quoting *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998)); *see also Dress for Success Worldwide v. Dress 4 Success*, 589 F. Supp. 2d 351, 357 (S.D.N.Y. 2008) ("[T]here is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it." (quoting *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir. 1989))).

## II.    Plaintiffs are Entitled to a Preliminary Injunction[23]

As an initial matter, the Court notes that the City Defendants state that they "do not oppose items 1-3 in Plaintiffs' proposed preliminary injunction concerning how CEC 14 meetings are conducted and access to the CEC 14's X (formerly known as Twitter) account" but that they "do not waive any defenses they may have to these items and preserve the right to oppose these requests as this case develops." *See* City Br. at 2 n.2; *see also* Tr. at 10 (counsel for City Defendants stating that "we chose not to oppose the actions we were taking that we found were indefensible"), 23 (counsel for City Defendants stating that "we're not defending the first

---

[23] The Court need not determine whether the requested preliminary injunction is mandatory or prohibitory because, as set forth below, Plaintiffs have presented sufficient evidence to warrant a preliminary injunction to the extent set forth below even under the more rigorous mandatory injunction standard. *See Yang v. Kellner*, 458 F. Supp. 3d 199, 209 (S.D.N.Y.) (declining to decide whether injunction sought was prohibitory or mandatory where more rigorous standard met), *aff'd sub nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020). And, as to that portion of Plaintiffs' request for relief in connection with CEC 14's Bylaws that the Court does not herein grant, Plaintiffs are unable to meet even the less rigorous standard.

three items"), 77 (counsel for City Defendants stating that "we are not opposing 1, 2 and 3" and, in response to Court's question, "Is that because you think you could not . . . meet the standard for preliminary injunction?" responding "That's correct, yes.").  And the Court further notes that although the City Defendants oppose the Motion with respect to Regulation D-210, *see* City Br. at 12-25, significantly, as set forth above, effective August 28, 2024, the Chancellor waived enforcement of certain provisions of Regulation D-210 – indeed, the very provisions at issue in Plaintiff Maron's removal – "while DOE prepares to post revisions in an effort to address Plaintiffs' concerns."  *See* ECF No. 64 at 2-3.

The Individual Defendants appear to oppose the Motion in its entirety, although their position as to Regulation D-210 is not entirely clear.  *See* Sutton Br. at 4 (arguing that the Motion must be denied); Tr. at 56 (counsel for Individual Defendants stating, "I find D-210 problematic"); ECF No. 52 at 19 (counsel for Individual Defendants stating, "I get as far as saying it's unconstitutional as applied.  I'm not sure I would attack it facially.").

In light of the Chancellor's waiver of enforcement of Sections II(C) and II(D) of Regulation D-210, which waiver is publicly memorialized as an "ADVISORY" attached to Regulation D-210, and the City Defendants' representation that DOE is "prepar[ing] to post revisions in an effort to address Plaintiffs' concerns," *see* ECF No. 64 at 3, which representation indicates that DOE does not intend, going forward, to enforce the *current versions* of Sections II(C) and II(D) of Regulation D-210, and given the applicable legal standard governing the issuance of a preliminary injunction, which is an extraordinary remedy, the Court declines *at this stage* to preliminarily enjoin Defendants from conducting any investigation or disciplining or removing from office any Community Education Council or Citywide Council member pursuant to Sections II(C) and II(D) of Regulation D-210.  *See* Motion at 2.

However, for the reasons set forth below, Plaintiffs' request for a preliminary injunction, *see* ECF No. 13, is GRANTED to the extent set forth below.

## A.      Plaintiffs Have Shown a Clear and Substantial Likelihood of Success on the Merits of at Least Some of Their Claims

### 1.      Applicable Law[24]

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I).  "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," and "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid."); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Generally, content-based laws are subject to strict scrutiny.  *See id*.  To pass strict scrutiny, a restriction "must serve a compelling government interest and be narrowly tailored to achieve that interest." *See Hotel Emps. & Rest. Emps. Union, Loc. 100 v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002); *see also Americans for Prosperity Found. v.*

---

[24] 42 U.S.C. § 1983 ("Section 1983"), the statute under which Plaintiffs bring each of their claims, "provides 'a method for vindicating federal rights elsewhere conferred,' including under the Constitution." *See Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  To sustain a claim brought under Section 1983, "[t]he conduct at issue 'must have been committed by a person acting under color of state law' and 'must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'"  *Id*. (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)).

*Bonta*, 594 U.S. 595, 607 (2021) ("Under strict scrutiny, the government must adopt 'the least restrictive means of achieving a compelling state interest.'" (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014))).

"Viewpoint discrimination is a subset or particular instance of the more general phenomenon of content discrimination, in which the government targets not subject matter but particular views taken by speakers on a subject." *Wandering Dago*, 879 F.3d at 31 (quotation omitted). "The government discriminates against viewpoints when it disfavors certain speech because of 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 829). "The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Matal v. Tam*, 582 U.S. 218, 234 (2017) (alteration accepted) (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)); *see also Rosenberger*, 515 U.S. at 828 (stating that "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another"). "To determine if a restriction rises to the level of viewpoint discrimination, [courts] consider 'whether – within the relevant subject category – the government has singled out a subset of messages for disfavor based on the views expressed.'" *Cipolla-Dennis v. Cnty. of Tompkins*, No. 21-712, 2022 WL 1237960, at *2 (2d Cir. Apr. 27, 2022) (quoting *Tam*, 582 U.S. at 248 (Kennedy, J., concurring in part and concurring in the judgment)).

The Supreme Court has stated that "a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *See Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (quoting *Tam*, 582 U.S. at 223); *see also Tam*, 582 U.S. at 223 ("Speech may not be banned on the ground that it expresses ideas that offend."), 243 (stating that "[g]iving offense is a

viewpoint" (Alito, J., concurring)); *Volokh v. James*, 656 F. Supp. 3d 431, 445 (S.D.N.Y. 2023) (noting that "the First Amendment protects individuals' right to engage in hate speech, and the state cannot try to inhibit that right, no matter how unseemly or offensive that speech may be to the general public or the state" (citing, *inter alia*, *Tam*, 582 U.S. at 246)).

"[S]peech restrictions imposed by the government on property that it owns are analyzed under a 'forum based' approach." *Hotel Emps.*, 311 F.3d at 544 (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)). "Under this approach, fora for expression are classified into four categories, which fall along a spectrum extending from those deserving the greatest constitutional protection to those deserving the least constitutional protection: (1) the traditional public forum; (2) the designated public forum; (3) the limited public forum; and (4) the non-public forum." *Tyler v. City of Kingston*, 74 F.4th 57, 61 (2d Cir. 2023) (quotation omitted).

As relevant here, the United States Court of Appeals for the Second Circuit has referenced open school board meetings as an example of a limited public forum. *See Hotel Emps.*, 311 F.3d at 545. A limited public forum exists "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Id.* (quotation omitted). "In limited public fora, strict scrutiny is accorded only to restrictions on speech that falls within the designated category for which the forum has been opened." *Id.* "For 'expressive uses not falling within the limited category for which the forum has been opened, restrictions need only be viewpoint neutral and reasonable.'" *Tyler*, 74 F.4th at 61 (quoting *Hotel Emps.*, 311 F.3d at 546). Further, in limited public fora, "government entities are permitted to restrict the form or manner of speech offered by members of the public, even if such speech addresses the topic or agenda of that forum." *Id.* at 63. "Such restrictions on the

form of speech are not subject to strict scrutiny; courts need only assess whether the restrictions are reasonable and viewpoint neutral." *Id.*

In a facial suit based on the First Amendment, "[t]he question is whether 'a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (alteration accepted) (quoting *Americans for Prosperity Found.*, 594 U.S. at 615) (discussing that in the First Amendment context, the standard for a facial challenge is "less demanding" than in other contexts "though still rigorous").   However, the Supreme Court has stated that it "has never applied that kind of analysis to a viewpoint-discriminatory law." *See Iancu*, 588 U.S. at 398-99.

In addition, as the Second Circuit has noted, "vagueness in the law is particularly troubling when First Amendment rights are involved." *See Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006); *see also id*. at 496 (noting that "[t]he general rule disfavoring facial vagueness challenges does not apply in the First Amendment context").[25]  A law "can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see also United States v. Williams*, 553 U.S. 285, 304 (2008).  "The degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all." *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008).  "When a statute

---

[25] "The vagueness doctrine is a component of the right to due process." *Farrell*, 449 F.3d at 485.

is capable of reaching expression sheltered by the First Amendment, the vagueness doctrine demands a greater degree of specificity than in other contexts." *VIP of Berlin*, 593 F.3d at 186 (alteration accepted) (quotation omitted).

Although the Second Circuit does not appear to have addressed the constitutionality of Regulation D-210, courts outside of the Second Circuit – referencing *Tam* and/or *Iancu* – have held speech restrictions similar to those set forth in Regulation D-210 to violate the First Amendment. *See, e.g.*, *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893-95 (6th Cir. 2021) (concluding that school board's restrictions on "abusive," "personally directed," and "antagonistic" speech, facially and as applied, constituted impermissible viewpoint discrimination because "they prohibit speech purely because it disparages or offends"); *Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1349-51 (N.D. Ga. 2022) (concluding that school board's "respectfulness" requirement, which court interpreted to be prohibition against "offensive, rude, insulting, or abusive" speech, was viewpoint-based and thus facially unconstitutional and that "because the Plaintiffs' facial challenge is successful, the Court need not address their as-applied challenge"); *see also, e.g.*, *Marshall v. Amuso*, 571 F. Supp. 3d 412, 422-26 (E.D. Pa. 2021) (concluding that defendant had not met burden to show that school district's prohibitions against speech deemed, *inter alia*, "personally-directed" and "abusive" did not constitute viewpoint discrimination as applied to plaintiffs, and concluding that defendant had not met burden to show that prohibitions against speech deemed, *inter alia*, "personally directed," "abusive," "offensive," "otherwise inappropriate," "personal attack," "inappropriate," and "intolerant" were not facially vague or overbroad); *but see Moms for Liberty - Brevard Cnty. v. Brevard Pub. Schs.*, 582 F. Supp. 3d 1214, 1221 (M.D. Fla.), *aff'd*, No. 22-10297, 2022 WL 17091924 (11th Cir. Nov. 21, 2022).

2. **Plaintiffs Have Shown a Clear and Substantial Likelihood of Establishing that the Challenged Portions of Regulation D-210 are Unconstitutional**

Plaintiffs argue, *inter alia*, that the challenged portions of Regulation D-210 discriminate against speech based on viewpoint, are unduly vague, and are overbroad.  *See generally* Pls.' Br.; *see also* Tr. at 63 (Plaintiffs' counsel stating that the City Defendants' "brief admits . . . that [Regulation D-210] was enacted to oppose allegedly racist views" and asking "how is it not viewpoint-based if it was enacted specifically . . .  to prevent the expression of particular views"), 71 (Plaintiffs' counsel stating that "here you have a code that says, well, it's subjective. There's a subjective component actually to all this democracy and sometimes we're not just not going to allow it"); *see also generally* Pls.' Reply to City (arguing that Plaintiffs are elected officials, not employees, and therefore Defendants' assertion that Regulation D-210 properly regulates Plaintiffs' speech for actual or potential disruption is "simply wrong;" that to the extent that they even approximate categories of unprotected speech, such as true threats, Regulation D-210's restrictions miss the mark; that the Supreme Court has squarely rejected Defendants' suggestion that a regulation is viewpoint neutral when the government applies it to speech of all political and ideological views; that Defendants' suggestion that D-210 only regulates speech as to manner is inapposite; and that the prohibition of viewpoint discrimination should end the inquiry, but Regulation D-210 also fails the strict scrutiny reserved for other content-based discrimination).

In opposition to the request for preliminary injunctive relief in connection with Regulation D-210, the City Defendants argue that CEC speech may be regulated due to actual or potential disruption, and CEC members' speech, like government employee speech, may be regulated when its value is outweighed by the disruption to government functions, *see* City Br. at

12-14; that the challenged portions of Regulation D-210 are "viewpoint- and content-neutral, and narrowly tailored to achieve compelling government interests," *see* City Br. at 14-19 (arguing that "Section II(C) is narrowly-tailored to preserve decorum and curtail the type of harassing, abusive, aggressive, intimidating and offensive behavior that deterred robust parent participation prior to the promulgation of D-210;" that "Section II(D) is narrowly tailored to protect students from harassment and derogatory or offensive comments by CEC members about any DOE student;" and that Section II(E) "is narrowly tailored to preserve student privacy, as well as protect students from being harassed and doxxed by CEC members"); and that Regulation D-210 is neither vague nor overbroad, *see* City Br. at 19-23 (arguing, *inter alia*, that Plaintiffs "fail[] to consider the specific context in which the regulation is applied and the compelling interests it upholds").[26]  As indicated above, it is not clear whether – and to what extent – the Individual Defendants oppose preliminary injunctive relief with respect to Regulation D-210.

Here, Plaintiffs have shown a clear and substantial likelihood of establishing that the challenged portions of Regulation D-210 – namely, the prohibitions against "frequent verbal abuse and unnecessary aggressive speech that serves to intimidate and causes others to have concern for their personal safety," *see* Regulation D-210 § II(C); "derogatory or offensive comments about any DOE student," *see* Regulation D-210 § II(D); and "conduct that would publicly reveal, share or expose private or personally identifiable information about a DOE student or a member of such student's family without their consent," *see* Regulation D-210 § II(E) – are unconstitutional, facially and/or as applied.

As an initial matter, Regulation D-210's scope appears to extend beyond regulating

---

[26]  At oral argument, the City Defendants confirmed that they did not view Regulation D-210's restrictions as time, place, and manner restrictions.  *See* Tr. at 45, 49, 50.

conduct at CEC meetings or otherwise on government-owned property.  *See* Regulation D-210 at 2 (defining "conduct" as "verbal and physical acts and behavior, including a Council Member's use of oral and written language, when it occurs at," *inter alia*, "other activities when such conduct creates or would foreseeably create a risk of disruption within the district or school community the Council Member serves and/or interferes with the functioning of the [CEC] or the performance of the Council Member's [CEC] duties").  Accordingly, the Court does not analyze Regulation D-210 under a forum-based approach.[27]

Plaintiffs have shown a clear and substantial likelihood of establishing that the challenged portion of Section II(C) of Regulation D-210 is facially unconstitutionally vague.  Regulation D-210 itself does not provide definitions for terms such as "frequent verbal abuse" or "unnecessary aggressive speech."  *See generally* Regulation D-210.  Indeed, when asked about the definition of "verbal abuse" at the June 18, 2024 oral argument, counsel for the City Defendants acknowledged that there was no definition in the regulation and stated, *inter alia*, that "there is going to be a subjective component" to the definition of such term, *see* Tr. at 46; *see also* Tr. at 47, 51, and that "there is a specific investigative process" to determine whether conduct would fall within the scope of "verbal abuse," *see* Tr. at 47 (also stating that the City Defendants "consider the context" of the speech).  Notably, a determination of the scope of "frequent verbal abuse" – *during the investigative process* – does not provide a reasonable opportunity to a person of ordinary intelligence – *before* such person is subject to investigation under Regulation D-210 – to understand what conduct Regulation D-210 prohibits.[28]  Here, given the lack of clarity with

---

[27]  The Court notes that, even under a forum-based approach, the Court's conclusions with respect to the challenged portions of Regulation D-210 would remain the same.

[28]  Further, the City Defendants' reliance on a separate DOE regulation – "Chancellor's Regulation A-421, Pupil Behavior and Discipline – Verbal Abuse" – is unavailing, particularly in light of the scope and purpose of that regulation.

respect to conduct covered by Section II(C), Plaintiffs have shown a clear and substantial likelihood of establishing that the challenged portion of Section II(C) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits and that it encourages arbitrary and discriminatory enforcement.  *See, e.g.*, *Marshall*, 571 F. Supp. 3d at 423-25.  Further, Plaintiffs have shown a clear and substantial likelihood of establishing that a substantial number of the challenged portion of Section II(C)'s applications are unconstitutional, judged in relation to its plainly legitimate sweep.  As Plaintiffs persuasively argue, "frequent verbal abuse and unnecessary aggressive speech" is a "boundless category" that does "not merely forbid well-established categories of unprotected speech, such as fighting words, obscenity, or true threats."  *See* Pls.' Br. at 20-21.

 Plaintiffs have also shown a clear and substantial likelihood of establishing that the challenged portion of Section II(C) is unconstitutionally vague as applied to Plaintiff Maron, who was removed as a member of CEC 2 based on, *inter alia*, a finding that her statement to the *New York Post* constituted unnecessary aggressive speech that served to intimidate and cause others to have concern for their personal safety.  *See* Pls.' Ex. J at 1.  Notably, Plaintiff Maron's comments did not identify the editorial's author and Plaintiff Maron declares that she did not know the author's identity or whether the author was a student, a staff member, or some other person.  *See* Maron Decl. ¶¶ 23-24.  Plaintiffs have shown a clear and substantial likelihood of establishing that the challenged portion of Section II(C) failed to provide Plaintiff Maron a reasonable opportunity to understand what conduct it prohibited and that the challenged portion of Section II(C) was discriminatorily enforced.

Plaintiffs have also shown a clear and substantial likelihood of establishing that the challenged portion of Section II(D) of Regulation D-210 facially violates the First Amendment

because it discriminates based on viewpoint.  As an initial matter, Section II(D), which prohibits

"derogatory" and "offensive" comments about any DOE student, regulates speech on the basis of

content.  Further, a prohibition on "derogatory" or "offensive" speech disfavors ideas that offend

and therefore discriminates based on viewpoint, in violation of the First Amendment.  *See Iancu*,

588 U.S. at 396; *Tam*, 582 U.S. at 223; *see also, e.g.*, *Ison*, 3 F.4th at 893-95; *Mama Bears of

Forsyth Cnty.*, 642 F. Supp. 3d at 1349-51.[29]

Having determined that Plaintiffs have shown a clear and substantial likelihood of

establishing that the challenged portion of Section II(D) facially violates the First Amendment,

the Court concludes that Plaintiffs have also shown a clear and substantial likelihood of

establishing that the challenged portion of Section II(D) is unconstitutional as applied to Plaintiff

Maron, who was removed as a member of CEC 2 based on, *inter alia*, a finding that her

statement to the *New York Post* – in which she expressed her views, including that the

anonymous author was a "coward" and displayed "Jew hatred" – constituted conduct involving

derogatory and offensive comments about a student.  *See* Pls.' Ex. J at 1.[30]

Further, Plaintiffs have shown a clear and substantial likelihood of establishing that

Section II(E) of Regulation D-210 facially violates the First Amendment.  Plaintiffs have shown

a clear and substantial likelihood of establishing that Section II(E) of Regulation D-210 is not

narrowly tailored to achieve a compelling government interest.  Section II(E), which prohibits

conduct that would publicly reveal, share, or expose private or personally identifiable

---

[29] Having determined that Plaintiffs have shown a clear and substantial likelihood of
establishing that Section II(D) discriminates based on viewpoint, the Court need not consider
whether there are any constitutionally permissible applications of Section II(D).  *See Iancu*,
588 U.S. at 399.

[30] Notably, at oral argument, counsel for the City Defendants acknowledged that "offensive
speech in itself is, of course, protected by the First Amendment."  *See* Tr. at 43.

information about a DOE student or a member of such student's family without their consent, regulates speech on the basis of content and therefore is subject to strict scrutiny. Plaintiffs have shown a clear and substantial likelihood of establishing that Section II(E) is not narrowly tailored to achieving even the interest of preserving student privacy identified by Defendants. Defendants do not explain, and it is not readily apparent, how revealing certain categories of information, such as the "employment status" of a DOE student's family member – a category of information included in Regulation D-210's definition of "personally identifiable information," *see* Regulation D-210 at 2 – would necessarily threaten the privacy of a DOE student or subject that student to harassment or "doxxing" by CEC members. Further, the definition of "personally identifiable information" set forth in Regulation D-210 states that the term is "not limited to" the types of information set forth therein. Section II(E) appears to span beyond "the least restrictive means" of achieving the interest of preserving student privacy. *See Americans for Prosperity Found*, 594 U.S. at 607; *see also Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (stating that the Supreme Court has "emphasized that it is the rare case in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest" (quotation omitted)). Plaintiffs have shown a clear and substantial likelihood of establishing that a substantial number of Section II(E)'s applications are unconstitutional judged in relation to its plainly legitimate sweep. *See Moody*, 144 S. Ct. at 2397.

The City Defendants appear to invite the Court to extend the law regarding speech of public employees. *See* City Defs.' Br. at 12-14 (arguing that CEC members' speech may be regulated due to "actual or potential disruption" (citing, *inter alia*, *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995); *Melzer v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 336 F.3d 185, 199-200 (2d Cir. 2003))); Tr. at 41-42 (counsel for City Defendants conceding that CEC members are not

public employees; arguing that CEC members are "quasi DOE officials;" and stating that "there is not a lot of case law on this kind of quasi in-between role" and that "it's somewhat a first impression, what we're considering and trying to do here").  Here, Plaintiffs do not receive a salary or stipend in connection with their roles as CEC members; Plaintiffs were elected to their respective CECs; and New York Education Law does not appear to classify CEC members as employees.  *See Harris v. Quinn*, 573 U.S. 616, 652 (2014).  Indeed, the City Defendants have conceded that Plaintiffs are not public employees.  Under these circumstances, the Court declines the invitation to extend the law regarding speech of public employees to Plaintiffs.

### 3. Plaintiffs Have Shown a Clear and Substantial Likelihood of Establishing that the Community Guidelines, Community Commitments, and a Portion of Article IV § 2 of CEC 14's Bylaws Violate the First Amendment

Plaintiffs argue, *inter alia*, that Defendants' restrictions on access to and speech at CEC 14's meetings unlawfully discriminate against speech and petition based on content and viewpoint and that Defendants violate the First Amendment freedoms of assembly and association by barring members of so-called "hate groups" from public meetings.  *See* Pls.' Br. at 10-16; *see also generally* Pls.' Reply to Sutton (arguing that CEC 14's policies are not time, place, and manner restrictions because they facially discriminate on the basis of content).[31]

As noted above, the City Defendants do not oppose the issuance of a preliminary injunction with respect to the Community Guidelines, Community Commitments, and Article IV § 2 of CEC 14's Bylaws.  The Individual Defendants, however, appear to argue that CEC 14's policies are reasonable time, place, and manner restrictions.  *See* Sutton Br. at 2-4; Tr. at 56.

---

[31] Plaintiffs argue in addition that these restrictions are overbroad and unduly vague.  *See* Pls.' Br. at 18-21.

Here, Plaintiffs have shown a clear and substantial likelihood of establishing that the Community Guidelines, Community Commitments, and a portion of CEC 14's Bylaws facially violate the First Amendment.

CEC 14's meetings constitute a limited public forum. *See Hotel Emps.*, 311 F.3d at 545.[32]  Accordingly, strict scrutiny is accorded to restrictions on speech that falls within the designated category for which CEC meetings have been opened – for example, the airing of concerns by parents and the community – whereas, for expressive uses not falling within that category, restrictions need only be viewpoint neutral and reasonable. *See Tyler*, 74 F.4th at 61-62; *Hotel Emps.*, 311 F.3d at 545.

Here, Plaintiffs have shown a clear and substantial likelihood of establishing that the Community Guidelines fail under either level of scrutiny because the prohibitions are not viewpoint neutral.  The Community Guidelines' prohibitions of, *inter alia*, "homophobia, transphobia, misogyny, ableism, racism, or any other forms of oppressive beliefs or behaviors," "name-calling," and "disrespect" are prohibitions against ideas that offend, and therefore discriminate on the basis of viewpoint in violation of the First Amendment. *See Iancu*, 588 U.S. at 396; *Tam*, 582 U.S. at 223; *see also Volokh*, 656 F. Supp. 3d at 445.  For the same reason, Plaintiffs have shown a clear and substantial likelihood of establishing that the Community Commitments violate the First Amendment.  The Community Commitments set forth various statements to which participants at CEC 14's meetings are required to agree, including "[w]e reserve the right to remove participants . . . affiliated with hate groups," which requirement discriminates on the basis of viewpoint, in violation of the First Amendment. *See Volokh*, 656 F.

---

[32] The parties appear to agree that CEC meetings constitute a limited public forum. *See* Pls.' Br. at 11; Sutton Br. at 3; Tr. at 20, 23.

Supp. 3d at 445.[33]

Plaintiffs have also shown a clear and substantial likelihood of establishing that a portion of Article IV § 2 of CEC 14's Bylaws – specifically, the restriction on "[d]iscussion and charges relating to the competence or personal conduct of individuals" – violates the First Amendment. As an initial matter, this restriction appears to cover speech that falls within the designated category for which the limited public forum – CEC meetings – has been opened. *See* N.Y. Educ. Law § 2590-e(14) (setting forth that CECs shall "[h]old public meetings at least every month with the superintendent during which the public may speak so that parents and the community have a voice and a public forum to *air their concerns*" (emphasis added)). Strict scrutiny therefore is accorded to this restriction, and Plaintiffs have shown a clear and substantial likelihood of establishing that the restriction does not pass strict scrutiny. Defendants have not offered a compelling government interest underlying this restriction. And, even assuming there were a compelling government interest, the restriction, which appears to prohibit speech that is core to the purpose of CEC meetings, would not be narrowly tailored.

Plaintiffs have not, however, at this stage shown a clear and substantial likelihood that the remainder of Article IV § 2 of CEC 14's Bylaws violates the First Amendment. The other restrictions set forth in Article IV § 2 of CEC 14's Bylaws – such as the restrictions that speaking

---

[33] Having determined that Plaintiffs have shown a clear and substantial likelihood of establishing that the Community Guidelines and Community Commitments discriminate based on viewpoint, the Court need not consider whether there are any constitutionally permissible applications of the Community Guidelines and Community Commitments. *See Iancu*, 588 U.S. at 399. Moreover, although the Court need not reach the issue of whether Plaintiffs have shown a clear and substantial likelihood of success with respect to their as-applied challenge to the enforcement of the Community Guidelines and the Community Commitments, the Court notes that Plaintiffs have shown a clear and substantial likelihood of demonstrating that Plaintiffs were expelled and/or barred from CEC 14 meetings because of their viewpoints and/or political associations.

time is limited to 3 minutes per person and that "time may be extended at the discretion of the

Chair, and may be limited if necessary to allow all persons who have signed the Speakers' List to

speak" – appear to restrict the form or manner of speech and appear to be reasonably related to

maintaining the environment the government intended to create in a CEC meeting. *See Tyler*, 74

F.4th at 63 (observing that a rule requiring meeting attendees to limit their verbal remarks to a

fixed amount of time would limit the form or manner of speech but plainly "would be upheld as

reasonable in a limited public forum"). Moreover, these restrictions appear to be viewpoint

neutral, and Plaintiffs have not shown a clear and substantial likelihood – or even a likelihood –

at this stage of establishing that these particular restrictions were applied in a viewpoint

discriminatory manner.

> **4.      Plaintiffs Have Shown a Clear and Substantial Likelihood of Establishing that CEC 14's Practices Regarding Its Official X Account Violate the First Amendment**

Plaintiffs argue that Defendants' restrictions on access to and speech in CEC 14's social

media spaces unlawfully discriminate against speech and petition based on content and

viewpoint as applied to Plaintiffs here. *See* Pls.' Br. at 10-12. Plaintiffs additionally argue that

Defendants' practice of locking CEC 14's official X account is an unconstitutional prior

restraint. *See* Pls.' Br. at 16-17 (arguing that Defendants' "decisions to admit or deny access to

the [X account] is left entirely to their wholly arbitrary, unbridled discretion, and as Harlan's

case demonstrates, Defendants' practices are entirely bereft of procedural safeguards to ensure

expeditious, reviewable decisionmaking").

Again, the Court notes that the City Defendants do not oppose the issuance of a

preliminary injunction with respect to CEC 14's official X account. However, the Individual

Defendants appear to oppose the issuance of a preliminary injunction with respect to CEC 14's

official X account, arguing that reasonable viewpoint neutral restrictions on postings by followers of CEC 14's social media survive First Amendment review.  *See* Sutton Br. at 4.

Here, Plaintiffs have shown a clear and substantial likelihood of establishing that CEC 14's practices regarding its official X account discriminate on the basis of viewpoint and/or political association as applied to Plaintiffs, in violation of the First Amendment.[34]  Plaintiffs have shown a clear and substantial likelihood of establishing that Defendants have prevented Plaintiffs from accessing CEC 14's official X account on account of their views.  Indeed, Plaintiffs' various declarations provide evidence that Plaintiffs have been blocked or otherwise prevented from accessing CEC 14's official X account on the basis of their viewpoints and/or political associations.[35]

\* \* \*

In sum, upon consideration of the record to date, including the parties' submissions and the June 18, 2024 oral argument, the Court concludes that Plaintiffs have shown a clear and substantial likelihood of success on the merits of at least some of their claims.[36]

### B.    Plaintiffs Have Made a Strong Showing of Irreparable Harm Absent Preliminary Injunctive Relief

Plaintiffs argue that unless the Court grants preliminary injunctive relief, Defendants will

---

[34]  Because Plaintiffs have shown a clear and substantial likelihood of establishing that CEC 14's practices regarding its official X account discriminate on the basis of viewpoint, which discrimination violates the First Amendment regardless of forum, the Court need not – and does not – address the nature of the forum at issue.

[35]  Although the Court need not – and does not – reach the issue of whether Defendants' practice of locking CEC 14's official X account is an unconstitutional prior restraint, the Court notes that Plaintiffs raise persuasive arguments as to this issue, *see* Pls.' Br. at 16.

[36]  In light of the fact that Plaintiffs need only show a likelihood of success on the merits of at least one of their claims, the Court need not – and does not – specifically address Plaintiffs' arguments regarding freedom of assembly and freedom of petition.

continue to chill Plaintiffs from speaking, petitioning, and associating freely.  *See* Pls.' Br. at 21; *see also* Motion ¶ 31 (stating that "Plaintiffs will suffer irreparable harm in the absence of a temporary restraining order and preliminary injunction, as they will be punished on the basis of their viewpoints and political associations in violation of their fundamental First Amendment rights to free speech, petition, assembly and association").

Here, Plaintiffs have made a strong showing of irreparable harm absent preliminary injunctive relief.  Specifically, Plaintiffs have made a strong showing that their First Amendment rights will be violated absent an injunction against (1) the enforcement of Section II(E) of Regulation D-210; (2) the enforcement of the Community Guidelines, the Community Commitments, and the portion of Article IV § 2 of CEC 14's Bylaws prohibiting discussion and charges relating to the competence or personal conduct of individuals, and otherwise discriminating against speakers at CEC 14's public meetings on the basis of viewpoint and/or political association; (3) the restriction of access to CEC 14's official X account to users approved by Defendants; and (4) the blocking of access to CEC 14's official X account based upon users' viewpoints and/or political associations.  With respect to Plaintiffs' challenges to Regulation D-210, the Community Guidelines, the Community Commitments, and the portion of Article IV § 2 of CEC 14's Bylaws prohibiting discussion and charges relating to the competence or personal conduct of individuals, the irreparable nature of the harm may be presumed because speech is directly limited.  *See Bronx Household of Faith*, 331 F.3d at 349. Moreover, Plaintiffs' various declarations provide evidence that the Community Guidelines, Community Commitments, and challenged portions of Regulation D-210 have chilled Plaintiffs' expression.  *See, e.g.*, Alexander Decl. ¶¶ 32-35, 38; Maron Decl. ¶¶ 31-34, 37; Harlan Decl. ¶¶ 15-18, 21-22.  Further, with respect to Plaintiffs' challenges to CEC 14's official X account,

Plaintiffs have made a strong showing that their exclusion from the X account and inability to respond to CEC 14 posts and the posts of others conducting discussions under CEC 14's timeline constitutes irreparable harm.  *See Kamerling*, 295 F.3d at 214-15.

The City Defendants' arguments in support of their position that Plaintiffs fail to demonstrate irreparable harm – for example, that Plaintiffs have failed to show how Regulation D-210 has changed Plaintiffs' expressive behavior except in broad hypotheticals and that in the event that a CEC member is suspended or removed, such member has the right to appeal that action – are particularly unavailing in light of Plaintiff Maron's removal from her position on CEC 2, the denial of her request for a stay of the enforcement of her removal pending her appeal, and the affirmance of Defendant Banks's June 14, 2024 order by PEP.[37]

### C.      The Public Interest Weighs in Favor of Granting a Preliminary Injunction

Plaintiffs argue that protecting First Amendment rights is always in the public interest, so the balance of equities heavily favors Plaintiffs.  *See* Pls.' Br. at 22 (arguing that "without these policies, Defendants can still conduct CEC 14 meetings and perform all the administrative duties of a school board and education department" and that "Defendants suffer no legitimate harm from having their unconstitutional policies and practices enjoined"); *see also* Motion ¶ 31 (arguing that "[t]he balance of the hardships and the public interest weighs decisively in Plaintiffs' favor, as Defendants lack any valid interest in depriving Plaintiffs of their First Amendment rights, and the public interest is served by securing constitutional rights").

The City Defendants argue that Plaintiffs' request for a preliminary injunction is against

---

[37]  The City Defendants' suggestion that Plaintiff Maron can "appl[y] to serve as a CEC 2 member in the upcoming term," *see* ECF No. 64 at 2 n.2, does not save the City Defendants' arguments against imposition of a preliminary injunction here.  Indeed, it is largely beside the point.

the public interest.  *See* City Br. at 23-24 (arguing, *inter alia*, that "Plaintiffs have not shown any legal or factual basis to support their request that this Court immediately enjoin DOE from addressing serious and harmful misconduct by individuals who are responsible for developing educational policies, and who interact with school community members and students in the performance of their functions for the City school district," and that "Regulation D-210 is a critical mechanism, that is neither *ad hoc* nor impermissibly subjective, to investigate alleged misconduct and avoid disruption in the DOE school system").[38]

Securing First Amendment rights is in the public interest, *see N.Y. Progress*, 733 F.3d at 488, and as set forth above, Plaintiffs have shown a clear and substantial likelihood of establishing that Regulation D-210 and the challenged CEC policies and practices violate the First Amendment.  Further, no public interest is served by maintaining unconstitutional policies when constitutional alternatives are available to achieve the same goal.  *See Agudath*, 983 F.3d at 637.  Even without the provisions, policies, and practices at issue, Defendants can reasonably restrict the form and manner of speech at CEC 14 meetings or on its X account and Defendants can regulate the conduct of CEC members in a manner that is not viewpoint discriminatory, vague, or otherwise unconstitutional.  For example, as Plaintiffs persuasively argue, Defendants can set time limits for speakers at meetings (as CEC 14 has already done), require that speakers discuss school-related topics, or ban unprotected forms of speech such as true threats.  *See* Pls.' Reply to City at 6; *see also* Pls.' Reply to City at 9 (acknowledging that Defendants can target "true threats or incitement to violence").  Accordingly, the public interest weighs in favor of granting preliminary injunctive relief here – namely, a preliminary injunction against (1) the

---

[38]  Defendant Sutton's opposition briefing does not address the public interest prong of the preliminary injunction standard.  *See generally* Sutton Br.

enforcement of Section II(E) of Regulation D-210, (2) the enforcement of the Community

Guidelines, the Community Commitments, and the portion of Article IV § 2 of CEC 14's Bylaws

prohibiting discussion and charges relating to the competence or personal conduct of individuals,

and otherwise discriminating against speakers at CEC 14's public meetings on the basis of

viewpoint and/or political association; (3) the restriction of access to CEC 14's official X

account to users approved by Defendants; and (4) the blocking of access to CEC 14's official X

account based upon users' viewpoints and/or political associations.[39]

### III.    Plaintiff Maron is Entitled to Reinstatement

As set forth above, Plaintiffs seek immediate reinstatement of Plaintiff Maron. *See*

*generally* ECF No. 46.[40]   The Court concludes that Plaintiff Maron's reinstatement is warranted

on the record here.

"Where a defendant has altered the status quo, exposing a plaintiff to irreparable harm,

the prohibitory standard properly applies, and may require that the defendant take action to

restore the status quo pending a decision on the merits." *Williamson v. Maciol*, 839 F. App'x

633, 635 (2d Cir. 2021).  "Preserving the status quo is not confined to ordering the parties to do

nothing: it may require parties to take action." *Mastrio v. Sebelius*, 768 F.3d 116, 120-21 (2d

Cir. 2014); *see also Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 89-90 (2d Cir. 1983) (characterizing

---

[39]   As set forth above, in light of, *inter alia*, the waiver of enforcement of Sections II(C) and
II(D) of Regulation D-210 and the indication that the City Defendants do not intend, going
forward, to enforce the current versions of Sections II(C) and II(D), the Court declines at this
stage to issue a preliminary injunction with respect to those – likely defunct – versions.

[40]   In their response to the request for reinstatement – which was submitted before Plaintiff
Maron's removal was affirmed on appeal – the City Defendants had argued that there was "no
basis for the Court to grant the extraordinary remedy of reinstating Plaintiff Maron because,
among other reasons, Plaintiff Maron may appeal and seek a stay of the June 14 Order
through the processes provided by the Education Law" and "Plaintiffs will thus not suffer any
irreparable harm should the Court deny the requested injunctive relief."  *See* ECF No. 49 at 2.

plaintiff's request for reinstatement as "a restoration of the *status quo ante*").

With respect to Plaintiff Maron, here, the status quo – the last actual, peaceable uncontested status that preceded the pending controversy – was Plaintiff Maron's serving as an elected member of CEC 2.  As set forth above, Plaintiffs have shown a clear and substantial likelihood of establishing that the challenged portions of Sections II(C) and II(D) of Regulation D-210 – which portions served as the bases for Plaintiff Maron's removal from CEC 2 – are unconstitutional, facially and as applied to Plaintiff Maron.  Further, Plaintiff Maron faces irreparable harm in the absence of reinstatement – namely, Plaintiff Maron faces the loss of her ability to participate as a CEC 2 member for the remainder of her term, which participation includes "[p]rovid[ing] input . . . to the chancellor and the city board on matters of concern to the district," *see* N.Y. Educ. Law § 2590-e(18).  And the public interest weighs in favor of granting this relief, as securing First Amendment rights is in the public interest.

Plaintiffs have demonstrated their entitlement to the reinstatement of Plaintiff Maron to CEC 2 for the pendency of this action, or until the end of her term should that term expire during the pendency of this action.

## IV.     The Court Waives the Security Requirement

Rule 65(c) of the Federal Rules of Civil Procedure provides in relevant part that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  *See* Fed. R. Civ. P. 65(c).  "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm."  *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (quotation omitted).

Plaintiffs argue that the Court should waive the Rule 65(c) security requirement, noting that "Plaintiffs have a high probability of success" and "Defendants will not suffer monetary damages or any harm by being commanded to respect Plaintiffs' First Amendment rights." *See* Pls.' Br. at 22-23. Defendants do not address the security requirement. *See generally* ECF No. 20; City Br.; Sutton Br.

In light of the particular circumstances here, including that Defendants have not offered proof of likelihood of harm, the Court waives the security requirement.

## CONCLUSION

For the reasons set forth above, Plaintiffs' request for a preliminary injunction, *see* ECF No. 13, is GRANTED to the extent set forth above and IT IS ORDERED THAT:

Defendants, their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them are, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, hereby preliminarily enjoined, during the pendency of this action, from:

1. Enforcing CEC 14's "Community Guidelines," "Community Commitments," and that portion of Article IV § 2 of CEC 14's Bylaws that sets forth that "[d]iscussion and charges relating to the competence or personal conduct of individuals will be ruled out of order," or otherwise discriminating against speakers at CEC 14's public meetings on the basis of viewpoint and/or political association;

2. Restricting access to CEC 14's official X account to users approved by Defendants;

3. Blocking or restricting access to CEC 14's official X account based upon users' viewpoints and/or political associations; and

4. Conducting any investigation, disciplining, or removing from office any Community Education Council or Citywide Council member pursuant to Section II(E) of Regulation D-210.

IT IS FURTHER ORDERED that Plaintiff Maron shall be reinstated immediately to her elected position on CEC 2 for the pendency of this action, or until the end of her term should that term expire during the pendency of this action.

SO ORDERED.

/s/ Diane Gujarati
DIANE GUJARATI
United States District Judge

Dated: September 3, 2024
       Brooklyn, New York